UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.A. and E.A., on behalf of M.A.,

                Plaintiffs,

- against -

EAST RAMAPO CENTRAL SCHOOL DISTRICT,

                Defendant.

**ELECTRONICALLY FILED**

Case No.: **07-cv-07075**
            **CLB**

## STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Defendant, the East Ramapo Central School District (hereinafter "District"), through its attorneys, Girvin & Ferlazzo, P.C., submit the following Statement of Material Facts of which it contends there is no genuine issue, in accordance with Local Rule 56.1.

### INTRODUCTION

1. Plaintiffs, J.A. and E.A., are the Parents of M.A. ("the Student") and reside in the East Ramapo Central School District ("The District") ("Defendant"). Compl. ¶3.

2. Plaintiffs appeal from the decision of the State Review Officer ("SRO") of the New York State Education Department dated April 9, 2007 dismissing Plaintiffs' appeal, sustaining, in part, the District's cross appeal and ordering the District to reimburse Plaintiffs for the private speech-language therapy services they obtained beginning in May 2006 through June 23, 2006. Compl. ¶14 and Norlander Aff. Ex. "A" at 24.

3. In their appeal to this Court, Plaintiffs seek compensatory educational services for alleged "gross violations" of M.A.'s right to a free appropriate public education ("FAPE"). Pls.' Compl. ¶¶7, 16.

1

4. The Plaintiff, E.A. attended the April 27, 2004 meeting of the CPSE and Plaintiff attended the meeting where M.A's IEP for the 2004-2005 school year was developed and the June 15, 2005 meetings where M.A's Individual Educational Programs ("IEPs) for summer of 2005 and the 2005-2006 school year were developed. Def.'s Ex. 24 at 5, Pls.' Ex. P at 4.

## PROCEDURAL HISTORY

### The Impartial Hearing

5. On July 29, 2005, the Plaintiffs filed a Complaint with the District requesting an impartial hearing. In their Complaint they allege that the IEPs offered by the District for the 2004-2005 and 2005-2006 school years and the programs offered for the summers of 2005 and 2006 failed to provide their son a free appropriate public education ("FAPE"). Pls.' Ex. A.

6. According to their request for hearing, the Plaintiffs asked the hearing officer to find both the 2004-2005 and 2005-2006 IEPs not appropriate and to order reimbursement "to the extent they secured and paid for supplemental ABA and speech services" for the 2004-2005 school year and the summer of 2005 and sought an award of compensatory speech-language services to the extent appropriate due to allegations of the District's "gross failures." *Id.*

7. The impartial hearing began on September 30, 2005 and ended on September 29, 2006 after twelve days of hearing. The record on review consists of more than 2500 pages of testimony and 85 Exhibits. The District called two witnesses and the Plaintiffs called nine witnesses. Compl. ¶17; Norlander Aff. Ex. "B" p. 1.

8. Dr. Albers, the CSE Chairperson, testified for the District. In addition to a Master's degree in special education supervision, Dr. Albers received full tuition and a stipend for a Doctorate in special education from Teacher's College, Columbia University in research on Special Education

Applied Behavior Analysis (ABA).

9. Mrs. Brusco, M.A.'s special education teacher for the 2005-2006 school year, who also testified for the District, has a Master's degree in special education and has completed her course work required to become a Board Certified Behavior Analyst when she testified. Hr'g Tr. at 2045, 2048.

10. On the first day of hearing, the District agreed on the record to change M.A.'s classification from "other health impaired" ("OHI") to autism. Hr'g Tr. at 58-61.

11. On December 30, 2006, the IHO issued his ruling and made, among others, the following findings:

(a) classification was no longer at issue because the Parents' request that M.A. be classified as autistic was granted at the start of the hearing (Norlander Aff. Ex. "B" at 11);

(b) M.A. made progress and received meaningful educational benefits in the class recommended by the District for the 2004-2005 school year. (Norlander Aff. Ex. "B" at 14);

(c) the need for a Functional Behavior Assessment ("FBA") and a Behavior Intervention Plan ("BIP") became obvious to the classroom teacher by the end of the school year. Norlander Aff. Ex. "B" at 2.

