

# The University of the State of New York

## The State Education Department
### State Review Officer

No. 07-012

Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the East Ramapo Central School District

**Appearances:**
Mayerson and Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Greenberg, Wanderman and Fromson, attorney for respondent, Carl L. Wanderman, Esq., of counsel

### DECISION

Petitioners appeal from those parts of a decision of an impartial hearing officer that denied their request for reimbursement for home-based applied behavioral analysis (ABA) instruction for the 2004-05 school year, summer 2005, the 2005-06 school year and summer 2006. Respondent cross-appeals from that portion of the hearing officer's decision which found that it denied the child a free appropriate public education (FAPE) for summer 2005 and the 2005-06 school year, and which ordered reimbursement for privately obtained speech-language therapy. The appeal must be dismissed. The cross-appeal must be sustained in part.

The child was described as one who thrives on positive reinforcement and encouragement (Dist. Ex. 6 at p. 1). He has a diagnosis of a pervasive developmental disorder (PDD) and exhibits global delays in fine and gross motor skills, receptive and expressive language, cognitive abilities and social skills (Dist. Ex. 4 at pp. 2-5). He exhibits speech patterns characterized by stuttering (dysfluent) behaviors, stereotypic behaviors such as finger flapping and, at times, oppositional/noncompliant behaviors (Tr. pp. 117-18; Dist. Ex. 4 at pp. 4-5). At the time of the commencement of the impartial hearing in September 2005, the child was five years old and enrolled in an 8:1+2 special class at Grandview Elementary School (Grandview) that emphasized social communication (Dist. Ex. 4 at pp. 1, 6). In addition, the child received occupational therapy (OT), speech-language therapy and physical therapy (PT) (id. at p. 1). He

also received ten hours per week of private home-based ABA services (Tr. p. 867, see Tr. pp. 1344, 1527).

With respect to the child's eligibility for special education services, on the first day of the impartial hearing, respondent agreed to change the child's classification from a student with an other health impairment (OHI) (see 8 NYCRR 200.1[zz][10]) to a student with autism (see 8 NYCRR 200.1[zz][1]);(Tr. pp. 57-58). Petitioners challenge the child's classification on appeal to the extent that they argue that respondent should have determined initially that the child was eligible for special education services as a child with autism.

The child experienced difficulties in the perinatal period and was reportedly "somewhat encephalopathic" during his first few weeks of life (Dist. Ex. 12).[1] His developmental milestones were delayed and he began speech-language therapy, OT and PT at five months of age (id.). The child also had difficulty with gastrointestinal reflux and severe colitis necessitating a specialized diet (id.). When he was two years old, he attended an Early Intervention Program (EIP) at the Hebrew Academy for Special Children (HASC) for five half-days per week, where he received OT, PT, speech-language therapy, feeding therapy, special instruction services and the services of a 1:1 aide (see Parent Exs. R; S; T; U). In early August 2003, a pediatric neurologist recommended a "more intensive full-day therapeutic nursery program" to address the child's speech, social and cognitive delays (Dist. Ex. 7). During the 2003-04 school year, the child attended a full-day 6:1+1 special class at HASC and received an unspecified amount of OT, PT, speech-language therapy and ABA services (Parent Ex. P at p. 4).[2] In November 2004, when the child was three years old, a pediatric neurologist evaluated him and reported that the child presented with PDD (Dist. Ex. 12).

On April 27, 2004, respondent's Committee on Preschool Special Education (CPSE) met for the child's annual review and determined that he was eligible for extended school year (ESY) special education services as a preschool student with a disability (id. at p. 1). His summer 2004 program consisted of a full-day non-integrated 6:1+2 class at HASC with the related services of individual and group OT and PT, and group speech-language therapy (Parent Ex. P at p. 2). Due to progress made during the 2003-04 school year, the CPSE recommended that for the 2004-05 school year the child attend a half-day 12:1+2 non-integrated class and receive ten hours of individual ABA instruction per week; twice weekly OT; PT and group speech-language therapy three times per week; and twice monthly parent counseling and training (id. at pp. 1, 4). CPSE meeting notes indicate that the child's mother requested in-school delivery of the ten hours of ABA instruction in addition to home-based ABA instructional hours (id. at p. 4). Respondent's CPSE determined that ten hours per week of ABA services were appropriate for the child (Tr. p. 274). On the same day as the April 27 2004 CPSE meeting, the child's mother signed a parental consent form noting that she agreed with the CPSE's recommendations for summer 2004 and the 2004-05 school year (Parent Ex. Q).

