receive a FAPE (see Cerra, 427 F.3d at 194-95). Although petitioners maintain that at the time the IEP was developed their son required home-based ABA services in order to generalize his skills across settings, the record is devoid of documentation to support this allegation. Based upon the information before me, I find that the program proposed in the 2004-05 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I find that for the reasons set forth above, respondent offered the child an appropriate program for the 2004-05 school year. Having determined that the challenged IEP offered the child a FAPE for the 2004-05 school year, I need not reach the issue of whether the privately obtained supplemental ABA services were appropriate, and the necessary inquiry is at an end (Mrs. C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I now turn to the appropriateness of the summer 2005 IEP. Respondent contends that the impartial hearing officer erred in determining that the child was not offered a FAPE during summer 2005. I concur. A review of petitioners' due process complaint notice reveals that although petitioners seek reimbursement for home-based ABA services obtained during summer 2005, they fail to set forth any procedural or substantive deficiencies in the summer 2005 IEP that would warrant reimbursement for privately obtained home-based ABA services (see Parent Ex. A). Based on the record before me, for the reasons detailed below I find that petitioners did not demonstrate during the impartial hearing that at the time the summer 2005 IEP was developed, it was inappropriate to meet the child's special education needs.

The record reveals that petitioners participated at the June 2005 CPSE meeting, accompanied by one of the child's private ABA therapists to report about his performance (Tr. pp. 397-98). According to the CPSE chairperson, the private ABA therapist recommended a "small, language-based class" for the child and did not specifically state that the child continued to need home-based ABA therapy (Tr. p. 402). It is not clear from the record whether or not petitioners requested home-based ABA services at the June 2005 CPSE meeting (see Tr. pp. 164, 397-98, 788, 1918).

A review of the summer 2005 IEP shows that it identified the child's social skill deficits and needs for peer interaction, "intensive individual instruction" to learn skills and behavior, and exposure to larger group settings to "practice social and language skills and to generalize skills learned" (Dist. Ex. 24 at pp. 4-5). Annual goals and short-term objectives were developed in the areas of study skills, speech-language, social/emotional/behavioral, motor and basic cognitive/daily living skills (id. at pp. 6-8). The summer 2005 IEP stated that the CPSE considered a program consisting of only related and SEIT services but determined that the child required a half-day special education program to successfully engage in age appropriate activities (id. at p. 3). The summer 2005 IEP recommended a five half-day per week 12:1+2 non-integrated program with related services, parent counseling and training, and ten hours of individual SEIT instruction per week provided at the preschool (id. at pp. 2-3).

The record reflects that the program proposed in the summer 2005 IEP met the child's needs as identified by the present levels of performance. I find that the self-contained classroom addressed the child's needs for peer interaction and social skill practice, and the individual SEIT instruction addressed the child's "intensive" individual instruction needs. The record also reveals that related service recommendations addressed the child's speech-language and fine and gross motor needs. Under the circumstances presented herein, I find that the record shows that the program proposed in the summer 2005 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). Accordingly, petitioners did not sustain their burden of persuasion that the child was denied a FAPE during summer 2005, and they are not entitled to reimbursement for private ABA services for that timeframe.

Next, I will address the appropriateness of the program proposed in the 2005-06 IEP. Both parties raise a number of issues with respect to the appropriateness of the 2005-06 IEP. As a preliminary matter, petitioners claim on appeal that respondent's failure to properly classify the child during the June 2005 CSE meeting as a student with autism should have been adjudicated by the impartial hearing officer as an additional denial of FAPE. I disagree. First, I note that the record shows ample parental participation in determining that the child was eligible for special education services as a student with an OHI. The record indicates that the June 2005 CSE meeting, which determined the child's initial classification, was attended by petitioners, who fully participated in that discussion (Tr. pp. 108, 121, 575-76; Dist. Ex. 4 at p. 5). The CSE chairperson testified that the June 2005 CSE recommended services based on the child's needs, regardless of his classification (Tr. pp. 182, 184). The CSE chairperson further testified that although the child met the New York State eligibility criteria for services as a student with autism, he also had a number of medical conditions including gastrointestinal reflux, the need for a restricted diet, esophagitis, and asthma (Tr. p. 120). She stated that there was a "long" discussion about classification at the meeting, and the June 2005 CSE recognized the child's diagnosis of PDD, but determined that another "piece" to the child existed (Tr. pp. 119-20). She stated that the intent of the CSE was to do a "better job" describing each of the child's needs, and accordingly respondent's CSE recommended that the child be found eligible for special education services as a student with an OHI (Tr. p. 120).

