

# The University of the State of New York

## The State Education Department
### State Review Officer

No. 01-080

**Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Scarsdale Union Free School District**

**Appearances:**

Gary S. Mayerson & Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Shaw & Perelson, LLP, attorneys for respondent, Marc E. Sharff, Esq., of counsel

## DECISION

Petitioners appeal from an impartial hearing officer's decision finding that respondent had offered their child a free appropriate public education (FAPE) during the 2000-01 school year, and denying their request for reimbursement for the cost of the one-to-one applied behavioral analysis (ABA) instruction they had obtained for the child. The appeal must be sustained in part.

Petitioners' five-year-old son was enrolled in a regular education kindergarten class in respondent's Quaker Ridge Elementary School at the commencement of the hearing on September 19, 2000. As part of his kindergarten program, the child received speech/language therapy, occupational therapy, physical therapy, and the assistance of a one-to-one aide. During kindergarten, petitioners obtained additional one-to-one ABA instruction, speech/language therapy, and occupational therapy for their son.

The child first began receiving special education under the auspices of the New York State Early Intervention Program (Title II-A of the Public Health Law) on or about December 1997. Thereafter, respondent's Committee on Preschool Special Education (CPSE) classified the child as a preschool student with a disability. During the 1998-99 school year, the child was enrolled in an 8:1+2 preschool

special education class on a half-day basis, and he received occupational therapy and speech/language therapy. In March 1999, the child's pediatrician diagnosed petitioners' son as having a pervasive developmental disorder, not otherwise specified (PDD-NOS). The pediatrician recommended that the child remain in his special education class and continue to receive related services. She further recommended that the child receive at least 30 hours of home-based ABA therapy per week (Exhibit 27).

The child reportedly made minimal progress in his special education class during the 1998-99 school year. On June 29, 1999, he began to receive approximately 34 hours of home-based ABA per week, as well as speech/language therapy, physical therapy and occupational therapy. He reportedly began to make significant progress with his ABA instruction. Petitioners' son continued to receive such instruction during the 1999-2000 school year. Petitioners arranged for their son to participate in a part-time regular education nursery school program during the 1999-2000 school year. In November 1999, it was agreed that a one-to-one aide should be with the child during his participation in the nursery school program. During both the 1998-99 and 1999-2000 school years, the child received special education services during the summers as part of a 12-month program.

In preparation for the child's transition to kindergarten and to the jurisdiction of respondent's Committee on Special Education (CSE), one of respondent's special education teachers observed the child in his nursery school program on December 15, 1999. The observer reported that the child held a magic marker appropriately and drew and copied effectively, transitioned well, engaged in spontaneous dialogue, and participated in a show and tell activity (Exhibit 4). On the Brigance Kindergarten Screening Test that was administered to him on March 14, 2000, the child exhibited age appropriate motor, visual, and academic skills (Exhibit 9).

A psychologist who evaluated the child on January 28, 2000 reported that the child had achieved a composite score of 110, with subtest composite scores of 124 in verbal reasoning, 79 in abstract reasoning, 122 in quantitative reasoning, and 107 in short-term memory, on the Stanford-Binet Intelligence Scale - Fourth Edition. The child's January 2000 cognitive scores were significantly higher than those he had achieved in 1998, when he received a Mental Development Index score of 85 on the Bayley Scales of Infant Development – Second Edition (Exhibit 31). He achieved a standard score of 117 on the Peabody Picture Vocabulary Test, which was a significant improvement over the standard score of 92 that he had achieved on that test in 1999. On the Vineland Adaptive Behavior Scales, he achieved age equivalent scores of 4.1 for communication, 3.8 for daily living skills, 2.1 for socialization, and 4.1 for motor skills. He showed improvement in all areas, except for socialization, when compared to the results he had achieved on that test in February 1999. All scores, however, were below age level including a two-year lag in socialization skills (Exhibit 6).

In February 2000, the case manager for the child's ABA program reported that the child had successfully completed an ABA program addressing group response to direction or instruction, and was continuing to work on programs addressing functioning independently in an inclusion classroom and discriminating between instructions directed to oneself and to another (Exhibit 7). In April 2000, the child's ABA provider reported that the child had mastered most of his pre-readiness skills and was working to achieve higher level expressive language skills. The ABA provider recommended that the child continue to receive ABA therapy for the 2000-01 school year (Exhibit 11).