(d) the level of speech-language services provided to the Student for the 2005-2006 school year was inadequate (*Id.* at 12);

(e) Dr. Wexler conducted stuttering sessions with M.A. and parent interviews starting on May 4, 2006 (*Id.* at 13); and

(f) concluded that "the IEPs were not reasonably calculated to enable M.A. to receive a meaningful benefit in the area of speech-language therapy, sessions for stuttering, parent

3

counseling and training and failure to administer the FBA and BIP." *Id.* at 15;

(g) found the IEP for the 2004-2005 school year appropriate. Comp. ¶ 38.

12. The IHO found no equitable considerations to preclude or diminish a reimbursement award. *Id.* at 16.

13. The IHO ordered the District to:

(a) administer a FBA and a BIP and use the results in planning future IEP goals and objectives (Norlander Aff. Ex. "B" at 11);

(b) provide M.A. with speech-language therapy one-on-one five times a week for one hour a session (*Id.* at 12); and

(c) "financially compensate Mr. and Mrs. A. for Dr. Karin Wexler's professional services" which began on May 4, 2006 and should be compensated through June 29, 2007 for three 45 minute sessions per week of one-to-one stuttering therapy at Dr. Wexler's rate of $150 per session" (*Id.* at 13).

14. The IHO further ordered that any stuttering sessions, interviews or consultations provided by Dr. Wexler after June 29, 2007 would become the financial responsibility of the Parents; that in the interim the District would compensate Dr. Wexler directly for parent counseling and training once a month for one hour and provide consultation to the District's professional staff one hour a month; and " prepare and update IEP goals and objectives for speech-language and stuttering for the Committee on Special Education ("CSE") to review and amend the IEP, where indicated." *Id.*

15. The Plaintiffs appealed the IHO's decision and order to the SRO challenging the denial of their request for reimbursement for home based ABA instruction for the 2004-2005 and

4

2005-2006 school years and the summers of 2005 and 2006. Plaintiffs also challenged M.A.'s classification, asserting that the hearing officer should have determined that he was initially eligible for special education services as a child with autism. Pls.' Petition to the SRO, dated January 31, 2007 at ¶20.

16. The District filed a cross appeal challenging the IHO's findings that the District did not provide the Student a FAPE for the summer 2005 and 2005-2006 school years, that there was sufficient evidence to order the District to conduct a FBA and BIP and to amend its goals and objectives, as needed, and order that the District compensate the Plaintiffs for Dr. Wexler's services from May 4, 2006 through June 29, 2007. Def.'s Answer and Cross Appeal to the SRO, dated February 5, 2005.

### The Decision of the State Review Officer

17. Relying on the Supreme Court's decision in *Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 537, 163 L. Ed.2d 387 (2005), the SRO placed the burden of persuasion on the Plaintiffs. Norlander Aff. Ex. "A" at 10.

18. The SRO found that the Plaintiffs did not meet their burden to establish that the IEPs for the 2004-2005 school year and the summer of 2005 were not appropriate. Norlander Aff. Ex. "A" at 23.

19. The SRO concluded that the IEP for the 2005-2006 school year was appropriate at the time it was recommended. Norlander Aff. Ex. "A" p. 17.

20. Regarding classification, the SRO concluded that the Committee's recommendation to classify the Student as OHI rather than autistic at the June 2005 meeting was not a basis to find the IEP recommended for the 2005-2006 school year not appropriate. Norlander Aff. Ex. "A" at 14.

21. The SRO ordered the District to reimburse the Plaintiffs for the speech-language services they secured for their son between May 4, 2006 and June 23, 2006 upon its receipt of "proof of payment." Norlander Aff. Ex. "A" at 24.

22. The record does not include any proof of payment for the services for which the Plaintiffs seek reimbursement.

23. After several telephone calls and a letter requesting proof of payment for the services for which Plaintiffs seek reimbursement in this appeal, the documentation requested by the Defendant has not been provided. Norlander Aff. Ex. "A" p. 24.

### The Student

24. M.A was born after 38 weeks gestation on October 13, 2000 and exhibited early difficulties with gastrointestinal reflux, severe esophagitis and severe colitis. Def.'s Ex. 12 at 12.