---

[1] I note that the record contains multiple duplicative exhibits. For purposes of this decision, only District exhibits were cited in instances where both a District and Parent exhibit were identical. I remind the impartial hearing officer it is his responsibility to exclude evidence that he determines to be irrelevant, immaterial, unreliable or unduly repetitious (8 NYCRR 200.5[j][3][xii][c]).

[2] The record does not indicate where the 2003-04 ABA services were provided.

2

By letter dated May 5, 2004 to the CPSE chairperson, the child's mother requested clarification regarding a form that she signed at the meeting (Parent Ex. V). She advised the CPSE chairperson that the child was receiving private ABA services at a "ten hour level" and noted that during the CPSE meeting she requested that respondent "pay on a going forward basis" for those services (id.). The child's mother stated that if respondent refused her request she would seek reimbursement (id.). In response to the letter, the CPSE chairperson sent information to petitioners about the consent forms that had been signed, the child's individualized education program (IEP), and petitioners' due process rights (Tr. pp. 302-03; Parent Ex. N). The child's home-based services provided by HASC were discontinued during summer 2004 (Tr. p. 624).

On November 1, 2004, the child began receiving private ABA services provided by a special education teacher (Tr. pp. 789, 822; Dist. Ex. 15 at p. 2).[3] Later that month, a pediatric neurologist provided a review of the child's history and concluded that the child had a history of "probable autistic spectrum disorder" (Dist. Ex. 12). The report stated that the child should continue to receive ABA services (id.).

In early December 2004 the pediatric neurologist conducted an observation of the child at his preschool (Parent Ex. L at p. 1). According to the observation report, the child's day consisted of breakfast, book time, circle time/small group activity, gross motor activity, large group circle time, lunch and "dedicated" ABA program time (id.). The pediatric neurologist reported that after discussing the child's progress with his teachers, he was "quite pleased" with their reports (id.). He observed the child to exhibit extreme distractibility, characterized by staring and daydreaming, and self-stimulatory behavior (id.). Although the child demonstrated the ability to sit in a chair for circle time, the observation report indicated that he did not actively participate and was more of an observer (id.). The pediatric neurologist concluded that the child required "a lot" of ABA instruction and recommended that he receive "14 hours per week of intensive ABA intervention and support in school and at home, with appropriate supervision, consultation and parent training" (id. at p. 2).

In spring 2005 respondent's Committee on Special Education (CSE) conducted and compiled a series of evaluations, a classroom observation of the child and a social history update to prepare for the child's transition from the CPSE (Tr. pp. 83-85, 88-91, 92-99; Dist. Exs. 6, 8-18).[4] On March 14, 2005, the child's HASC special education teacher conducted an educational review (Dist. Ex. 16). She reported that the child showed interest in number and letter recognition, and that he enjoyed group activities but demonstrated non-compliant behaviors when presented with challenging tasks or tasks he did not want to complete (id. at p. 1). She noted that the child's non-compliant behavior was addressed through "consistent use of

---

[3] The record refers to the child's private special education teacher as a "SEIT" (special education itinerant teacher). However, Section 4410(1)(k) of the Education Law defines "special education itinerant services" as "an approved program provided by a certified special education teacher on an itinerant basis in accordance with the regulations of the commissioner, at a site determined by the board, including but not limited to an approved or licensed prekindergarten or head start program; the child's home; a hospital; a state facility; or a child care location as defined in [§4410(8)(a)]." The record did not indicate whether or not the SEIT's employer was an approved or licensed program. In this decision, I will refer to the child's "SEIT" as the child's "private special education teacher."

[4] Dist. Exhibits 16 and 18 are identical. For the purposes of this decision, Dist. Exhibit 16 will be cited.