Based on the record before me, and in light of the testimony of the CSE chairperson regarding the information about the child's medical conditions that the CSE had at the time of the June 2005 meeting, I find that the record supports the June 2005 CSE's determination that the child was eligible for special education services as a student with an OHI (see Dist. Ex. 12). Under the circumstances, I disagree with petitioners' contention that respondent's failure to initially classify the child as a student with autism resulted in an additional denial of FAPE.

I will now address respondent's argument that the impartial hearing officer erred in determining that respondent did not provide the child with a FAPE during the 2005-06 school year. Specifically, respondent asserts that the impartial hearing officer erred in finding that the 2005-06 IEP was deficient because the June 2005 CSE failed to conduct an FBA of the child and further finding that "by the end of the school year, the need for a BIP and FBA became obvious

14

to the classroom teacher" (IHO Decision at p. 3). State regulations require that an FBA be performed as part of an initial evaluation of a child suspected of having a disability if the child's behavior impedes his or her learning or that of others (8 NYCRR 200.4[b][1][v]). In addition, the IDEA as well as state and federal regulations mandate that the CSE "shall...in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior" (20 U.S.C. 1414[d][3][B][i]; 34 C.F.R. § 300.324[a][2][i]; see 8 NYCRR 200.4[d][3][i]).

Where behavior impedes a child's learning, the CSE must properly assess that behavior as an initial step in developing an appropriate IEP (Application of the Bd. of Educ., Appeal No. 05-123; Application of the Bd. of Educ., Appeal No. 05-031; Application of a Child with a Disability, Appeal No. 03-057; Application of a Child with a Disability, Appeal No. 02-032; Application of a Child with a Disability, Appeal No. 01-094; Application of the Bd. of Educ., Appeal No. 01-060). Respondent contends that the impartial hearing officer erred by considering evidence of the child's interfering behaviors during the 2005-06 school year, evidence that was not before the June 2005 CSE when the 2005-06 IEP was formulated. I concur. Numerous courts have held that the determination of appropriateness "is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the child's] subsequent progress ... but rather consider the propriety of the [program] with respect to the likelihood that it would benefit [the child] at the time it was devised" (J.R. v. Bd. of Educ. of Rye Sch. Dist., 345 F. Supp. 2d 386, at 395-96 [S.D.N.Y. 2004]). Accordingly, I will consider whether the child was denied a FAPE by respondent not conducting an FBA at the time that 2005-06 IEP was devised based on the information before the June 2005 CSE.

Reports considered by the June 2005 CSE indicated that at times during the 2004-05 school year, the child engaged in behaviors that impeded his learning; however, his substantive program addressed those behaviors (Dist. Exs. 4 at p. 6; 6; 9 at p. 1; 13; 16 at pp. 1, 5; 17 at p. 1). The March 2005 OT evaluation report states that the child exhibited distractibility, limited frustration tolerance and task refusal (Dist. Ex. 6 at p. 1). The therapist reported that he used verbal and physical cues to help the child follow directions, and that the child was learning to "manage his frustration" by using language such as "please help me" (id.). The March 14, 2005 education review report described the child's non-compliant behaviors and stated that these behaviors were addressed through consistent use of behavioral techniques, such as prompting the child through the task and expecting compliance from him (Dist. Ex. 16 at p. 1). The special education teacher stated that instructions were repeated and prompts were faded until the child completed the task independently (id. at pp. 1-2). She also reported that, in order to address behavioral concerns, the child was provided with opportunities throughout the day to have control over his learning environment, such as choosing a preferred activity (id. at p. 2). The record also indicates that ABA instruction was incorporated into the child's program in order to maintain "compliant" behavior (id.). The March 22, 2005 classroom observation report stated that the child had "difficulty" with multi-step transitions, but when the special education teacher broke down each step of the transition and provided a visual prompt, the child followed the direction (Dist. Ex. 13). In the March 29, 2005 speech-language annual review report, the speech-language therapist stated that when the child was distracted, many verbal prompts were required to redirect him to the activity (Dist. Ex. 17 at p. 1). The April 2005 psychological evaluation report indicated that during testing, the child was initially reluctant to answer questions with verbal answers but did so when prompted by the evaluator (Dist. Ex. 9 at p. 2). I