Petitioners arranged to have a speech/language pathologist privately evaluate their son on April 6, 2000. The evaluator reported that the child had a receptive language disorder characterized by difficulties with the form and use of language. She noted that the child's vocabulary was at least average, but he had difficulty accessing it because of deficits in verbal retrieval. The evaluator also noted that the child's ability to converse by taking turns during a discussion of a particular topic was

limited, as were other pragmatic language skills such as narrating and comparing. Despite having average receptive language test scores, the child was reported to exhibit occasional receptive language difficulties. The evaluator further reported that an articulation disorder occasionally impaired the intelligibility of the child's spontaneous speech. She recommended that petitioners' son receive intensive language therapy focusing on expressive/receptive language, speech, voicing, and oral motor skills, on a daily basis. She did not recommend a specific number of hours of service (Exhibit 10).

The child's occupational therapist reported on May 20, 2000 that the child exhibited significantly impaired sensory functioning and moderate gross motor delay, but his perceptual fine motor skills were age appropriate. She indicated that the child's impaired sensory functioning impeded his safety in the classroom and during gym, and decreased his self-esteem. The therapist recommended that the child continue to receive occupational therapy three times a week and during the summer (Exhibit 12).

The child's physical therapist reported that his ability to skip and run had improved, but still needed improvement. She indicated that he continued to have weak trunk and shoulder strength, and had difficulty standing and hopping on his left foot. The therapist opined that the child would have difficulty in maintaining a sitting posture, raising and holding up his hand, keeping up with his peers in the playground, and in physical education class. She recommended that the child continue to receive two 45-minute sessions of physical therapy per week (Exhibit 13).

Respondent's CSE met on June 1, 2000 and on June 15, 2000 to discuss the child's educational program for the 2000-01 school year. The CSE classified the child as autistic. It recommended that the child attend the regular education kindergarten program at the Quaker Ridge Elementary School five mornings a week, with the support of a one-to-one classroom aide, and that each afternoon, he receive two hours of one-to-one ABA at school. On three afternoons, the child was to have received his one-to-one ABA instead of participating in the kindergarten program's three days per week afternoon sessions. The CSE also recommended that the child receive 30 minutes of individual speech/language therapy five times per week, and 45 minutes of individual physical therapy twice a week. In addition, it recommended 45 minutes of occupational therapy in a group of two and 45 minutes of occupational therapy individually (Exhibit 2).

The child's mother had requested that her son participate in the afternoon as well as the morning kindergarten program, that he receive five hours of speech/language therapy each week and 12.5 hours a week (excluding clinic and supervisory hours) of one-to-one ABA therapy after school. She requested that he receive his other related services on the two afternoons that he would not be in kindergarten (Joint Exhibit 2, pp. 119, 142-43, 144-45, 147-48). She also objected to having her son's occupational therapy delivered on the stage of the school's auditorium, and advised the CSE that she would not accept those services at that location (Joint Exhibit 1, pp. 116-17; Joint Exhibit 2, p. 139). In a letter dated June 19, 2000, petitioners' attorney asserted to respondent's director of special education that the services recommended by the CSE were inadequate, but that petitioners would accept certain services without prejudice to their right to challenge the adequacy of the recommended services in an impartial hearing (Exhibit 1).

Petitioners' attorney had not specified what services would be accepted. In September 2000, petitioners and respondent's staff agreed that the child would attend respondent's kindergarten program in the mornings with an aide. As a result of meetings on September 25 and September 27, 2000, respondent's staff and petitioners agreed that, starting in October when respondent's kindergarten program began its three afternoon a week sessions, the child would attend those sessions with an aide. In a letter dated October 23, 2000, the child's mother advised respondent's director of special education that she had hired experienced personnel to implement an ABA program in her home (Exhibit 39).

In a letter dated October 27, 2000, petitioners' attorney asserted additional claims, some in non-specific or conclusory terms, concerning the adequacy of the child's 2000-01 individualized education program (IEP), as well as respondent's alleged failure to implement parts of that IEP. He requested that petitioners be reimbursed for monies spent on private one-to-one ABA services during the 2000-01 school year. The attorney asked to have the June 19, 2000 hearing request deemed to be amended or supplemented, or in the alternative, that the October 27 letter be construed as a request for a further impartial hearing and that it be consolidated with the pending hearing. The parties subsequently stipulated to a consolidation (HO Exhibit 2).