25. M.A.'s developmental milestones were delayed, and he began speech-language therapy, occupational therapy ("OT") and physical therapy ("PT") at five months of age. *Id.*

26. When M.A. was two years old, he attended an Early Intervention Program at Hebrew Academy for Special Children ("HASC") half-days, five days per week, where he also received OT, PT, speech-language therapy, feeding therapy, special instruction services and a 1:1 aide. Pls.' Exs. R, S, T, U.

27. In early August 2003, a pediatric neurologist recommended a "more intensive full-day therapeutic nursery program" to address M.A.'s speech, social and cognitive delays. Def.'s Ex. 7.

28. During the 2003-04 school year, when M.A. was three years of age, the Committee on Preschool Special Education ("CPSE") recommended a full-day 6:1+1 special class at HASC as

well as OT, PT, speech-language therapy and ABA services. Pls.' Ex. P at 4.

29. During the 2003-2004 school year, M.A. received between seven and a half to ten hours of ABA. According to the CPSE Chair, M.A. made "wonderful progress" that year. Hr'g Tr. at 274, 312.

### Summer 2004

30. On April 27, 2004, the District's CPSE convened its annual review and recommended that M.A. receive extended school year ("ESY") special education services. Pls.' Ex. P at 1.

31. At the meeting, the minutes reflect that Plaintiff, E.A. requested that M.A. receive ten hours of ABA instruction in school in addition to ABA services at home *Id.* at p. 4.

32. At the meeting, the District's CPSE recommended ten hours per week of ABA services which it offered to provide in the child's home, in school or in both settings. Hr'g Tr. 274; Pls.' Ex. P at 4.

33. When asked her opinion whether ten hours of ABA services was appropriate, the supervisor of M.A.'s home based ABA program testified that she could not answer because she "didn't know" M.A.'s program. Hr'g Tr. at 846.

34. When asked whether ten hours of ABA instruction a week would be appropriate to meet M.A.'s needs, the supervisor of M.A.'s home based program stated that with ten hours he was "making progress" and felt that in that sense "ten hours was appropriate." Hr'g Tr. at 848.

35. In accordance with his IEP, M.A.'s summer 2004 program consisted of a full-day non-integrated 6:1+2 class at HASC with individual and group OT and PT and speech-language services three times a week for 30 minutes a session. Pls.' Ex. P at p. 2.

36. On May 5, 2004, Plaintiff, E.A. requested, in writing, that the District pay for an

additional ten hours of ABA services in her home and advised that if the District declined to do so, she would seek reimbursement. Pls.' Ex. V.

37.  The District did not agree to provide home-based ABA services the Plaintiff requested and sent them a letter advising them with a copy of their due process rights. Hr'g Tr. at 274, 302-303; Pls.' Ex. N.

### The 2004-2005 School Year

38.  For the 2004-05 school year, when M. A was four years of age, the District's CPSE recommended a half-day 12:1+2 non-integrated class and ten hours of individual ABA instruction per week, twice weekly OT and PT, group speech-language therapy three times a week and parent counseling and training twice monthly. Pls.' Ex. P at 1 and 4.

39.  According to the Chairperson of the CPSE, M.A. made consistent progress since she first observed him in August 2003 and stated that as his language emerged, he became more social and more focused while his rate of skill mastery increased (*Id.* at 12, Hr'g Tr. at 277) that the CPSE recommendation for the 2004-2005 school year to provide ten hours of ABA services was based on the report that during the 2003-2004 school year when the Student received between seven and a half to ten hours of ABA instruction, he made "wonderful progress" (*Id.* at 12, Hr'g Tr. at 270, 273-274, 312. ; and that before making its recommendation the Committee considered the Plaintiff's concern that her son was not generalizing skills to the home setting. *Id.* According to his IEP, M.A. was using single words to communicate. Pls.' Ex. P at 4.

40.  The IEP for the 2004-2005 school year included a goal and short term objective that focused on speech fluency. Pls.' Ex. P at 5.

41.  On April 27, 2004, Plaintiff signed a consent form indicating that she agreed with the

CPSE's recommendations for the summer of 2004 and the 2004-2005 school year. Pls.' Ex. Q.