3

behavioral techniques" and the use of ABA instruction within the child's program (id. at pp. 1-2). His special education teacher also commented that the child was easily distracted by visual and auditory stimuli, and that social interactions were reportedly anxiety provoking for him (id. at p. 2). Administration of the Learning Accomplishment Profile-Diagnostic Edition (LAP-D) yielded a fine motor manipulation subtest score in the 2nd percentile, a fine motor writing subtest score in the 28th percentile, a cognitive matching subtest score in the 15th percentile, a cognitive counting subtest score in the 90th percentile, a language naming subtest score in the 30th percentile and a language comprehension subtest score in the 60th percentile (id. at p. 3). The special education teacher recommended "special education services" due to the child's demonstrated delays in social, cognitive and language skills, and because his behavior and limited attention span impeded his ability to learn (id. at p. 5).

A March 2005 classroom observation completed by his special education teacher indicated that the child adjusted to the class routine but had difficulty with the multi-steps involved during transitions between activities (Dist. Ex. 13). It was reported that the child had "strong" academic skills such as counting and matching as well as imaginative play skills (id.). The report also indicated that the child exhibited self-stimulatory behaviors, was often highly distractible and had difficulty gaining peer attention (id.).

On March 22, 2005, a HASC occupational therapist conducted an OT evaluation of the child (Dist. Ex. 6). Administration of the Peabody Developmental Motor Scales-Second Edition (PDMS-2) indicated that the child's fine motor and visual motor integration skills were "significantly delayed" (id. at p. 2). He also was reported to exhibit delays in self-care, sensory processing, attention and eye contact skills (id.). The evaluator strongly recommended that the child continue to receive OT during the upcoming school year (id.). Later that month a speech-language pathologist and teacher of the speech and hearing handicapped (TSHH) from HASC completed a speech-language evaluation of the child (Dist. Ex. 17). The report stated that the child's therapy focused on improving his receptive and expressive language skills in addition to his speech fluency (id. at p. 1). Administration of the Clinical Evaluation of Language Fundamentals-Preschool (CELF-P) yielded a receptive language standard score (SS) of 79 (8th percentile), an expressive language SS of 81 (10th percentile) and a total language SS of 78 (7th percentile, age equivalent 2-7 years) (id. at p. 2). The child used three to four word utterances to answer questions and required models to make a request, comment, or formulate a question (id.). His single word articulation skills were assessed to be above average; however, his connected speech intelligibility was judged to be moderately impaired due to a "lack of fluency" (id. at p. 3). The evaluator recommended speech-language therapy to address the child's language and speech fluency needs (id.).

In late April 2005 a HASC school psychologist conducted a psychological evaluation of the child (Dist. Ex. 9). Administration of the Stanford-Binet Intelligence Scales-Fifth Edition (SB5) yielded a verbal IQ SS of 71 (Borderline), a nonverbal IQ SS of 81 (Low Average), and a full scale IQ SS of 74 (Borderline) (id. at p. 3). The school psychologist reported that the child was more comfortable completing nonverbal tasks and that completion of quantitative reasoning tasks was an area of relative strength (id. at pp. 3-4). The child's working memory was found to be an area of relative weakness, and his SS was in the delayed range of functioning (id. at p. 4). Completion of the Vineland Adaptive Behavior Scales (VABS)-Interview Edition resulted in a communication domain SS of 81, a daily living skills domain SS of 60, a socialization domain SS of 64, a motor skills domain SS of 58 and an adaptive behavior composite SS of 60 (Low)

4

(id. at p. 5). Petitioners completed the Conners' Parent Rating Scale-Revised Short Version, which indicated that the child exhibited an elevated profile in the areas of cognitive problems/inattention and Conners' attention deficit hyperactivity disorder (ADHD) index (id. at p. 7). Administration of the Behavior Assessment System for Children (BASC) to the child's mother indicated that the child exhibited significantly clinical or at-risk profiles in the areas of somatization, atypicality, attention problems, adaptability and social skills (id. at p. 8). The school psychologist recommended that the child continue to receive special education and related services as well as social skills instruction that included positive peer interactions (id.).