also note that none of the evaluation reports contained in the record that the June 2005 CSE based its recommendations upon recommended that the child undergo an FBA (Dist. Exs. 4 at p. 6; 6; 8-18).

The private ABA education annual review report also considered by the June 2005 CSE stated that the child sat for up to 30 minutes with little prompting and did not need to be "highly reinforced" (Dist. Exs. 15 at p. 2; 4 at p. 6). The private special education teacher reported that sensory activities were used with the child when he had difficulty with an ABA program, and that she also encouraged him to use his language skills when he was frustrated (id. at pp. 2-3). The private special education teacher also used planned ignoring of a behavior with the child (id. at p. 3). None of the extended school day ABA programs described in the private special education teacher's annual review report specifically address the child's behaviors that impeded his learning, nor does the report indicate that the level of the child's behaviors warranted an FBA (id. at pp. 4-8). The majority of recommended annual goals and short-term objectives to address the child's social/emotional/behavioral needs contained in the private special education teacher's report were adopted by the June 2005 CSE and are contained in the child's 2005-06 IEP (compare Dist. Ex. 4 at pp. 7-8, with Dist. Ex. 15 at p. 8).

The record also demonstrates that the 2005-06 IEP present levels of performance reflected the child's behavioral difficulties, including his use of stereotypic behaviors, non-compliance with teacher directives, and attention deficits, which were documented in the evaluation reports that the June 2005 CSE considered (Dist. Ex. 4 at pp. 4-6). The 2005-06 IEP contained annual goals and short-term objectives in the area of study skills that addressed the child's attention problems, and in the social/emotional/behavioral areas that addressed non-compliance and self-stimulatory behaviors (id. at pp. 7-8). The 2005-06 IEP also recommended a positive reinforcement plan and refocusing/redirection throughout the child's educational program (id. at p. 1).

The CSE chairperson testified that the program recommended for the child for the 2005-06 school year was an ABA program, and her description of the child's classroom revealed that principles of ABA instruction were applied throughout the day (Tr. pp. 125-26). She stated that the program incorporated more than individual discrete trial instruction, as it also included skill generalization to small and large group settings (Tr. p. 125). She opined that the child's program analyzed behavior on an ongoing basis and therefore consisted of an "ongoing Functional Behavioral Assessment" (Tr. p. 126). She also opined that FBAs and BIPs are more commonly needed in programs that are not so data based, because those programs do not gather information for analysis (id.). She stated that the program specifically recommended for the child was designed to analyze and respond to behavior throughout the day, which she opined was "the assessment and intervention" (Tr. p. 251).

Accordingly, under the circumstances presented herein, the record does not demonstrate that at the time the 2005-06 IEP was developed, the child required an FBA. As noted above, although at times the child engaged in behaviors that impeded his learning, the record shows that his teachers and therapist successfully employed a variety of behavior management techniques to redirect the child to task completion. The record also indicates that the 8:1+2 program recommended for the child incorporated principles of ABA instruction throughout the day, in which his behavior could be assessed and interventions could be implemented.

Moreover, I note that at the time that the 2005-06 IEP was developed in June 2005, the child had had yet to attend the proposed placement. Therefore, the June 2005 CSE had no way of knowing if the child would exhibit behaviors that would impede his learning in the proposed program, which included structures and supports designed to manage such behaviors. In addition, an integral aspect of conducting an FBA is determining how a child's behavior relates to the environment in which it occurs. At the time of the development of the child's proposed IEP, the CSE did not yet know whether, in his new environment, the child would engage in behavior that impeded learning. Therefore, I find that an FBA would have been premature because the child had not attended the recommended program and placement (see Application of a Child with a Disability, Appeal No. 04-033).