The hearing commenced on September 19, 2000. It continued for another 15 days, ending on April 18, 2001. The hearing officer rendered his decision on August 23, 2001. Contrary to the claims in petitioners' June 19, 2000 letter, the hearing officer found that the child's IEP for the 2000-01 school year provided him with a FAPE. The hearing officer found that the parents' claims with regard to the implementation of their son's IEP should have been raised with the CSE.

Petitioners assert that their son's IEP for the 2000-01 school year was not calculated to provide him with meaningful educational benefit, in large part because it did not provide an intensive ABA program. In essence, they assert that respondent's CSE failed to ascertain the extent of their son's needs and did not recommend that he be provided with an adequate amount of ABA instruction and speech/language therapy to successfully function in respondent's regular education kindergarten program. Petitioners also object to the implementation of their son's IEP, alleging that the school district did not begin to provide any ABA instruction until November 2000, and that the staff assigned to their son did not adequately communicate with him or address his needs. They assert that their child began to regress after the school year began. Petitioners argue that the hearing officer erred in upholding the adequacy of their child's IEP, and that he failed to address the issues that were raised in their attorney's letter of October 27, 2000.

Respondent asserts that petitioners' claim that there were "numerous procedural and substantive FAPE violations" is too vague for me to consider. However, I find that I can ascertain at least some of petitioners' objections to their son's IEP from their petition and memorandum of law. Respondent asserts that any evidence about events occurring after the child's IEP was prepared in June 2000 is irrelevant and may not be considered in determining the appropriateness of the IEP. I understand that the appropriateness of the IEP and the manner in which it was implemented are separate issues, but respondent's assertion does not follow. The Board of Education also asserts that petitioners should have come to the CSE first with their complaints about the implementation of the child's IEP. While it is always desirable to resolve disputes without a hearing, I know of no legal basis for respondent's position (34 C.F.R. § 300.507[a][1]).

A board of education bears the burden of demonstrating the appropriateness of the program recommended by its CSE (Application of a Child Suspected of Having a Disability, Appeal No. 93-9; Application of a Child with a Handicapping Condition, Appeal No. 92-7; Application of a Handicapped Child, 22 Ed Dept Rep 487 [1983]). To meet its burden, a board of education must show that its recommended program is reasonably calculated to confer educational benefits (Board of Educ. v. Rowley, 458 U.S. 176 [1982]). The recommended program must also be provided in the least restrictive environment (LRE) (34 C.F.R. § 300.550[b]; 8 NYCRR 200.6[a][1]). An appropriate program begins with an IEP which accurately reflects the results of evaluations to identify the student's needs, establishes annual goals and short-term instructional objectives related to those needs, and provides for the use of appropriate special education services (Application of a Child with a Disability, Appeal No. 93-12; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

The child's IEP includes data from his January 28, 2000 psychological evaluation and the Brigance

Screening that was administered on March 14, 2000. It describes his cognitive skills and other skills that are relevant in planning an instructional program for him, such as the extent to which he can remain on task without supervision, provide personal information, identify colors, understand quantitative concepts, and understand directional and positional concepts. The IEP also includes data from his speech/language evaluation, and identifies his expressive and pragmatic language deficits, his mild articulation difficulty, and mild oral motor delay. The child's social/emotional development is described in terms used in a report by his special education itinerant teacher in February 2000. It notes that he evidences many age appropriate skills, but has difficulty with impulsivity and may not react appropriately to frustration or stress. The IEP description of the child's physical development is taken from a May 2000 report of his physical therapist and appears to accurately reflect that report. The IEP describes his management needs briefly, but accurately indicates that he requires adult support to function successfully in a less restrictive environment such as a mainstream kindergarten class.