42. On November 1, 2004, the Plaintiffs arranged for M.A. to receive private ABA services from a special education teacher. Hr'g Tr. at 789, 822; Def's. Ex. 15 p. 1.

43. In November 2004, Plaintiffs secured a neurological evaluation with a pediatric neurologist who diagnosed M.A. with a pervasive developmental disorder ("PDD"). Def.'s Ex. 12 at 1.

44. In early December 2004, the same pediatric neurologist observed M.A. at HASC and, after talking with his teachers, reported that he was pleased with their reports. Pls.' Ex. L p. 1.

45. In his report, the pediatric neurologist recommended that M.A. receive "14 hours per week of intensive ABA intervention and support in school and at home, with appropriate supervision, consultation and parent training." Pls.' Ex. L p. 2.

46. According to M.A's March 2005 progress report, M.A. made "significant progress" despite his significant delays. Def.'s Ex. 16 at 2 and 5.

### Evaluations Conducted Prior to Annual Review

47. In the spring of 2005, the CPSE arranged and obtained several new evaluations including a classroom observation and a social history update. Def.'s Ex. 6, at 8, 18, 83-85, 88-91, 92-99.

48. On March 14, 2005, M.A.'s special education teacher at HASC completed an educational evaluation and reported that M.A. displayed noncompliant behaviors when presented with challenging tasks he did not want to complete, that were being addressed through the "consistent use of behavior techniques" and the use of ABA instruction within the child's program." Def.'s Ex. 16 at 1-2.

49. In March, 2005, a speech-language pathologist and a teacher of the speech and hearing handicapped from HASC conducted a speech-language evaluation on which M.A. obtained a receptive language standard score of 79 (8th percentile), an expressive language standard score of 81 (10th percentile) and a total language SS of 78 (7th percentile), with an age equivalent of 2.7 years. Def's. Ex. 17 at 2.

50. According to that evaluation, when using single words, M.A.'s articulation skills were above average while his connected speech intelligibility was moderately impaired due to a lack in fluency. Pls.' Ex. 17 at 3.

51. In late April 2005, a psychologist from HASC also conducted an I.Q. test on which M.A. obtained a verbal I.Q. score of 71 (borderline) a nonverbal I.Q. score of 81 (low average) and a full scale I.Q. score of 74 (borderline). Pls.' Ex. 9 at 3.

52. The Plaintiffs secured a private speech-language evaluation in May 2005, which reported M.A.'s overall speech intelligibility as age-appropriate, with severe expressive and receptive language delays and a severe pattern of speech dysfluency characterized by initial sound and syllable repetitions, whole word repetitions and secondary behaviors such as audible inhalations, lip posturing and tension, changes in pitch and intensity and avoidance in answering questions. The private therapist recommended five one hour sessions of speech-language therapy a week to address M.A.'s speech dysfluency, language and pragmatic deficits. Pls.' Ex. 14 at 2, 5 and 6.

53. In April 2005, Plaintiffs also secured an evaluation from M.A's private special education teacher. According to her report and the results of the Gilliam Autism Rating Scale, she concluded that "the probability of autism was... below average." Def's Ex. 15 at 3.

54. M.A.'s private special education teacher recommended for M.A. for the 2005-2006

school year placement in a small language-based class with a focus on social interaction. Her report does not recommend or discuss the need for home based ABA services. Hr'g Tr. at 402; Def.'s Ex. 15 at 8.

55.     The District's CPSE and CSE convened on June 15, 2005 to develop M.A.'s summer IEP and a program for the 2005-2006 school year. Def.'s Exs. 24 at 1 and 4 at 1.

56.     Plaintiff, E.A. attended the meeting on June 15, 2005, where her son's IEPs for the summer and the 2005-2006 school year were developed and signed a consent form accepting the CSE's recommendations "without prejudice." Def.'s Ex. 20.

57.     Plaintiff, E.A. and M.A.'s private special education teacher attended the meetings where M.A.'s summer 2005 and 2005-2006 IEP were developed. Hr'g. Tr. at 818-819.