In April 2005 the child's private special education teacher evaluated him (Dist. Ex. 15). Administration of the Brigance Inventory of Early Development yielded designations of below average in the areas of gross and fine motor skills, self-help skills and social emotional development (id. at p. 3). Although the child's speech-language skills and general knowledge and comprehension skills ranged from below average to average, the special education teacher reported that the child's skills in these areas were primarily below average (id.). The child performed in the above average range in the areas of readiness and basic math (id.). Results of the Gilliam Autism Rating Scale indicated that "the probability of autism is below average" (id. at p. 4). The special education teacher's report described the programs on which she worked with the child, and his progress with those programs (id. at pp. 4-8). She opined that the child would benefit from instruction in a small group, language-based setting with a focus on social interaction, for which she provided suggested annual goals and short-term objectives (id. at pp. 8-9).

In April and May 2005 a private speech-language evaluation of the child was conducted (Tr. p. 592; Dist. Ex. 14). Administration of an articulation assessment revealed that the child's overall intelligibility of speech was generally age appropriate (Dist. Ex. 14 at p. 2). Following formal language assessments and informal observations of the child's speech and language production, the speech-language pathologist concluded that the child demonstrated severe expressive and receptive language delays characterized by restricted form, content and use of language, restricted vocabulary, deficits in auditory processing and marked difficulty with pragmatic language skills (id. at pp. 5-6). The speech-language pathologist also reported that the child exhibited a severe pattern of speech dysfluency characterized by initial sound and syllable repetitions, whole-word repetitions, and secondary behaviors such as audible inhalations, lip posturing and tension, changes in pitch and intensity, and avoidance of answering questions (id. at pp. 3, 6). He concluded that the child's dysfluency "clearly and significantly" affected his language use and pragmatic skills, though the speech-language pathologist also opined it was difficult to separate symptoms of the dysfluent behavior with the child's diagnosis of PDD (id. at p. 6). The speech-language pathologist recommended "intensive" hourly sessions of speech-language therapy five times per week to remediate the child's speech dysfluency and language and pragmatic deficits (id.). Parent counseling also was recommended (id.).

On June 15, 2005 respondent's CPSE and CSE convened to develop the child's summer 2005 and 2005-06 school year programs, respectively (Tr. p. 78; Dist. Exs. 3; 4; 19-21; 24). For summer 2005, the CPSE concluded that the child was eligible for special education services as a preschool student with a disability and recommended a half-day non-integrated 12:1+2 program at HASC with ten hours per week of individual SEIT services to be provided at the preschool program (Dist. Ex. 24 at p. 2). The CPSE also recommended that the child receive individual speech-language therapy two times per week for 30 minutes and once in a group, in addition to

5

one group and one individual 30-minute session of OT and PT per week (id. at pp. 2-3). Parent counseling and training was also provided twice monthly for one hour (id. at p. 2).

The child's 2005-06 IEP indicated that he exhibited delayed cognitive skills as well as difficulty generalizing skills (Dist. Ex. 4 at p. 2). He was reported to have difficulty following oral directions and understanding long and complex sentences (id. at p. 3). The child used three to four word utterances to answer questions and it was reported that his connected speech intelligibility was moderately impaired due to his lack of fluency (id.). His social interactions with peers were limited and he demonstrated "stereotypical" behaviors such as finger flapping (id. at p. 4). Respondent's CSE found the child eligible for special education services as a student with an OHI and established annual goals and short-term objectives in the areas of study skills, speech-language, social/emotional/behavioral, motor, and basic cognitive/daily living skills (id. at pp. 1, 7-10). The June 2005 CSE recommended that the child receive instruction in a full-day, non-integrated 8:1+2 class at Grandview with related services including individual speech-language therapy three times per week, group language instruction two times per week in the classroom, individual OT one time per week and one time per week in a group, and individual PT one time per week (id. at p. 1). One 30-minute session of parent counseling and training per month also was recommended (id.). Refocusing, redirection and a positive reinforcement plan were recommended as program modifications and the child was offered extended time (1.5) as a testing accommodation (id. at pp. 1-2). The 2005-06 IEP noted that eligibility for summer 2006 ESY services would be determined at the child's annual review (id. at p. 1).

On June 15, 2005, the child's mother signed a consent form wherein she accepted the June 2005 CSE's recommendations that the child was eligible for special education services as a student with an OHI and placement in a non-integrated class on a "without prejudice basis" (Dist. Ex. 20). By letter received by respondent on June 17, 2005, the child's mother advised the CSE and CPSE chairpersons that she wanted her son's classification changed to autism (Tr. pp. 105-06; Dist. Exs. 22; 24). Her letter also indicated that she would request an independent evaluation "if the district is not prepared to correct this problem" (Dist. Ex. 22).