The record also indicates that the June 2005 CSE was aware of the child's speech-language needs, including his dysfluent speech, and addressed them (Tr. pp. 117-18; Dist. Exs. 4 at pp. 3, 5-6; 9 at p. 2; 14; 16 at p. 2; 17). It recommended that the child receive individual speech-language therapy three times per week for 30-minute sessions, language instruction twice weekly in a group of five students, and placement in a "social communication class" (Tr. pp. 112-13; Dist. Ex. 4 at p. 1). The CSE chairperson described the program as a full-day 8:1+2 self-contained class with a certified special education teacher and two teacher assistants for eight children (Tr. pp. 113-14). The emphasis of the class was on language, communication, social interaction and academics; and children in the classroom had needs in those areas (Tr. p. 113). The CSE chairperson further stated that the social communication class utilized an ABA model with a heavy emphasis on communication and language, but that in addition to the class itself and the two group language instruction sessions, the child needed a level of individual speech-language service to address his dysfluent speech (see Tr. pp. 117-18).

In light of the foregoing, the record reflects that at the time the 2005-06 IEP was developed, the June 2005 CSE's recommendation regarding the child's speech-language services for the 2005-06 school year was appropriate, based on the information before it. The record further shows that the overall recommendation was for a small, staff-rich and language-based classroom, with additional twice-weekly group language instruction and three individual speech-language therapy sessions per week to address the child's dysfluent speech. Lastly, a review of the private speech-language pathologist's report considered by the June 2005 CSE indicates that his recommendation for five one hour sessions of speech-language therapy per week was designed to not only address the child's stuttering, but to attend to the child's other communication deficits as well, which respondent addressed with its total program recommendation (Parent Ex. 4 at p. 6; Dist. Ex. 14 at p. 6). Under the circumstances, I find that at the time that it was developed the June 2005 CSE made an appropriate recommendation with respect to the child's dysfluency and speech-language needs.

Furthermore, although the impartial hearing officer found, among other things, that the child was denied a FAPE for the 2005-06 school year because the June 2005 CSE did not conduct an FBA, he noted that the child made progress and received an educational benefit from respondent's full-day classroom program. Nevertheless, petitioners contend that the 2005-06 IEP was substantively deficient because it failed to take into account the child's need for an extended day program consisting of individual home-based ABA services. I disagree. As detailed below, I find that the program recommended for the child in the 2005-06 IEP was appropriate to meet the child's special education needs at the time that it was developed by respondent's CSE.

17

The record indicates that the June 2005 CSE considered a significant amount of current evaluative data regarding the child (Dist. Ex. 4 at pp. 3-4, 6). None of the evaluation reports contained in the record upon which the June 2005 CSE based its recommendations recommended that the child receive extended school day services (id. at p. 6; Dist. Exs. 6; 8-18). The present levels of performance contained in the 2005-06 IEP identified, among other things, the child's cognitive, social/emotional/behavioral, and attention needs based on information contained in the spring 2005 evaluation reports (Dist. Ex. 4 at pp. 3-6).

Additionally, the child's private special education teacher testified that at the June 2005 CSE meeting she provided information about the child's home-based ABA programs, her concerns about the child's speech and the results of testing she had conducted (Tr. pp. 650-51). The child's private special education teacher recommended that the child be placed in a small group language-based setting with a particular focus on social interaction (Dist. Ex. 15 at p. 8). As described above, the CSE chairperson indicated that the child's recommended program was a full-day 8:1+2 self-contained social communication class with an emphasis on language, communication, social interaction and academics (Tr. pp. 113-14). She further stated that the program utilized an ABA model with a heavy emphasis on communication and language (see Tr. pp. 117-18). The CSE chairperson testified that when the CSE considers the need for an extended school day program, it considers the child's total needs (Tr. p. 169). She opined that in light of the child's individualized special education needs, he did not require extended school day services (Tr. p. 184).