Petitioners assert that the CSE failed to conduct adequate testing of their son. The CSE chose to rely upon evaluations performed by individuals who were not employees of the school district, as it was authorized to do (Application of Child with a Disability, Appeal No. 01-038). The evaluation reports it used were recent. The only specific omission claimed by petitioners is that the CSE should have performed a functional behavioral analysis (FBA) as part of its preparation for developing their child's IEP. An FBA is required for a student whose behavior impedes his learning (8 NYCRR 200.4[b][1][v]). Notwithstanding the child's classification as autistic, which I do not review (Hiller v. Bd. of Educ., 674 F. Supp. 73 [N.D. N.Y. 1987]), I find that an FBA was not required. An ABA program is by definition a behavioral program. This student was receiving ABA during the 1999-2000 school year, so a behavioral database already existed. The record indicates that the child had progressed from primary to secondary reinforcers, and that he did not display behavior in nursery school that would require an extensive program of behavior management in order to function successfully in kindergarten. I find that the IEP accurately identified the child's special education needs.

Although petitioners generally assert that their son's IEP annual goals and objectives were inappropriate for him, I find that the record does not support their assertion. The IEP includes annual goals to improve the child's ability to maintain attention, speak clearly, improve his oral motor skills, improve his ability to listen, comprehend and use appropriate pragmatic language skills, improve his social skills, and improve his gross and fine motor skills. These goals reflect the needs identified in the child's evaluations. Petitioners suggest that the IEP should have included an annual goal for their son to master the physical act of doing a forward roll. That activity is part of the physical therapy that child was to receive. I find that the IEP goals adequately addressed the child's physical needs.

A child's IEP must provide for an appropriate amount of special education services to afford the child the opportunity to achieve his IEP goals in the LRE. In this instance, there is no dispute about the CSE's recommendation that the child attend a regular education kindergarten with an aide. Petitioners do not challenge the CSE's recommendations with respect to the amount of physical therapy and occupational therapy to be provided. They do challenge its recommendations with respect to the amount of one-to-one ABA instruction and speech/language therapy.

Petitioners assert that their son needed a more intensive program of one-to-one ABA instruction than the ten hours per week recommended by the CSE in order to maximize his ability to be educated with his non-disabled peers. They argue that the CSE had no factual basis for recommending ten hours of ABA per week, which was significantly less than the 34 hours of ABA per week he received during the 1999-2000 school year. Respondent asserts that the difference between the amount of ABA that the child received in 1999-2000 and the amount the CSE recommended for the 2000-01 school year is far less than that because the aide who was to be with the child during the morning kindergarten sessions for a total of 20 hours per week was ABA trained. However, the aide was assigned to the child to

facilitate his participation in the kindergarten class.

In their attorney's June 19, 2000 request for a hearing, petitioners indicate that a program of 12.5 hours of one-to-one ABA instruction per week, plus four hours of "clinic" and one and one-half hours of a supervisor's time per week would have been acceptable to them during the 2000-01 school year. This is to be contrasted with the ten hours of one-to-one ABA instruction plus one hour of consultation per week that the child was to receive pursuant to his 2000-01 IEP (Exhibit 2). I note that petitioners assert that their son needed to have services provided at home after school. Since there does not appear to be any educational justification for having it provided at home rather than at some other location, I find that there is no merit to their claim that it should have been provided in their home.

I am also not persuaded by petitioners' claim that the one-to-one ABA should have been provided to their son after school. The kindergarten class was in session on three afternoons each week, so that some of the recommended ABA could have been provided on at least two days each week without conflicting with his class. While I recognize petitioners' desire for their son to spend the maximum amount of time within the regular education class, I must note that special education services are frequently provided to students during the time that they would otherwise be educated in a regular education setting. Moreover, this is a very young child who was to have an extensive school day on three of the five days of the week. Absent unusual circumstances, I find that there is no reason for compelling respondent to provide services to him after such a long day.

In considering whether the CSE recommended an adequate number of hours of ABA for petitioners' son, I must examine the purpose for which the service is being offered, as well as his present needs. The ABA methodology generally involves breaking down a skill or tasks into many small steps, which a child is then taught to perform in a series of discrete trials. After the child has mastered a skill or task in a carefully controlled environment, the next step is to generalize the skill or ability to perform the task, i.e., be able to do it in other settings or contexts. At the June 1, 2000 CSE meeting, the director of the private program that provided ABA to the child during the 1999-2000 school year indicated that the student should be involved in training other than discrete trial (Joint Exhibit 1, p. 120). She indicated to the CSE that the child's after school time should be enriched, but declined to specify whether he should receive two or three hours of ABA per day.