**Summer 2005**

58.     The IEP recommended for M.A. for the summer of 2005 included goals to address speech-language deficits, to develop social/emotional/ behavioral skills, motor and basic cognitive skills, daily living skills and identified social skills and recognized his need for peer interactions, intensive individual instruction to learn skills and behavior, and exposure to a larger group setting to practice social and language skills and to generalize learned skills. Def.'s Ex. 24 at 6-8.

59.     M.A.'s IEP for the summer of 2005 recommended a half day five days a week in a non-integrated 12:1+2 program at HASC, ten hours a week of individual SEIT services, speech-language therapy twice a week for 30 minutes a session individually and once a week in a group, and one group and one individual session of OT and PT weekly. The IEP also provided for parent counseling and training twice monthly for an hour. *Id.* at 2-3.

60.     The CPSE added two individual speech-language therapy sessions in the summer

11

2005 IEP to address M.A.'s stuttering . Hr'g Tr. at 335-337, 350; Def.'s Ex. 24 at 3.

61. According to the CPSE Chairperson, the Committee became aware of M.A.'s dysfluency at the end of the 2004-2005 school year as he began using more language. Hr'g. Tr. at 351.

62. There is no evidence in the record that M.A.'s private special education teacher, who attended the June 2005 CPSE meeting, recommended the need for an extended day program or home based ABA services. Hr'g Tr. at 818-819.

63. There is no evidence in the record that the Plaintiffs requested the Committee to consider the need for home-based services for M.A. at its June 2005 meeting. Hr'g Tr. at 164, 397-98, 788, 1918.

64. Neither the evaluations secured by the Plaintiffs nor those arranged by the District and reviewed at the June 2005 meeting recommend home-based extended day services for M.A. to receive a FAPE. Def.'s Ex. 4 at 6.

**The 2005-2006 IEP**

65. At its meeting on June 15, 2005, following an extended discussion, the District's CSE recommended that M.A. be classified OHI. *Id.* at 1; Hr'g Tr. at 362, 401.

66. According to his 2005-2006 IEP, M.A. exhibited delayed cognitive skills, difficulties following multi-step directions, difficulty generalizing skills and difficulty understanding long and complex sentences. *Id.* at 2-3.

67. According to his IEP, M.A. needed to continue to improve speech fluency and generalize his skills to include spontaneous conversations, to develop attending skills and to locate common objects. *Id.* at 3.

68. According to his IEP, M.A. used three to four word utterances in response to questions and displayed above average articulation skills with moderately impaired intelligibility in connected speech due to a lack of fluency. *Id.*

69. In the area of social development the CSE recognized M.A.'s need to improve social interactions with peers and adults, to learn to play, share and take turns with peers and to comply with and attend to an adult's directives. *Id.* at 5.

70. The 2005-2006 IEP also recognized physical deficits in fine and gross motor functioning. *Id.* at 5.

71. According to the record, the CPSE and CSE considered all of the evaluations referred to in paragraphs 47-54 above at their June 2005 meetings to develop the summer 2005 IEP and the IEP for the 2005-2006 school year. Def.'s Exs. 4 at 3, 4 and 6; Hr'g Tr. at 146.

72. The Committee considered M.A.'s needs for extended day services for the 2005-2006 school year and concluded that he did not need them. Hr'g Tr. at 184.

73. Regarding the need for summer services for the summer of 2006, the IEP specified that the recommendation would be made at the student's next annual review. Def's. Ex. 4 at 1.

74. The IEP recommended M.A.'s placement in a full-day non-integrated 8:1+2 class in his local elementary school with individual 1:1 speech-language therapy three times a week, group language instruction with no more than five students twice a week, OT once a week individually and once a week in group, individual PT once a week and parent counseling and training 30 minutes once a month. *Id.*

75. The IEP for the 2005-2006 school year included a majority of goals and objectives recommended by Mrs. Hauser, M.A.'s private special education teacher. <u>Compare</u> Def.'s Ex. 4 at

7-8 and Ex. 15 at 8; Hr'g Tr. at 1519.

76. The IEP for the 2005-2006 school year included goals to address speech fluency, to generate spontaneous communication and two goals that specifically targeted behaviors. Def's Ex. 4 at 7 and 8.

77. The 2005-2006 IEP recommended three individual sessions of speech-language services per week to address M.A.'s dysfluent speech. Hr'g Tr. at 117-118.