By due process complaint notice dated July 29, 2005, petitioners requested an impartial hearing and alleged that the child's 2004-05, summer 2005 and 2005-06 IEPs were inappropriate, inadequate and resulted in a denial of a FAPE (Parent Ex. A). Petitioners alleged, among other things, that the aforementioned IEPs were substantively inadequate because they failed to include individual home-based ABA instruction as part of the child's proposed programs (see id.). Accordingly, petitioners sought reimbursement relief for purposes of the 2004-05 school year, summer 2005, the 2005-06 school year, and summer 2006 (id. at p. 1). Petitioners also requested reimbursement for "supplemental" ABA and speech-language services provided during the 2004-05 and 2005-06 school years, in addition to "compensatory" speech-language services "to the extent deemed appropriate" for the 2004-05 school year and summer 2005 (id. at p. 5).

During the 2005-06 school year the child received ten hours per week of private direct ABA services and two to four hours per month of ABA supervision (Tr. pp. 822-23, 867-68). Beginning in September 2005, the child attended respondent's full-day self-contained social communications class (Tr. p. 113; Parent Ex. DDD at p. 1). He was instructed within the social communications class with the exception of his related services and participation in mainstream lunch, gym and "specials" (id.). He received approximately one hour per day of individual direct

6

instruction that included implementation of discrete trial ABA programs (Tr. p. 2370: see Parent Ex. DDD at p. 1).

An impartial hearing convened on September 30, 2005 and after 12 days of testimony concluded on September 29, 2006. At the commencement of the impartial hearing, the parties stipulated to change the child's eligibility for special education services as a student with an OHI to a student with autism (see Tr. pp. 58-61). Accordingly, the impartial hearing officer determined that the child was eligible for special education services as a student with autism (see Tr. p. 58; IHO Decision at p. 2).

In November 2005 the child's mother began attending monthly parent counseling and training sessions with respondent's school psychologist (Tr. p. 1593; Parent Exs. AA; DDD at p. 6). At the December 2005 counseling session, the child's mother and the school psychologist drafted an amendment for the child's IEP adding a half hour of play therapy per week (Tr. pp. 1593-95). The record indicates that respondent's CSE convened in March 2006 to add this service to the child's program, but it does not contain a March 2006 IEP (Tr. pp. 1599, 1743).

During the 2005-06 school year the child's mother and his private ABA supervisor observed him at school (Tr. pp. 1642-44; Parent Ex. BB; Joint Ex. 2 at pp. 54-55).[5] During a February 2006 classroom observation of the child's ABA session, the private ABA supervisor reported that despite distractions, the child attended to the special education teacher, was highly motivated by her social praise and was immediately prompted for incorrect responses (Joint Ex. 2 at p. 54). The child also was observed to make comments to the special education teacher about the book they were reading, to select his own motivators, and to complete tasks independently (id.). At times during the observation, the child required prompting to remain on task or for redirection (id. at p. 55).

In spring 2006 educational, PT, OT, and speech-language evaluations of the child were conducted, and the school psychologist prepared a parent training report (Parent Ex. DDD). Special education teacher administration of the Wide Range Achievement Test - 3 (WRAT-3) to the child yielded a reading SS of 112 (79th percentile), spelling SS of 95 (37th percentile) and arithmetic SS of 97 (42nd percentile) (id. at p. 2). The special education teacher stated that the child's skills were "equivalent to his grade level" (id.). She reported that the child made progress within the "cognitive domain," was well-liked, interacted appropriately with peers and was an active verbal participant in the classroom (id. at p. 3). She further commented that he exhibited periods of non-compliant behavior that usually occurred when he was removed from the group for individual ABA instruction (id.). The report stated that the child mastered 7 out of 22 ABA programs that were implemented during the year (id. at p. 1). The parent training report indicated that sessions focused on discussing the child's behavior at home and school, parental concerns about the child's communication skills and the child's private ABA services (id. at p. 6).