As set forth above, I find that the 2005-06 IEP contained extensive evaluative data, specific present levels of performance, and annual goals and short-term objectives that addressed the child's identified areas of need. I further find that an independent review of the record does not reveal that the proposed 8:1+2 special class could not have addressed the child's needs or that the child required home-based ABA instruction in his areas of deficit in order to receive a FAPE. Based upon the information before me, I find that the program proposed in the 2005-06 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with respondent that it offered the child an appropriate program for the 2005-06 school year. Having determined that the challenged IEP offered the child a FAPE for the 2005-06 school year, I need not reach the issue of whether petitioners' privately obtained home-based ABA services were appropriate, and the necessary inquiry is at an end (Mrs. C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

Petitioners' due process complaint notice dated July 29, 2005 also seeks reimbursement for unspecified services obtained or to be obtained during the 2004-05 school year, summer 2005, the 2005-06 school year and summer 2006 (Parent Ex. A; Pet'r Reply Mem. of Law at p. 1). At the time that petitioners filed their due process complaint notice in July 2005, the only private expenses incurred by petitioners were for the private ABA services. Petitioners also asserted claims for reimbursement for supplemental speech-language therapy and compensatory speech for the 2004-05 school year and summer 2005. The impartial hearing officer awarded

18

reimbursement for private speech-language therapy for the child for the period of May 4, 2006 through June 29, 2007 (IHO Decision at p. 13). It is unclear from his decision whether this award was intended to be relief for petitioners' claims for summer 2006 services, supplemental speech-language therapy or compensatory speech-language therapy. Under the circumstances, I have reviewed the appropriateness of the impartial hearing officer's award of reimbursement and prospective award for the privately obtained speech-language therapy for the period of May 2006 through June 2007, and for the reasons expressed below, while I agree with the impartial hearing officer's finding that respondent failed to offer the child a FAPE during part of the 2005-06 school year, I have modified the award as indicated.

Compensatory education is instruction provided to a student after he or she is no longer eligible because of age or graduation to receive instruction. It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]). Compensatory education is an equitable remedy that is tailored to meet the circumstances of the case (Wenger v. Canastota, 979 F. Supp. 147 [N.D.N.Y. 1997]).

While compensatory education is a remedy that is available to students who are no longer eligible for instruction, State Review Officers have awarded "additional services" to students who remain eligible to attend school and have been denied appropriate services, if such deprivation of instruction could be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (Application of the Bd. of Educ., Appeal No. 02-047; Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030).

The standard for awarding compensatory education or additional services depends on whether there is a finding of a "gross violation" of IDEA or a denial of FAPE, respectively. Here, the child was five years old at the time of the commencement of the impartial hearing and the deprivation of instruction can be remedied through the provision of additional services before he becomes ineligible for instruction (Application of a Child with a Disability, Appeal No. 04-054; Application of the Bd. of Educ., Appeal No. 04-016; Application of the Bd. of Educ., Appeal No. 03-075; Application of a Child with a Disability, Appeal No. 01-094).

In April 2004 the child primarily used single words to communicate and used full sentences only with "much support" (Tr. p. 326; Parent Ex. P at p. 4). The CPSE chairperson testified that in April 2004 she was aware of the child's dysfluent speech (Tr. pp. 324-25). She stated that the "theory" at that time was that as the child's language emerged and he became more comfortable using language, possibly the dysfluent speech would resolve (Tr. pp. 324-25, 334-35). In April 2004 the child's speech dysfluency was not considered a primary problem, and the CSE chairperson stated that the child had many other areas of need that were more significant (Tr. pp. 325-26). The focus was to improve the child's ability to use language with other children because, in the CSE chairperson's opinion, that was more of an "issue" with children "on the spectrum" than dysfluent speech (Tr. pp. 323-24). The 2004-05 IEP did not contain any information about the child's speech fluency skills or needs, but it contained one annual goal and short-term objective in the area of speech fluency (Parent Ex. P at p. 5). The CPSE chairperson testified that the people who worked with the child recommended the goal, the goals were reviewed at the CPSE meeting, and petitioners agreed to that particular goal (Tr. p. 337).