Respondent's then director of special education testified at the hearing that the child had made "significant progress in the period of time in which he had received the ABA services" and that she "felt he needed to continue with some ABA services" (Transcript p. 1249). According to her, the purpose of the one-to-one ABA instruction was to provide the child with "intensive skill development" in areas that would "supplement and support" his kindergarten curriculum so as to ensure that he would benefit from his regular education environment (Joint Exhibit 2, p. 144, Transcript p. 1323). The program was to be a "transition" program and the number of hours would be reviewed by the CSE after a reasonable amount of time (Joint Exhibit 2, p. 146, 138; Transcript pp. 1331-32). The then director of special education also explained that she believed the ten hours a week of one-to-one ABA services was reasonable given the child's needs and the other services he would be receiving (Joint Exhibit 2, pp. 137, 143). Having reviewed the record, I find that it supports the director's opinion, and the CSE's decision to recommend that the child receive ten hours of one-to-one ABA instruction per week plus one hour of consulting time.

Petitioners contend that respondent should have offered to provide five hours of speech/language therapy per week to their child. Respondent provided the child with two and one-half hours of individual, push-in speech/language therapy a week as required by 8 NYCRR 200.13(a)(4). Respondent provided the individual services at a time (8:35 am to 9:05 am) that would reduce interference with the child's regular classroom programming. The therapist worked with the child on eye contact, listening

skills, appropriate voicing, reducing extraneous information in spontaneous conversation, increasing his relevant responses and providing appropriate detail in structured conversations, articulation, and helped with appropriate oral-motor exercises. During push-in services, she observed the child's interaction with others and worked to facilitate his language and speech interactions with others. The therapist's program was consistent with the child's needs identified in the April 2000 speech and language update report (Exhibit 10). The child's speech and language therapist testified that the child had done well in her program during the 2000-01 school year. I find that respondent provided an adequate amount of speech/language therapy to petitioners' son during that school year.

Petitioners have raised other objections to their son's IEP that I have considered and found to be without merit. One of their contentions is that the CSE failed to recommend a 12-month program for their son. Respondent's then director of special education testified that the CSE intended to consider the question of the child's eligibility for 12-month programming at its annual review in 2001 (Transcript pp. 943-946). Petitioners do not allege that their child failed to receive appropriate services in July and August 2000. I agree that the annual review in 2001 would be the appropriate time to make that determination (Application of a Child with a Disability, Appeal No. 00-006).

I must note, although petitioners do not raise it, that the child's IEP does not make provision for parent counseling and education as required by 8 NYCRR 200.13(d). Provision should be made for such service on an autistic child's IEP (Application of a Child with a Disability, Appeal No. 01-044). I conclude that the child's IEP was nevertheless calculated to provide him with meaningful educational benefit. Therefore, I concur with the hearing officer's determination as to the appropriateness of the IEP.

Petitioners claim that respondent failed to properly implement their son's IEP for the 2000-01 school year. One of their concerns involves the site for their son's occupational therapy, part of which was to have been provided on the stage of the school auditorium. Respondent's occupational therapist testified that the use of the stage, while not ideal, was nevertheless adequate for her needs and those of the child (Transcript pp. 479-80). I find that there is nothing in the record to refute her testimony.

The child's parents also complain that respondent did not provide the ten hours of one-to-one ABA per week that it had indicated it would provide to their son during the 2000-01 school year. Respondent asserts that at the CSE meeting and all times prior to the start of school in September 2000, the child's mother had indicated that she would not accept the ABA services that the district had offered to provide. It further asserts that the child's mother did not agree to accept the district's ABA services until late September 2000 (Transcript p. 3173), and that she continued to object to the district's attempts to schedule the services between 1:00 and 3:00 p.m., making it impossible to implement the services.