78. According to the minutes of the meeting where the IEP was developed, the Plaintiff agreed with the goals on the IEP. Def's Ex. 4 at 6.

79. Neither the Plaintiff, E.A. nor the professionals who accompanied her to the meeting objected to the IEP and Ms. Hausner, M.A.'s private special education teacher, could not recall anyone stating that the program recommended was not appropriate. Hr'g Tr. at 1908, 1915.

80. The class recommended for M.A. for the 2005-2006 school year is described as a "social communications class" with an emphasis on language, communication, social interaction and academics. Def.'s Ex. 4 at 6.

81. According to the record, the class utilized an ABA model using ABA instruction throughout the day with a heavy emphasis on communication and language. Hr'g Tr. at 117-118, 125.

82. The recommended ABA program uses discrete trials and included 1:1 ABA instruction an hour a day. Hr'g Tr. at 125, 126, 2370; Pls.' Ex. DDD.

83. The 2005-2006 IEP included a recommendation for a positive reinforcement plan and refocusing/redirection throughout the student's program. Def.'s Ex. 4 at 1 and 4. The IEP indicated that social interactions with peers were limited and that M.A. exhibited "stereotypical behaviors."

*Id.* at 4. Def.'s Ex. 4 at 4.

84. According to Dr. Albers, the CSE Chair, M.A.'s program included skill generalization to small and large group settings and offered a program that analyzed behavior on an ongoing basis which she described as an "ongoing Functional Behavior Assessment." Hr'g Tr. at 126.

85. The CSE Chair, Dr. Albers, explained that ABA, by its very nature, is an analysis of behavior and that M.A.'s program was one designed to analyze and respond to behavior throughout the day which she described as " the assessment and the intervention." *Id.* at 251.

86. M.A. attended the program recommended by the District's CSE for the 2005-2006 school year.

87. In addition to the program recommended by the Committee for the 2005-2006 school year, Plaintiffs arranged for ten hours a week of private ABA services after school and between two and four hours a month of ABA supervision. Hr'g Tr. at 867-869.

88. M.A.'s private ABA supervisor observed M.A. at school in February 2006. Joint Ex. 2 at 57-61.

89. In her classroom observation of an in-school ABA session, Mrs. Sanchez, M.A.'s private ABA supervisor, reported that, despite distractions, M.A. attended to his teacher, was highly motivated by her praise and was immediately prompted for incorrect responses. Joint Ex. 2 at 57-61.

90. The Plaintiff, E.A. acknowledged that she was meeting with the school psychologist, Dr. Bernstein, once a month for parent counseling. Hr'g Tr. at 1593; Pls.' Exs. AA , DDD at 6.

91. M.A.'s November 2005 progress report indicated that a fluency program was incorporated into his individual speech-language sessions that introduced methods to correct

diaphramatic abdominal breath control. Pls.' Ex. DD at 2.

92. Based on M.A.'s prior sessions, his speech-language teacher reported that M.A.'s prognosis for success was good. Pls.' Ex. DD at 2.

93. According to the Plaintiff, E.A. by March 2006, M.A.'s stuttering was moderate to severe. Pls.' Exs. DD at 2, DDD at 9; Hr'g Tr. at 1636-1638.

94. Sometime between January and March 2006, the CSE Chairperson and M.A.'s speech-language therapist referred Plaintiffs for a consultation with Dr. Wexler, a speech-language pathologist who specializes in stuttering. Hr'g Tr. at 1636-1640, 1757, 1895.

95. Commencing in May 2006, Plaintiffs arranged privately to have M.A. see Dr. Wexler who provided him with speech-language therapy three times a week for 45 minute sessions to address his stuttering. Hr'g Tr. at 1822.

96. According to Dr. Wexler, M.A. had made "very significant meaningful progress" (Hr'g Tr. at 1822) after ten sessions, and by then spoke more easily with an increase in his speech initiation. Hr'g Tr. at 1814.

97. Dr. Wexler testified that she had no first-hand knowledge of the speech and language therapy M.A. receives in the public schools and had never seen M.A.'s IEP, observed his class or spoke with his teachers. Hr'g Tr. at 1842, 1862, 1892.