The February 2006 PT report stated that the child enjoyed going to therapy and was cooperative (id. at p. 4). The evaluator noted that the child required verbal cues to refocus in

---

[5] A February 10, 2006 classroom observation of the child conducted by the private ABA supervisor is discussed as part of Joint Exhibit 2 (Tr. pp. 1647-59). The Office of State Review did not receive this part of the exhibit. Respondent confirmed that this office received the correct number of pages contained in Joint Exhibit 2.

7

order to remain on task (id.). The report indicated that the child made progress toward his gross motor and physical goals (id.). The February 2006 OT report stated that that the child was motivated and demonstrated progress in the areas of fine motor, visual perception, activities of daily living (ADL) skills, and sensory processing (id. at p. 7). In March 2006 the speech-language therapist reported that the child exhibited moderately dysfluent speech patterns characterized by repetitions of initial sounds of words and limited secondary characteristics (id. at p. 9). The March 2006 speech-language report also noted that the child demonstrated use of learned fluency techniques and, with minimal prompting, exhibited them in structured settings (id.). Administration of the Test of Language Development-Primary: Third Edition (TOLD-P: 3) yielded scores within the average range for three out of four subtests administered (id.). The child achieved scores within the average range during administration of the Test for Auditory Comprehension of Language-Third Edition (TACL-3) (id.). The speech-language therapist also reported that at the beginning of the year the child's pragmatic skill deficits interfered with goal attainment "many times" during therapy sessions, but were "slowly dissipating at present" (id. at p. 10).

On May 4 and 5, 2006, a private speech-language pathologist who specialized in stuttering (specialist) conducted a speech fluency evaluation of the child (Tr. pp. 1756-57; Dist. Ex. 25 at pp. 13-16). The specialist reported that the child exhibited "severe" speech-motor symptoms characterized by laryngeal blocks, repetitions and prolongations (Dist. Ex. 25 at p. 13). He also exhibited struggle to force out words and verbal inhibition (id. at p. 14). The private specialist recommended that the child receive individual therapy from a speech-language pathologist "specializing in this condition," five times per week for one hour sessions (id. at p. 15). Her report concluded that the recommended service was educationally necessary for the purposes of class participation, discourse with teachers and peers, and oral presentations (id.). The child received private fluency services provided by the specialist three times per week for 45-minute sessions through at least June 13, 2006 (Tr. p. 1800; Dist. Ex. 25 at p. 1).

By decision dated December 30, 2006, the impartial hearing officer concluded that the IEPs at issue were not reasonably calculated to provide the child with an educational benefit and accordingly denied the child a FAPE (IHO Decision at p. 15).[6] Specifically, he concluded that the IEPs were substantively deficient because respondent failed to administer a functional behavioral assessment (FBA) and develop a behavioral intervention plan (BIP) (id. at p. 11). He noted that by the end of the 2005-06 school year, the need for an FBA/BIP became evident (id. at p. 2). Accordingly, the impartial hearing officer ordered respondent to develop an FBA/BIP for the child and to amend goals and objectives as needed (id. at p. 11). In addition, the impartial hearing officer determined that the child required individual speech-language sessions in light of the severity of his speech-language needs (id. at p. 12). As a result, he ordered respondent to provide the child with five 60-minute sessions of individual speech-language therapy per week (id.).[7] In addition, the impartial hearing officer ordered respondent to reimburse the private

---

[6] It is not clear from the impartial hearing officer's determination on which of the IEPs at issue in this matter he based his decision. Consequently, for purposes of this decision, I will consider the appropriateness of each IEP as raised by petitioners in their due process complaint notice dated July 29, 2005.

[7] Inasmuch as neither party appeals the impartial hearing officer's order with respect to the provision of five 60-minute sessions of speech-language therapy, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

8

speech-language therapist for "three 45-minute sessions per week of one to one stuttering therapy at [her] rate of $150.00 per session" (id. at p. 13). He further found that the private speech-language therapist "conducted the stuttering sessions and parent interviews starting on May 4, 2006 and [that] she should be compensated through June 29, 2007" (id.). Lastly, the impartial hearing officer concluded that respondent failed to provide petitioners with adequate parent training and counseling, and he ordered respondent to provide petitioners with one 60-minute session of individual parent training per month (id. at p. 15).[8,9] Although he concluded that the IEPs were substantively deficient, the impartial hearing officer did not award reimbursement for the home-based ABA instruction that petitioners obtained for their son (id. at p. 14). He determined that the child made progress and obtained an educational benefit from his 8:1+2 program and further noted that while petitioners had the right to supplement the ABA instruction that the child received in school, respondent was not obligated to reimburse them for it (id.). Lastly, the impartial hearing officer concluded that there were no equitable considerations that weighed against petitioners (id. at p. 16).