19

The child's mother testified that the child exhibited dysfluent speech at the beginning of the 2004-05 school year (Tr. pp. 578-79). Respondent's CPSE chairperson testified that she was aware of a "mild" dysfluency problem at the beginning of that school year as well (Tr. p. 323). The HASC speech-language pathologist who provided therapy to the child one time per week in a group reported that she noted the child's speech dysfluency in December 2004 (Parent Ex. NN at p. 23), though it was not documented again in speech-language therapy log notes until March 2005, when it was noted that during the session the child worked on "fluency and rate" (id. at p. 26). HASC's TSHH, who provided therapy to the child twice per week in a group during the 2004-05 school year, testified that she did not notice his dysfluent speech until approximately January 2005 (Tr. pp. 692, 717, 720; Dist. Ex. 17). The TSHH testified that the child's speech dysfluency was not pronounced when she worked with him (Tr. pp. 707-08, 712). The TSHH stated that, after discussion with her supervisor, she did not address the child's dysfluency "much" in therapy because she did not observe it frequently in her sessions and, in her opinion, the child was too young to address it (Tr. pp. 707-08, 715-16). She reported that as the year progressed and the child's language increased, the dysfluent speech emerged (see Tr. p. 324).

The child's March 2005 annual speech-language report states that a portion of therapy focused on improving the child's speech fluency (Dist. Ex. 17 at p. 1). At that time, the child used three to four word utterances to answer questions, but required a model to request, comment or formulate a question (id. at p. 2). In April 2005, the TSHH reported that the child made "some progress" toward the speech fluency objective on his IEP (Tr. pp. 744-45; Parent Ex. P at p. 5).

Neither party presented testimony from the child's 2004-05 HASC special education teacher, whose March 2005 educational review report stated that the child "at times" had difficulty expressing himself and that he repeated the beginning sound of a word (Dist. Ex. 16 at p. 2). The report also stated that the child made "significant progress" interacting with friends in the classroom, and that during formal testing the child recited numbers one through 20 and completed a variety of naming activities (id. at pp. 2, 4-5). The child's HASC special education teacher concluded that although the child continued to exhibit delays, he had made "significant progress" (id. at p. 5).

Furthermore, I note that the record does not contain information pertaining to the child's level of speech performance at the beginning of the 2004-05 school year. If the child's levels of speech performance at the beginning of the 2004-05 school year were consistent with the characterization developed in April 2004, the child was primarily using single words to communicate. If the child was using only single words to communicate, it would have been difficult for respondent to address fluency problems, especially in relation to his more pressing language needs, his cognitive delays and associated features of PDD. The record also indicates that by March 2005 the child's expressive language skills improved to the three to four word utterance level. Although the record reflects that the child's stuttering increased to a noticeable level at school during the period of December 2004 through January 2005, probably in relation to his improved expressive language skills, neither the TSHH's testimony or the special education teacher's report reflect that the child's speech dysfluency contributed to a lack of progress toward his IEP goals and objectives or inhibited his progress in speech therapy and in the classroom. In summary, based on the foregoing, I find that the record does not support petitioners' claims that during the 2004-05 school year the child's stuttering was pronounced to the extent that it

negatively affected his educational performance or that the speech-language services offered by respondent denied the child a FAPE.

Petitioners also asserted a claim for compensatory speech-language therapy for summer 2005. The CPSE chairperson testified that she became aware that the child's dysfluent speech had increased during the 2004-05 school year when she received information from the child's HASC TSHH and the spring 2005 report from the private speech-language pathologist (Tr. pp. 335, 350). She stated that although ESY services were provided to prevent regression, the June 2005 CPSE recommended that the child receive two individual sessions per week of speech-language therapy to address his stuttering (Tr. pp. 335, 350; Dist. Ex. 24 at p. 3). She stated that petitioners participated in the meeting and discussed the child's needs (Tr. p. 397). She did not recall that petitioners expressed dissatisfaction with the level of speech-language therapy that was recommended for the child during summer 2005 (Tr. p. 360).