The record reveals that the child's mother agreed on September 27, 2000 that her son receive ABA maintenance and generalization services in a group, rather than one-to-one, on Monday, Tuesday, and Thursday afternoons during the afternoon kindergarten sessions (Transcript p. 3171). In a letter to respondent's director of special education dated October 23, 2000, the mother asserted that it was unclear to her how the ABA group maintenance program would be implemented. She also noted that respondent had offered to provide one-to-one ABA to her son from 1:00 to 3:00 p.m. on Wednesdays and Fridays, which she characterized as only a proposal. She advised the director that petitioners would implement their own program of ABA for the child (Exhibit 39). The director of special education testified that the child's mother had advised him that her child would not be available between 1:00 and 3:00 p.m. on Wednesdays and Fridays (Transcript p. 3170). The director's testimony has not been refuted. Under the circumstances, I must find that petitioners' claim that respondent failed to provide ten hours of one-to-one ABA services per week to their son during the 2000-01 school year is not substantiated.

I have examined the record with regard to the six hours of group ABA per week that respondent was to have provided to the child pursuant to the September 27th agreement. The aide who was assigned to provide ABA to petitioners' child on Monday, Tuesday, and Thursday afternoons testified on January 16, 2001 that she used the time to collect data for use with ABA services and had not worked on any specific ABA program with the child (Transcript p. 1876). Later that month, the witness ceased to provide any service to the child. Respondent appears to have obtained a replacement for the aide in March 2001. The record does not reveal what ABA was provided to the child during the remainder of the school year. Respondent has the burden of proving that it implemented the child's IEP, as amended by the September 27th agreement. Upon the record before me, I find that it has failed to do so.

A board of education may be required to pay for educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parent's claim (Burlington Sch. Comm. v. Dep't of Educ., 471 U.S. 359 [1985]). The failure of a parent to select a program known to be approved by the state in favor of an unapproved option is not itself a bar to reimbursement (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]). I have found that respondent failed to meet its burden of proof with regard to the six hours of ABA services in a group that it was supposed to provide to the child during the 2000-01 school year.

The burden of proof shifts to petitioners to demonstrate that the private ABA services they obtained for their son during the 2000-01 school year were appropriate (Burlington, 471 U.S. at 370; Application of a Child with a Disability, Appeal No. 94-29). A private consultant developed and supervised the child's ABA program after observing the child in his regular kindergarten classroom and reviewing reports from his previous ABA consultant and the private agency that had prepared a number of evaluations of the child (Transcript pp. 1537-38, 1555, 1644). The consultant's detailed reports (Exhibits L, M, N, JJ) show that the child's active ABA instructional programs focused on identified and real needs of the child and skills that were relevant to the child's needs and to his kindergarten curriculum. The child's maintenance ABA programs included printing, eye contact, increased expressive vocabulary, social questions, and reciprocal conversations. Part of the child's ABA work was done in a "mock school" format for additional realism and generalization to his regular school program (Transcript pp. 1509, 1937). Finally, a significant amount of the child's ABA services was provided by the aide who worked with him in his kindergarten program from September 1999 to mid January 2000. I find that the child's ABA instruction focused on appropriate needs of the child and was relevant to his kindergarten program. I find that petitioners have met their burden of proof.

The third and final criterion for reimbursement is that the claim for reimbursement must be supported by equitable considerations. Petitioners provided annual reports to the CSE from his ABA providers. One or both petitioners also met with respondent's director of special education prior to the first CSE meeting, and they encouraged the child's ABA providers to participate in the CSE process. At least one petitioner attended all of both CSE meetings, and the child's mother advised those at those meetings of her feelings about the child's ABA needs and her disagreement with the ABA proposal recommended at the June 15, 2000 CSE meeting. Notwithstanding her preference for one-to-one ABA service for her son, the mother agreed as an interim measure to have respondent provide six hours of group ABA per week to her son. However, it does not appear that respondent provided those services. I find that petitioners' claim for reimbursement is supported by equitable considerations.

I have considered petitioners' other contentions, which I find to be without merit.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**IT IS ORDERED** that the hearing officer's decision is hereby annulled to the extent that it denied petitioners partial reimbursement for the services they obtained for their son; and

**IT IS FURTHER ORDERED** that respondent shall reimburse petitioners for the cost of up to six hours a week of one-to-one ABA services provided the child during the period September 27, 2000 to the end of the 2000-01 school year in June 2001, as well as for the cost of supervision from the New Jersey Institute for Early Intervention for the aforesaid period, upon petitioners' submission of proof of payment for such services.

**Dated:** Albany, New York

September 10, 2002    _____

FRANK MUÑOZ