98. Dr. Wexler testified that "there are children who stutter...who can make meaningful progress but below their abilities." As she explained, they would not reach their capacity. Hr'g Tr. at 1835.

99. On May 4 and 5, 2006, Dr. Wexler conducted a speech fluency evaluation and reported that M.A. presented with "severe" speech motor symptoms and struggles to force out words

16

and verbal inhibition. Def.'s Ex. 25 at 13-14.

100. Dr. Wexler recommended that M.A. receive individual therapy from a specialist five times a week for one hour sessions and concluded that the services were educationally necessary. She did not prescribe how long her services would be necessary. Hr'g Tr. at 1817. Dr. Wexler charges $200 a session. Def.'s Ex. 25 at 15; Hr'g Tr. at 1794, 1799.

### Testing 2006

101. According to educational testing conducted in the spring of 2006 by M.A.'s special education teacher, M.A.'s academic skills were "on grade level." Pls.' Ex. DDD at 2.

102. Both the PT and OT reports completed in February 2006 indicated that M.A. made progress in meeting his goals. *Id.* at 4 and 6.

103. Based on an assessment conducted by M.A.'s speech-language therapist in March 2006, M.A.'s dysfluent speech patterns were described as "moderate" with "barely noticeable secondary characteristics." Pls.' Ex. DDD at 9-10.

104. On the Test of Language Development-Primary Third Edition ("TOLD-P-3"), M.A. obtained scores within the average range in three out of four subtests administered and tested in the average range on the Test for Auditory Comprehension of Language-Third Edition ("TACL-3"). *Id.* at 9.

105. According to the March 2006 speech-language report, M.A. was sometimes aware of his speech patterns, and with prompting and learned techniques, was able to "pull out" of dysfluent episodes with good to excellent results and was beginning to use many and sometimes all of the techniques with minimal prompting. *Id.* at 9.

106. According to the speech-language report, "formal and informal observations have

not revealed struggle and/or frustration or tension associated with his dysfluent speech." *Id.* at 9. Based on her assessment in March 2006, M.A.'s speech-language therapist recommended that M.A. receive speech-language therapy to improve his speech fluency and pragmatics twice a week individually and once a week in a group. Def.'s Ex. 25 at 13-16.

107. According to the report from his special education teacher, M.A. was well liked, interacted appropriately with peers and was an active participant in class. Behaviorally, his teacher reported that he "exhibits periods of non-compliant behaviors." *Id.* at 3.

108. According to the Parent Training Report, sessions focused on discussion of M.A.'s behavior at home and in school, parental concerns about her son's communication skills and M.A.'s private ABA services. *Id.* at 6.

109. The March 2006 speech-language report indicated that M.A. exhibited moderately dysfluent speech patterns and used learned fluency techniques in structured settings with minimal prompting. Pls.' Ex. DDD.

110. According to Ms. Slackman, the CPSE Chairperson who testified at the hearing that she had observed M.A. "at least once or twice a year every year" since 2003, up to ten days prior to her testimony on November 15, 2005, she reported that during the two years he was with the CPSE he "consistently made progress" (Hr'g Tr. at 277) and specifically reported progress in socialization, copying skills, language development and readiness skills. Hr'g Tr. at 278.

111. The Plaintiffs have not challenged the IEP developed by the District for the 2006-2007 or the 2007-2008 school years and, except for the updated information offered in the Norlander Affidavit, neither party has sought to expand the record beyond the one made at the hearing. Norlander Aff. ¶¶ 5 and 6.

DATED:	December 21, 2007

          GIRVIN & FERLAZZO, P.C.

          By: *[signature]*

          Karen S. Norlander
          Bar Roll No.: KN1860
         Attorneys for Defendants
         Office and P.O. Address
         20 Corporate Woods Blvd.
         Albany, New York 12211
         Tel: (518) 462-0300
         Fax: (518) 462-5037
         Email: ksn@girvinlaw.com

TO: Gary S. Mayerson
   Bar Roll No.:
   Attorneys for Plaintiffs
   Mayerson & Associates
   330 West 38th Street, Suite 600
   New York, NY 10580
   Tel.: (212) 265-7200
   Fax: (212) 265-1735