This appeal ensued. Petitioners maintain that the issue of the child's classification was a live claim that should have been adjudicated as an additional deprivation of FAPE. Petitioners further contend that the impartial hearing officer erred by failing to award reimbursement for privately obtained home-based ABA instruction for the child, and that the impartial hearing officer applied an erroneous and unduly elevated standard in denying petitioners' claim for reimbursement.

Respondent cross-appeals, arguing that the impartial hearing officer erred in determining that it failed to offer the child a FAPE during summer 2005 and the 2005-06 school year. Respondent contends that the impartial hearing officer erred in finding that the lack of a FBA/BIP compromised the child's right to a FAPE. Respondent further maintains that the summer 2005 and 2005-06 IEPs offered programs to the child that were tailored to meet his special education needs. Respondent also asserts that the impartial hearing officer erred in ordering reimbursement for the services provided by the speech-language pathologist privately obtained by petitioners. Specifically, respondent argues that petitioners are not entitled to reimbursement for the privately obtained speech-language therapy because the IDEA does not require respondent to provide the child with an optimum level of services as provided by an expert such as the therapist obtained by petitioners. With regard to petitioners' request for reimbursement for home-based ABA services, respondent asserts that the impartial hearing officer properly denied their claim. Finally, respondent argues that equitable considerations do not favor petitioners' request for reimbursement.

---

[8] Inasmuch as neither party appeals the impartial hearing officer's order with respect to parent counseling and training, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

[9] I note that in their due process complaint notice and at the impartial hearing, petitioners raised objections to the annual goals and short-term objectives contained in the child's 2005-06 IEP. Inasmuch as the impartial hearing officer did not make a finding on this issue nor was the issue raised by either party on appeal, I do not address it in this decision.

A central purpose of the IDEA (20 U.S.C. §§ 1400-1482)[10] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. July 27, 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[11, 12] "The core of the statute" is the collaborative process between parents and schools, primarily through the IEP process (see Schaffer, 126 S.Ct. at 532). A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]. In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (id. at pp. 370-71; see 20 U.S.C. § 1412[a][10][C][ii]). With respect to equitable considerations, the IDEA allows that tuition reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; see Mrs. C. v. Voluntown, 226 F.3d 60, 66 n. 9 [2d Cir. 2000]).

The first step is to determine whether the district offered to provide a FAPE to the student (see Mrs. C., 226 F.3d at 66). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to

---

[10] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEA], Pub. L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute, as it existed prior to the 2004 amendments. The relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA; therefore, the provisions of the IDEA 2004 do not apply.

[11] The term "free appropriate public education" means special education and related services that -
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
20 U.S.C. § 1401[8]; see also 34 C.F.R. §300.17; 20 U.S.C. §1414[d].

[12] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all the relevant events occurred prior to the effective date of the new regulations. However, for convenience, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]. If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). The IDEA directs that, in general, a decision by an impartial hearing officer shall be made on substantive grounds based on a determination of whether or not the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; see 8 NYCRR 200.5[i]). Also, an impartial hearing officer is not precluded from ordering a local educational agency to comply with IDEA procedural requirements (20 U.S.C. § 1415[f][3][E][iii]). The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (Cerra, 427 F.3d at 195, quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]), in other words, likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.114; 8 NYCRR 200.6[a][1]).