I note that the record does not contain information regarding implementation of the child's summer 2005 speech-language therapy services. The provider of the child's summer 2005 speech-language therapy did not testify, nor are there reports of how the summer 2005 IEP was implemented or reports of progress. What the record does show is that the CPSE recognized the child's speech fluency problem and added two sessions of individual speech-language therapy to address his needs. In light of the foregoing, I find that petitioners did not establish that the child was denied a FAPE with respect to his speech-language needs during summer 2005 and, accordingly, they are not entitled to reimbursement for future speech-language (fluency) services as additional services for that timeframe.

I must now consider whether petitioners sustained their burden of proving that the child is entitled to additional services as a remedy for a denial of FAPE with respect to his speech-language needs during the 2005-06 school year. As set forth in greater detail below, I find that the record supports their claim that for a portion of the 2005-06 school year respondent failed to adequately address the child's dysfluency, an identified area of need, thereby resulting in a denial of FAPE.

The special education teacher testified that in September 2005 the child usually used three to four word utterances to answer questions and that he spoke "well" (Tr. pp. 2540-42). The child's special education teacher also stated that once the child spoke in longer utterances, "issues" were noticed (Tr. p. 2542). She agreed with the statement on the child's IEP that his speech intelligibility was moderately impaired during connected speech due to a lack of fluency and that it was a problem he had "at times" throughout the 2005-06 school year (Tr. pp. 2545-46).

In November 2005 the child's IEP progress report stated, "a fluency program has been incorporated within the individual sessions of speech-language therapy. [The child] has revealed good modeling skills for all methods introduced, of correct diaphragmatic/abdominal breath control. Prognosis for success with this type of therapy is good, as revealed from the past four sessions" (Parent Ex. DD at p. 2). In November 2005, the CSE chairperson testified that the child's speech-language therapist emphasized a slower speech rate for the child (Tr. p. 422). The CSE chairperson also stated that she observed the child using four to five word utterances without stuttering, and that the special education teacher and speech-language therapist indicated that the child was dysfluent when excited or speaking too fast (id.).

21

The child's mother testified that during an early December 2005 observation of a school speech-language therapy session, her son's speech-language therapist told her that the child did not have a "true stutter" (Parent Ex. BB at p. 3). According to the child's mother, the speech-language therapist reported that the child's special education teacher also did not observe "much" dysfluent speech, "just recently a little" (Tr. pp. 1632-34; Parent Ex. BB at p. 3). The speech-language therapist informed the child's mother that she used relaxation, imagery techniques, ball rolling, blowing bubbles, breathing techniques and active listening as methods to improve his speech fluency (Tr. p. 1635; Parent Ex. BB at p. 4). At some point between January and March 2006 the child's speech-language therapist and the CPSE chairperson referred the child's mother to a private speech-language pathologist who specialized in therapy for stuttering (Tr. pp. 1636-40, 1756-57, 1895).

The child's mother testified that during a March 1, 2006 observation of the child the speech-language therapist described the child's stuttering as "severe" (Tr. pp. 1636-38).

On March 7, 2006, respondent's speech-language therapist conducted a speech-language evaluation of the child (Parent Ex. DDD at pp. 9-10). In her report, she described the severity of the child's dysfluent speech patterns as "moderate" with "barely noticeable secondary characteristics" (id. at p. 9). The report stated that formal and informal observations of the child during conversational speech did not reveal struggle and/or frustration or tension associated with his dysfluent speech (id.). She noted that the child was "sometimes" aware of his speech patterns, and that with prompting and learned techniques he was able to "pullout" of dysfluent episodes (id.). The report stated that the child exhibited good to excellent results when he used speech fluency techniques such as continuous airflow, easy onset, cancellation and pullout, and that he incorporated many to all of the techniques with minimal prompting in a structured setting and during small group speech-language therapy sessions (id. at pp. 9-10). The speech-language therapist recommended that for the upcoming 2006-07 school year the child receive twice weekly individual and once weekly group speech-language therapy to develop and improve speech fluency and pragmatic skills (id. at p. 10). As described above, in May 2006 the stuttering specialist conducted a speech fluency evaluation of the child and reported that he exhibited severe speech dysfluencies for which she recommended speech therapy five times per week (Dist. Ex. 25 at pp. 13-16).