As a preliminary matter, I note that the impartial hearing officer's decision was unclear as to which party was assigned the burden of proof on prong one of the Burlington/Carter analysis described above, i.e., whether the services offered by the board of education were appropriate. In the instant matter, the impartial hearing commenced before and concluded after the Schaffer v. Weast decision, which was issued on November 14, 2005. In Schaffer, the United States Supreme Court held that the "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." (Schaffer, 126 S.Ct. at 537 [2005]). Moreover, "where [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule" (Harper v. Virginia Department of Taxation, 509 U.S. 86 at 97 [1993]; see also, Bay Shore Union Free School Dist. v. T ex. rel. R, 405 F. Supp. 2d 230 [E.D.N.Y. 2005]). Accordingly petitioners, as the party seeking relief, have the burden of persuasion to demonstrate that respondent failed to offer the child a FAPE.

I will address the parties' claims in chronological order. I note that the impartial hearing officer's decision does not indicate whether he considered the appropriateness of the 2004-05 IEP; however, the record shows that he considered evidence with respect to the 2004-05 IEP (see Tr. p. 36). The record reveals that petitioners raised the issue of its appropriateness at the impartial hearing; however, it is unclear from the pleadings whether respondent seeks review of the 2004-05 IEP as part of its cross-appeal. A review of petitioners' due process complaint notice indicates that petitioners alleged that the 2004-05 IEP was substantively inadequate because it failed to provide the child with individual home-based ABA services, which they contend were a necessary component of a FAPE for the child (Parent Ex. A). Under the

11

circumstances, inasmuch as petitioners raised the issue of the appropriateness of the 2004-05 IEP at the impartial hearing, I have reviewed the appropriateness of the 2004-05 IEP, and for reasons set forth in greater detail below, I find that at the impartial hearing, petitioners did not sustain their burden of proving that at the time that the 2004-05 IEP was formulated, the proposed program was inappropriate to meet the child's special education needs.

Despite having alleged in their due process complaint notice a number of deficiencies with respect to the 2004-05 IEP, an independent review of the record reveals that it is devoid of information to support petitioners' claims. I further note that many of the allegations cited in the due process complaint notice were not raised or developed at the impartial hearing. The record also reflects that with the exception of testimony from the child's 2004-05 HASC TSHH, petitioners did not enter into evidence the evaluative information considered by respondent's CPSE at the time the 2004-05 IEP was formulated to support their claim that the proposed program was insufficient to meet their son's special education needs (see Parent Ex. P at p. 4), nor did they call any witnesses who provided the child's special education services during the 2004-05 school year, or otherwise provide information regarding that school year.

At the impartial hearing, petitioners asserted that the April 2004 CPSE failed to adequately consider the child's need for intensive home-based ABA services in order to generalize his skills across settings (Parent Ex. A). The CPSE chairperson testified that at the April 2004 CPSE meeting she was unaware that the child received private ABA services (Tr. pp. 308-09). In April 2004 the CPSE recommended a five half-day per week 12:1+2 special class with ten hours of in-school delivery of 1:1 ABA instruction provided by a SEIT, and related services (Parent Ex. P at pp. 1, 4).

The CPSE chairperson testified that there was a lengthy discussion about the amount of ABA services and where the services would be provided (Tr. pp. 270-71). The CPSE offered to provide the ABA services at the child's home, at school or in a combination of settings (Parent Ex. P at p. 4). According to the 2004-05 IEP, the child's mother rejected this idea and requested that the child receive his ABA instruction at the preschool program and that he also receive additional ABA hours at home (id.).

The CPSE chairperson reported that the child had made "consistent progress" since she first observed him in August 2003, in that he became more social, his language emerged, he became more focused and his rate of skill mastery increased (Tr. p. 277). She testified that for the 2004-05 school year the CPSE recommended ten hours of ABA services, given that during the 2003-04 school year the child received between seven and a half and ten hours of ABA instruction and made "wonderful progress" (Tr. pp. 270, 273-74, 312). She stated that the CPSE took into consideration the child's mother's concern that her son was not generalizing skills to the home setting and her request for home-based ABA hours in addition to the ten school-based hours (Tr. p. 273). Nevertheless, the CPSE determined that ten hours of ABA instruction in total were "appropriate for [the child] to make good progress" (id.). The CPSE chairperson stated that with the exception of the child's mother, the CPSE agreed that ten hours of in-school ABA instruction were appropriate (id.).

Based on the foregoing, the record demonstrates that respondent afforded petitioners meaningful parent participation in the development of the 2004-05 IEP and gave careful consideration to their concern that their son required home-based ABA services in order to

12