A review of the record reveals that it does not contain testimony from the child's 2005-06 school-based speech-language therapist. Moreover, there are no speech-language therapy notes, progress reports or anecdotal information from the speech-language therapist about the child's speech dysfluency during the 2005-06 school year. Although as early in the year as November 2005 the speech-language therapist reported that the child made progress toward his IEP fluency objectives, a review of the record reveals that by March 2006 his stuttering was characterized as moderate to severe (Tr. pp. 1636-38; Parent Exs. DD at p. 2; DDD at p. 9). At that point, under the circumstances, I find that respondent's CSE should have reconvened to determine what additional intervention could be added to the child's program to address the increase in dysfluent speech. By referring the child to a stuttering specialist at some point in winter-spring 2006 and failing to address the dysfluency at school to increase the level of service, respondent effectively acknowledged the child's need for an increase in services.

22

Having found that respondent failed to adequately address the child's speech-language needs with respect to the 2005-06 school year, I must now consider whether the speech-language services privately obtained by petitioners were appropriate. Respondent asserts that the IDEA does not entitle the child to the optimum services that petitioners have obtained through the stuttering specialist. Respondent does not argue that the private speech-language therapy was inappropriate to meet the child's speech-language needs, only that his needs did not require the services of an "expert" therapist. As explained in greater detail below, I disagree, and find that the services of the specialist were appropriate to address the child's individual speech-language needs.

The record shows that the specialist who provided the May-June 2006 private speech fluency therapy has a doctorate in speech-language pathology with a specialization in stuttering (Tr. pp. 1754-55). She is a board recognized stuttering specialist who has devoted her "entire professional life to helping children and adults who stutter" (Tr. pp. 1755, 1759). She has taught courses in stuttering and stuttering therapy to graduate students since 1978 (Tr. p. 1755). Her May 4 and 5, 2006 evaluation of the child identified the characteristics of his speech dysfluency (Tr. pp. 1784-93). She provided strategies to petitioners for use at home (Tr. pp. 1794-96). During therapy sessions, she used intervention techniques such as enhanced modeling (speaking in a way to the child that includes all the fluency techniques that are taught to people who stutter), face-to-face communication with appropriate eye contact and full attention (Tr. pp. 1803-06, 1810-11). The specialist testified that the child sustained attention during the 45-minute sessions, maintained eye contact, smiled and appeared happy (Tr. pp. 1812-13). The specialist reported that by the middle of June 2006 the child spoke more easily and his speech initiation increased (Tr. p. 1814). She testified that within the 45-minute sessions the child made "very significant meaningful progress," and that the therapy met his individual needs (Tr. p. 1822).

Based on the foregoing, I find that the speech-language services that petitioners obtained for their son in May 2006 were appropriately tailored to address the child's individual speech-language needs. However, as detailed below, I will modify the award made by the impartial hearing officer.

The record suggests that a CSE meeting was held to develop an IEP a "few weeks" prior to the specialist's testimony on June 14, 2006 (Tr. p. 1861). I note that the most recent IEP contained in the record is the 2005-06 IEP. The record does not show whether the CSE meeting that took place in spring 2006 was held to amend the 2005-06 IEP or to develop the 2006-07 IEP. Under the circumstances, the record does not demonstrate what the CSE recommended for the child for the remainder of the 2005-06 school year, summer 2006 or the 2006-07 school year in regard to fluency therapy. Even if respondent did amend the 2005-06 IEP at some point in May 2006 to add additional fluency therapy, reimbursement for the specialist's services through the end of June 2006 may help remedy the deprivation of appropriate services that occurred since at least March 2006. Under the circumstances, I will modify the award to the extent that respondent will reimburse petitioners for the cost of the private stuttering specialist from May 4, 2006 through the end of the 2005-06 school year.

I have the considered the parties' remaining contentions and find them to be without merit.

23

THE APPEAL IS DISMISSED.

THE CROSS-APPEAL IS SUSTAINED TO THE EXTENT INDICATED.

IT IS ORDERED that upon proof of payment respondent shall reimburse petitioners for the private speech-language therapy obtained during the period of May 4, 2006 through June 23, 2006.

Dated:   Albany, New York
         April 9, 2007

PAUL F. KELLY
STATE REVIEW OFFICER