UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.A. and E.A., on behalf of M.A.,

                    Plaintiffs,

                                              **ELECTRONICALLY
FILED**

- against -

EAST RAMAPO CENTRAL                Case No.: **07-cv-07075**
SCHOOL DISTRICT,                               **CLB**

                    Defendant.

---

## CORRECTED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

---

                                          Respectfully submitted,

                                          GIRVIN & FERLAZZO, P.C.
                                          Attorneys for Defendants
                                          20 Corporate Woods Boulevard
                                          Albany, New York 12211
                                          Tel: 518-462-0300
                                          Fax: 518-462-5037

Karen S. Norlander, Esq. (of Counsel)
Bar Roll No.:  KN1860

**PRELIMINARY STATEMENT**

The Plaintiffs, J.A. and E.A., are the Parents of M.A. ("the Student") and reside in the East Ramapo Central School District ("The District") ("Defendant"). Def.'s L.R. 56.1 St. ¶ 1. Plaintiffs appeal from the decision of the State Review Officer ("SRO") of the New York State Education Department dated April 9, 2007 dismissing their appeal, sustaining, in part, the District's cross appeal and ordering the District to reimburse Plaintiffs for private speech-language therapy services they obtained beginning in May 2006 through June 23, 2006. Def.'s L.R. 56.1 St. ¶ 2.

Plaintiffs filed their Complaint with this Court on August 8, 2007 and seek reversal of the decision of the SRO and the December 30, 2006 decision of the Impartial Hearing Officer ("IHO") to the extent they denied their request for privately secured speech-language services and Applied Behavioral Analysis ("ABA") extended day services in their home. In addition, they seek a declaration that Defendant failed to offer their son, M.A., a free appropriate public education ("FAPE") for the 2004-2005, school year, the summer of 2005, the 2005-2006 school year and the summer of 2006. Plaintiffs also seek a declaration finding that M.A.'s privately secured programs for the 2004-2005 school year, the summer of 2005, the 2006-2007 school year and the summer of 2006 were appropriate and an order directing Defendant to reimburse them for the actual costs they incurred. In addition, they seek "compensatory damages with the full supplementary services M.A. was slated to receive under 'pendency' " to remedy Defendant's alleged gross failure to provide M.A. a FAPE during the years in question, and leave to submit a fee application. Compl. Wherefore Clause ¶¶ (a)-(e).

By this motion for summary judgment, Defendant seeks dismissal of Plaintiff's Complaint in its entirety.

1

## STATEMENT OF FACTS

As set forth in Defendant's Rule 56.1 statement,  M.A was born on October 13, 2000 after 38 weeks gestation and exhibited early difficulties with gastrointestinal reflux, severe esophagitis and severe colitis.  Def.'s L.R. 56.1 St. ¶ 24.  From the time of his  birth, M.A.'s developmental milestones were delayed.  He began speech-language therapy, occupational therapy ("OT") and physical therapy ("PT") at five months of age.  Def.'s L.R. 56.1 St. ¶ 25.

At the age of  two, M.A. attended an Early Intervention Program at Hebrew Academy for Special Children ("HASC") five half-days a week, where he also received OT, PT, speech-language therapy, feeding therapy, special instruction and a 1:1 aide.  Def.'s L.R. 56.1 St. ¶ 26.

In August 2003,  a pediatric neurologist recommended a "more intensive full-day therapeutic nursery program" to address M.A.'s speech, social and cognitive delay. Def.'s L.R. 56.1 St. ¶ 27.  Thereafter, when M.A. was three, the District's Committee on Preschool Special Education ("CPSE") recommended a full-day 6:1+1 special class at HASC with OT, PT and speech-language therapy.  Def.'s L.R. 56.1 St. ¶ 28.   During that  year, M.A.'s program also provided somewhere between 7.5 and 10 hours of ABA. According to the CPSE Chair, M.A. made "wonderful progress" that year.  Def.'s L.R. 56.1 St. ¶ 29.

On April 27, 2004, the CPSE convened and recommended that M.A. receive extended school year ("ESY") special education services that summer. [1]  Def.'s L.R. 56.1 St. ¶ 30.   The District's CPSE also recommended ten hours per week of ABA services and offered to provide them in school, in M.A.s home or in both settings.  Def.'s L.R. 56.1 St. ¶ 32.  According to the minutes of that

---

[1]According to law and regulation, the purpose of extended year services is to provide special education services to the extent necessary to avoid substantial regression over the summer months. 8 N.Y.C.R.R. §§ 200.1(aaa), (eee); 200.6(k)(1)(i)(v).

meeting, Plaintiff, E.A. asked the District to provide, in addition to the ten hours of ABA instruction recommended in school, ABA services at home. Def.'s L.R. 56.1 St. ¶ 31.   At that meeting, Plaintiff also signed a consent indicating that she agreed with the IEPs recommended for M.A. for summer 2004 and the 2004-2005 school year. Def.'s L.R. 56.1 St. ¶ 41. Following the meeting, Plaintiff requested, in writing, the District to pay for an additional ten hours of ABA services in her home, advising that if the District declined to do so, she would seek reimbursement. Def.'s L.R. 56.1 St. ¶ 36. The District declined her request and sent a letter with a copy of her due process rights. Def.'s L.R. 56.1 St. ¶ 37. According to his Individualized Education Program ("IEP"), M.A.'s summer 2004 program provided a full-day, non-integrated 6:1+2 class at HASC with individual and group OT and PT with speech-language services three times a week for 30 minutes a session. Def.'s L.R. 56.1 St. ¶ 35.

For the 2004-2005 school year, M. A. attended a half-day 12:1+2 non-integrated class with ten hours of individual ABA instruction per week, twice weekly OT and PT, group speech-language therapy three times a week and parent counseling and training twice monthly. Def.'s L.R. 56.1 St. ¶ 38. According to the CPSE Chairperson, M.A. had made consistent progress since she first observed him in August 2003 and specifically noted that, as his language emerged, he became more social and more focused, while his rate of skill mastery increased. Def.'s L.R. 56.1 St. ¶ 39. By April 2004, M.A. was using single words to communicate and full sentences infrequently. Def.'s L.R. St. ¶ 39. Although not a major concern at the time, the CPSE included a goal and short term objective on M.A.'s 2004-2005 IEP to also address M.A.'s speech fluency. Def.'s L.R. 56.1 St. ¶ 40.

In November 2004, Plaintiffs secured a neurological evaluation that diagnosed M.A. with a pervasive developmental disorder ("PDD"). Def.'s L.R. 56.1 St. ¶ 43. In early December 2004, the neurologist also observed M.A. in his school program and reported that he was pleased. Def.'s L.R. 56.1 St. ¶ 44. In his report, the pediatric neurologist recommended that M.A. receive "14 hours per week of intensive ABA intervention and support in school and at home, with appropriate supervision, consultation and parent training." Def.'s L.R. 56.1 St. ¶ 45. According to M.A.'s March 2005 progress report, M.A. made "significant progress" in his current program despite his significant delays. Def.'s L.R. 56.1 St. ¶ 46.

The CPSE arranged for several new evaluations in the spring of 2005 in preparation for M.A.'s annual review and transition to a school-age program. Def.'s L.R. 56.1 St. ¶ 47. According to the educational evaluation completed by M.A.'s special education teacher at HASC in mid-March, M.A. displayed noncompliant behaviors when presented with challenging tasks he did not want to complete, which were being addressed through the "consistent use of behavior techniques" and the use of ABA instruction within the child's program. Def.'s L.R. 56.1 St. ¶ 48. According to the speech-language evaluation conducted by a speech-language pathologist and a teacher of the speech and hearing handicapped from HASC, M.A. earned a receptive language standard score of 79 (8th percentile), an expressive language standard score of 81 (10th percentile) with a total language SS of 78 (7th percentile), and an age equivalent of 2.7 years. Def.'s L.R. 56.1 St. ¶ 49. According to that evaluation, when using single words, M.A.'s articulation skills were above average while his connected speech intelligibility was found to be moderately impaired due to a lack in fluency. Def.'s L.R. 56.1 St. ¶ 50. According to psychological testing in late April, M.A. had a verbal I.Q. score

of 71 (borderline), a nonverbal I.Q. score of 81 (low average) and a full scale I.Q. score of 74 (borderline). Def.'s L.R. 56.1 St. ¶ 51.

In addition to the District's testing, the Plaintiffs secured a private speech-language evaluation in May 2005 which reported M.A.'s overall speech intelligibility as age-appropriate with severe expressive and receptive language delays and a severe pattern of speech dysfluency characterized by initial sound and syllable repetitions, whole word repetitions and secondary behaviors such as audible inhalations, lip posturing and tension, changes in pitch and intensity and avoidance in answering questions. The private therapist recommended five one-hour sessions of speech-language therapy a week to address M.A.'s speech dysfluency, language and pragmatic deficits. Def.'s L.R. 56.1 St. ¶ 52.

In April 2005, Plaintiffs also secured an evaluation from M.A.'s private special education teacher. According to her report and the results of the Gilliam Autism Rating Scale, she concluded that "the probability of autism was. . . below average" for M.A. Def.'s L.R. 56.1 St. ¶ 53. For the 2005-2006 school year, she recommended that M.A. be placed in a small language-based class with a focus on social interaction. Other than describing the work she was doing with M.A. in his home-based program, she made no mention and did not recommend the need for home-based ABA services. Def.'s L.R. 56.1 St. ¶ 54.

The District's CPSE and CSE convened on June 15, 2005 to develop M.A.'s summer IEP and program for the 2005-2006 school year. Def.'s L.R. 56.1 St. ¶ 55. Plaintiff, E.A. attended the meeting and signed a consent form accepting the CSE's recommendations "without prejudice" Def.'s L.R. 56.1 St. § 56. M.A.'s private special education teacher attended the meeting as well. Def.'s L.R. 56.1 St. ¶ 57. There is no indication that she ever raised at the meeting the need for the

5

Committee to consider extended day services or any record that the Plaintiff requested them either. Def.'s L.R. 56.1 St. ¶ 56, 63.  None of the evaluations  arranged by the District or secured by the Parent for the June 2005 meeting recommended home-based extended day services for M.A. to receive a FAPE. Def.'s L.R. 56.1 St. ¶ 64.

The IEP recommended for the summer of 2005 included goals to address M.A.'s speech-language deficits, to develop social/emotional/behavioral skills, motor and basic cognitive skills, and daily living skills. The summer IEP recognized, as well, the need for M.A. to interact with  his peers, intensive individual instruction to learn skills and behavior, and exposure to a larger group setting to practice social and language skills and to generalize them.  Def.'s L.R. 56.1 St. ¶ 58.

According to his IEP, the CPSE recommended that M.A. receive a half-day five days a week in a non-integrated 12:1+2 program at HASC, ten hours a week of individual SEIT services, speech-language therapy twice a week for 30 minutes a session individually and once a week in a group, with one group and one individual session of OT and PT  weekly for the summer of 2005.  The IEP also provided for parent counseling and training twice a month  for an hour. Def.'s L.R. 56.1 St. ¶ 59. According to the CPSE Chairperson, by the end of the 2004-2005 school year, as M.A. began to use more language, the Committee recognized  M.A.'s dysfluency as an emerging area of need. Def.'s L.R. 56.1 St. ¶ 61.  Consequently, the CPSE added two individual speech-language therapy sessions to his summer program to address it.  Def.'s L.R. 56.1 St. ¶ 60.

Following extended discussion and review of the latest evaluations and reports,  the District's CSE recommended that M.A., now school-age, be classified other health impaired ("OHI").  Def.'s

6

L.R. 56.1 St. ¶ 65, 71. [2] According to his 2005-2006 IEP, M.A. exhibited delayed cognitive skills, difficulties following multi-step directions, difficulty generalizing skills and difficulty understanding long and complex sentences.   Def.'s L.R. 56.1 St. ¶ 66.   According to the IEP, M.A. needed to improve speech fluency and generalize his skills to include spontaneous conversations, to develop attending skills and to locate common objects. Def.'s L.R. 56.1 St. ¶ 67.  Regarding his current levels of performance,  his IEP indicated that M.A. was using three to four words in response to questions and displayed above average articulation skills with moderately impaired intelligibility in connected speech due to a lack of fluency.  Def.'s L.R. 56.1 St. ¶ 68.   In the area of social development, the CSE recognized M.A.'s need to improve social interactions with peers and adults, to learn to play, share and take turns with peers and to comply with and attend to adult directives.  Def.'s L.R. 56.1 St. ¶ 69.  The 2005 IEP also recognized physical deficits in fine and gross motor functioning. Def.'s L.R. 56.1 St.¶70.   The Committee considered  M.A.'s needs for extended day services for the 2005-2006 school year and concluded that he did not need them. Def.'s L.R. 56.1 St. ¶ 72.  Regarding the need for services for the summer of 2006, M.A.'s IEP specified that the recommendation would be made at his next annual review.  Def.'s L.R. 56.1 St. ¶ 73.

The IEP for the 2005-2006 school year also recommended that  M.A. be placed in a full-day non-integrated 8:1+2 class in his local elementary school with individual 1:1 speech-language therapy three times a week, group language instruction with no more than five students twice a week, OT once a week individually and once a week in group, individual PT once a week and parent counseling and training 30 minutes once a month.   Def.'s L.R. 56.1 St. ¶ 74. The 2005-2006 IEP

---

[2] According to New York regulations, a child with a disability is not identified with a specific classification until he is eligible for school-age services. 8 N.Y.C.R.R. § 200.1(mm)(zz).

recommended three individual sessions of speech-language services a  week to address M.A.'s

dysfluent speech. Def.'s L.R. 56.1 St. ¶ 77.  Notably, the majority of goals and objectives in M.A.'s

IEP were those recommended by Mrs. Hauser, M.A.'s private special education teacher, which

included goals to address speech fluency, to generate spontaneous communication and to address

targeted behaviors.  Def.'s L.R. 56.1 St. ¶ 75, 76.

     According to the minutes of the meeting, the Plaintiff agreed with the recommended goals.

Def.'s L.R. 56.1 St. ¶ 78.  According to the private special education teacher who accompanied the

Plaintiff to the meeting, she could not recall anyone stating that the recommended program was not

appropriate.  Def.'s L.R. 56.1 St. ¶ 79.

     Consistent with the recommendation of M.A.'s private special education teacher, the class

recommended for M.A. for the 2005-2006 school year was a "social communications class" with an

emphasis on language, communication, social interaction and academics. Def.'s L.R. 56.1 St. ¶¶ 54,

80.   According to the record, the class utilized an ABA model using ABA instruction throughout

the day with a heavy emphasis on communication and language.  Def.'s L.R. 56.1 St. ¶ 81.  The

recommended ABA program used discrete trials and included 1:1 ABA instruction for M.A. an hour

a day.  Def.'s L.R. 56.1 St. ¶ 82.  In addition to the ABA services built into M.A.'s school program,

Plaintiffs arranged on their own for ten hours a week of private ABA services after school and

between two and four hours a month of ABA supervision.  L.R. 56.1 St. ¶ 87.

     According to his IEP, M.A. exhibited "stereotypical behaviors." Def.'s L.R. 56.1 St. ¶ 83.

The IEP specifically included a recommendation for a positive reinforcement plan and the need to

provide for refocusing/redirecting throughout his day.  Def.'s Ex. 4 at 1 and 4.  Regarding the need

to generalize skills and address behavior, Dr. Albers, the CSE chair, explained that M.A.'s program

included skill generalization to small and large group settings and offered a program that analyzed his behavior on an ongoing basis which she described as an "ongoing Functional Behavior Assessment." Def.'s L.R. 56.1 St. ¶ 84. As she explained, ABA, by its very nature, is an analysis of behavior. As such, she described M.A.'s program as one designed to analyze and respond to behavior throughout the day. Def.'s L.R. 56.1 St. ¶ 85.

The private ABA supervisor, Mrs. Sanchez, who supervised the teacher of M.A.'s home-based program, observed M.A. in class. Based on her observation, she reported that, despite distractions, M.A. attended to his teacher, was highly motivated by her praise and was immediately prompted for incorrect responses. Def.'s L.R. 56.1 St. ¶ 89. The Plaintiff, E.A. also acknowledged that she was meeting with the school psychologist, Dr. Bernstein, once a month for parent counseling. Def.'s L.R. 56.1 St. ¶ 90. According to M.A.'s. November 2005 progress report, M.A.'s speech-language therapist incorporated a fluency program into his sessions and introduced methods to correct diaphramatic abdominal breath control. Def.'s L.R. 56.1 St. ¶ 91. Based on his progress by that time, his speech-language teacher reported a good prognosis. Def.'s L.R. 56.1 St. ¶ 92.

According to the Plaintiff, by March 2006, M.A.'s stuttering was moderate to severe. Def.'s L.R. 56.1 St. ¶ 93. Based on the assessment conducted by his speech-language therapist at the same time, M.A.'s dysfluent speech patterns were described as "moderate" with "barely noticeable secondary characteristics." Def.'s L.R. 56.1 St. ¶ 103. According to that report, M.A. was sometimes aware of his speech patterns and, with prompting and learned techniques, was able to "pull out" of dysfluent episodes with good to excellent results and was beginning to incorporate many and sometimes all of these techniques with minimal prompting. Def.'s L.R. 56.1 St. ¶ 105.

9

Notably, the therapist reported that both"formal and informal observations did not reveal any struggle, frustration or tension associated with M.A.'s dysfluent speech." Def.'s L.R. 56.1 St. ¶ 106. Based on her assessment, M.A.'s speech-language therapist recommended that he receive speech-language therapy to improve his speech fluency and pragmatics twice a week individually and once a week in group. *Id.*

Around the same time, somewhere between January and March 2006, the CSE Chairperson and M.A.'s speech-language therapist referred Plaintiffs for a consultation with Dr. Wexler, an expert who specializes in stuttering. Def.'s L.R. 56.1 St. ¶ 94. Plaintiff followed through with the referral and, in May 2006, Plaintiffs arranged privately for M.A. to see Dr. Wexler three times a week for 45 minute sessions. Def.'s L.R. 56.1 St. ¶ 95. According to Dr. Wexler, who testified at the hearing on June 19, 2006, M.A. had already made very significant and meaningful progress with her after ten 45-minute sessions. Def.'s L.R. 56.1 St. ¶ 96.

By the spring of 2006, M.A.'s academic skills were reported to be "on grade level." Def.'s L.R. 56.1 St. ¶ 101. Both the PT and OT reports completed in February 2006 indicated progress in meeting his goals. Def.'s L.R. 56.1 St. ¶ 102. On the Test of Language Development-Primary Third Edition ("TOLD-P-3"), M.A. earned scores within the average range in three out of four subtests administered and tested in the average range on the Test for Auditory Comprehension of Language-Third Edition ("TACL-3"). Def.'s L.R. 56.1 St. ¶ 104. According to his teacher's report, M.A. was well liked, interacted appropriately with peers and was an active participant in her class. Behaviorally, she reported that he "exhibits periods of non-compliant behaviors." Def.'s L.R. 56.1 St. ¶ 107. According to the Parent Training Report, those sessions focused on discussion of M.A.'s

behavior at home and in school, parental concerns about M.A.'s communication skills and M.A.'s private ABA services. Def.'s L.R. 56.1 St. ¶ 108. The March 2006 speech-language report indicated moderately dysfluent speech patterns, and M.A.'s demonstrated use of learned fluency techniques in structured settings with minimal prompting. Def.'s L.R. 56.1 St. ¶ 109.

On May 4 and 5, 2006, the Plaintiff secured from Dr. Wexler a speech fluency evaluation that indicated "severe" speech motor symptoms and reported M.A.'s struggles to force words out and verbal inhibition. Def.'s L.R. 56.1 St. ¶ 99. Based on her assessment, Dr. Wexler recommended that M.A. receive individual therapy with a stuttering specialist five times a week for one hour sessions stating that the services were educationally necessary. Def.'s L.R. 56.1 St. ¶ 106. Dr. Wexler charges $200 a session. According to Dr. Wexler, she had no first-hand knowledge of the speech and language therapy M.A. was receiving in the public schools, had never seen his IEP or spoken to his teachers or observed him in class. Def.'s L.R. 56.1 St. ¶ 97. Dr. Wexler testified that in some cases, children who stutter "can make meaningful progress but below their abilities." As she explained, they would "not reach their capacity, the potential." Def.'s L.R. 56.1 St. ¶ 98. Regarding M.A., she testified on June 14, 2006 that after ten sessions, M.A. made "very significant meaningful progress" and bu then was speaking more easily. Def.'s L.R. 56.1 St. ¶ 96.

The Plaintiffs have not challenged the IEP developed by the District for the 2006-2007 or the 2007-2008 school years and neither party sought to supplement the record beyond the brief statements offered in the attorney's affidavit. Def.'s L.R. 56.1 St. ¶ 110.

11

## ARGUMENT

### POINT I

### CONSISTENT WITH IDEIA's STANDARD OF REVIEW IN MATTERS INVOLVING EDUCATIONAL POLICY, THE SRO's DECISION IS ENTITLED TO DEFERENCE

#### A.  The Standard of Review

In accordance with the Second Circuit, a motion for summary judgment in an IDEA case is often more than an inquiry into possible disputed issues of fact and serves as a "pragmatic procedural mechanism" for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *Lillbask v. State of Conn. Dep't. of Educ.,* 397 F 3d 77, 83 n.3 (2d Cir. 2005). By analogy the Court compared  "the role Rule 56 motions play in allowing courts to review administrative determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative review of Social Security determinations" and recognized that  "[t]hough the parties [in an IDEA action] may call the procedure 'a motion for summary judgment'. . . the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask, supra* at 83 n.3.    Furthermore, unlike an ordinary summary judgment motion, the existence of a disputed issue of material fact will not defeat the motion.   *Viola v. Arlington Cent. Sch. Dist.,* 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).

In 1982, the Supreme Court set the standard of review applicable to IDEA cases which "strictly limit[s] judicial review of state administrative decisions." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, et al.* 458 U.S. 176, 207 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). According to the Court, federal courts reviewing administrative decisions must give "due weight"

to administrative proceedings and decisions, "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 206, 208.  On such matters, the Court specifically cautioned that such reviews are "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review." *Id.* at 206.

In accordance with the standard of review, the Second Circuit Court of Appeals recognized that "[w]hile federal courts do not simply rubber stamp administrative decisions," deference is particularly due where the decision of the State Review Officer, as here, is "thorough and careful." *Walczak v. Florida Union Free School District*,142 F.3d 119, 129 (2d Cir.1998).  Further, where a court's review is based solely on the record before the SRO, due weight is particularly important when assessing an IEP's substantive adequacy. *Cerra v. Pawling Cent. Sch. Dist.,* 427 F.3d 186, 195 (2d Cir. 2005).  Under the appellate standard of deferential review, the Second Circuit declared that an administrative decision amply supported by the evidence in the record, must prevail as a matter of law. *Sherman v. Mamaroneck Union Free Sch. Dist,* 340 F 3d. 87, 93 (2d Cir. 2003).

Recognizing that this Court has seldom given the SRO's decisions the deference IDEA cases demand *(Briggs v. Board of Educ. of State of Conn.*, 882 F.2d 688, 692 (2d Cir. 1989); *Walzcak v. Florida Union Free School District*, 142 F.3d 119,129 (2d Cir.1998); *Sherman v. Mamaroneck Union Free School Dist.*, 340 F.3d 87 (2d Cir. 2003); *Grim v. Rhinebeck* Central School Dist., 346 F. 3d 377, 383 (2d Cir. 2003); *Cerra v. Pawling Central School Dist.*, 476 F.3d 186,196, (2d Cir. 2005)) for the reasons set forth below, Defendant respectfully asks this Court to follow the Supreme Court's admonition that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley* at 207.

13

In the case under review, the SRO issued a 23 page decision and reviewed an administrative record with over 2500 pages of testimony and 85 exhibits. Def.'s L.R. 56.1 St. ¶7.   After a careful and thorough review, the SRO reversed the IHO's decision to the extent the IHO found the IEP offered by the District for the 2005-2006 school year and the summer  2005 IEP  not appropriate. Norlander Aff. Ex. "A" at 10-17.

In reaching his decision, the SRO was careful to consider and weigh all of the evidence presented in the record before the hearing officer and provides citations to the record throughout. Norlander Aff. Ex."A" at 11-17.    In accordance with the standard of review, and the fact that his rulings involve issues of educational policy , there is no basis for the Court to substitute its judgment for the SRO 's  rulings regarding the IEPs under review.

POINT II

**THE PLAINTIFFS FAILED TO MEET THEIR BURDEN OF PROOF TO ESTABLISH THAT THE IEPs RECOMMENDED BY THE DEFENDANT FOR THE 2004-2005 AND 2005-2006 SCHOOL YEARS AT THEIR INCEPTION WERE NOT DESIGNED TO OFFER THE STUDENT A FREE APPROPRIATE PUBLIC EDUCATION**

> **A.    In Accordance With the Supreme Court's Decision in *Schaffer v. Weast* the SRO Properly Placed the Burden of Persuasion on the Plaintiffs to Establish That the IEPs Challenged Failed to Offer a FAPE**

In November 2005,  the Supreme Court held in *Schaffer v. Weast,* 546 U.S. 49, 126 S.Ct. 528, L.Ed. 2d 387 (2005) that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer* at 537**.**   Relying on another Supreme Court decision which holds that  "the controlling interpretation of federal law must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events

14

predate or postdate [the] announcement of the rule" (*Harper v. Virginia Dept. of Taxation*, 509 U.S. 86 at 97 (1993)**,** 113 S. Ct. 2510),  the SRO correctly  placed the burden of persuasion on the Plaintiffs.  Norlander Aff. Ex. "A" at 11.  As such, he correctly found that Plaintiffs failed to meet their burden to establish that the IEPs, at their inception, were not designed to afford M.A. an appropriate education.

**B.**    **The SRO Applied the Correct Standard When he Found that the IEPs were  Designed to Offer the Student a FAPE**

To determine whether a district offered a FAPE, courts inquire whether  (a) the Board of Education complied with the procedural requirements set forth in the IDEA, and (b) if the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits.  *Rowley* at 206-07; *Cerra* at 192.

The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression  and if the IEP affords the student an opportunity greater than mere trivial advancement;" (*Cerra*, 427 F.3d at 195) and likely to provide some "meaningful" benefit. *Mrs. B. v. Milford Bd. of Educ.*, 103 F. 3d 1114, 1120 (2d Cir. 1997).  The IDEA does not, however, require school districts to develop IEPs that maximize the potential of a student with a disability (*Rowley* at 197 ln.21, 199; *Grim*, 346 F.3d at 379; *Walczak*, at 132).

Regarding procedural violations, the 2004 amendments to the IDEA specifically provide that a hearing officer may only find that a child did not receive a free appropriate public education if the violations:

(I) impeded the child's right to free appropriate public education;

15

(II) significantly impeded the Parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the Parents' child; or

(III) caused a deprivation of educational benefits.

20 U.S.C. §1415(E)(ii).

Plaintiffs have not established any procedural flaws. To the extent they seek to do so, their challenges are substantive in nature and involve allegations that the District denied their son a FAPE by failing to arrange for the services of an expert in stuttering and declining to provide the additional hours of ABA services they requested the District arrange for their son after school at home.

To the extent the SRO faulted the District for not arranging for the services of Dr. Wexler after the District staff had referred Plaintiffs to her, the SRO ordered the District to reimburse the Plaintiffs for the services they secured. Norlander Aff. Ex. "A" at 24. The District does not appeal from the SRO's order and has continued to ask the Plaintiffs, to no avail, to present proof of payment in accordance with the decision of the SRO issued more than nine months ago. Norlander Aff. ¶23. Regarding the Plaintiffs' request for Dr. Wexler's services beyond the end of the 2005-2006 school year, as set forth below, an award of compensatory services is not a proper remedy under the facts of this case.

Regarding Plaintiffs' claim that without the additional ABA services they secured for their son, his IEPs for the years in question were not appropriate, Plaintiffs offer no evidence to support it. The fact that M.A. may have derived benefit from the services is not the issue. Instead the issue is whether the IEPs, as offered at the time they were developed, were designed to offer M.A. educational benefit.

In considering whether a parent is entitled to reimbursement for special education, the court's continue to remind  that the Individuals with Disabilities Improvement Act, 20 U.S.C. §1400 *et. seq.* does not require a district to "maximize interventions" or to provide services to enable a student to "reach her true potential." *Walczak v. Florida Union Free School District*, 142 F. 3d 119, 132 (1998). In denying claims for reimbursement, the Second Circuit recognizes that the IDEA does not underwrite "everything that might be thought desirable by loving parents." *Tucker v. Bay Shore Union Free Sch Dist.,* 873 F. 2d. 563, 567 (2nd Cir. 1989).

The Plaintiffs cannot be faulted for securing additional services for their son, particularly where those services may have enabled him to generalize, more quickly, certain skills he learned in school in his home setting.  Certainly, their pursuit of the expert on stuttering, whose name they received from District personnel, is completely understandable.  However, regarding the ABA services they secured, unless the Plaintiffs had shown that the services were necessary to enable their son to progress through his annual goals  or access the general curriculum, they cannot meet their burden to show that the District failed to offer their son a FAPE or that they were entitled to reimbursement.   Because Plaintiffs did not provide any evidence to support a finding that M.A.s' failed to make meaningful progress through the years in question or  only made progress in his school program because of the home services they provided, they did not meet their burden.  Consequently, Defendant's motion for summary judgment under the IDEA should be granted.

### C.    The SRO Applied the Proper Standard in Reviewing the IHO's Award of Compensatory Education When he Denied Prospective Reimbursement

Plaintiffs seek dismissal of the SRO's order and reinstatement of the hearing officer's award of compensatory educational services as "compensatory damages"  beyond the 2005-2006 school

17

year. Compl. Wherefore Clause (a)(c)(d)(e). The SRO correctly found, in accordance with law, that given the facts of the case, the I HO abused his discretion when he granted reimbursement prospectively beyond the time frame covered by the hearing.

The question of whether compensatory damages are available under the IDEA was first considered by the Supreme Court in 1985 in *School Committee of the Town of Burlington, Mass. v. Department of Educ. of Mass.*, 471 U.S. 359, 368, 369,105 S. Ct. 1996, 2001, 2002, 85 L. Ed 2d 385 (1985). While the Court did not make a definitive statement on the question, it recognized reimbursement as a proper remedy under the IDEA which constituted a belated payment of expenses for services it should have provided all along. Later, however, in *Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist.*, 288 F. 3d. 478, 486 (2d Cir. 2002), the Second Circuit declared that "[t]he purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy-as contrasted with reimbursement of expenses-is fundamentally inconsistent with this goal."

In regard to an award of compensatory services, courts have carved out a narrow set of exceptions to provide remedies for gross violations of the IDEA resulting in a complete denial or exclusion from school to individuals who would otherwise no longer be eligible for services due to their age. *Mrs. C. v. Wheaton*, 916 F 2d 69, 75 (2d Cir. 1990). For example, in *Burr by Burr v. Ambach*, 863 F.2d 1071, 1076, 1078 (2d Cir.1988) *vacated on other grounds by sub. nom. Sobol v. Burr*, 492 U.S. 902 (1989) *on remand to Burr by Burr v. Sobol*, 888 F.2d 258 (2d Cir 1989) *cert denied by Sobol v. Burr by Burr*, 494 U.S. 1005, the Second Circuit Court of Appeals awarded a student over the age of 21 compensatory education at the Institute for the Education of the Blind where he had been deprived altogether of any education for over a year-and-a-half due to the undue

18

delay in the agency hearing combined with a total lack of services during the pendency of his appeal because his prior school had closed   As the Court reasoned in *Burr*, in the absence of an award of compensatory education, the student could not "go back to his previous birthdays to recover and obtain the free education to which he was entitled when he was younger." *Burr* at 1078.  In another case involving an award of compensatory education,  the Court found that a state agency committed "gross violations" when it gave its consent to allow a  disabled student over the age of 18 to leave its facility and failed to notify her parents, as required by IDEA, of the pending change of placement, which resulted in the complete cessation of her education.  Similarly, in *Butler v. South Glens Falls Cent. Sch. Dist.*, 106 F. Supp.2d 414, 419 (N.D.N.Y. 2000)  the court denied a motion for summary judgment where the District argued that an alleged  six-year deprivation of FAPE did not constitute a gross violation under the IDEA or grounds to award compensatory education.

In other cases, courts have properly denied compensatory education for students no longer eligible for public education, where there was no evidence that the student's "condition regressed as a result of the District's failure to provide an appropriate education in a timely and consistent manner." *Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp 147, 151 (N.D.N.Y. 1997) *affirmed by* 181 F. 3d 84 (2nd Cir. 1999) *and affirmed by* 208 F. 3d 204 (2nd Cir. 2000) *cert. denied by* 531 U.S. 1019 (2000) *rehearing denied by* 531 U.S. 1134 (2001).  Similarly, in  *Bruno v. Greenwich Bd. of Educ.*, 2006 WL 44363, (D. Conn. 2006) the Court did not  find a "gross violation" where the district's failure to comply with statutory notice requirements did not prevent the student from receiving a meaningful opportunity to participate in the collaborative IEP process.

In this case, the State Review Officer correctly found that because M.A."was only five years old at the time of the commencement of the impartial hearing and the deprivation of instruction could

be remedied through the provision of additional services before she becomes ineligible for instruction" and found no evidence of gross violations of the IDEA or denial of FAPE, the IHO's prospective award of a full year of services with a particular therapist was not a proper remedy under the IDEA. Norlander Aff. Ex. "A" at 19.[3]

The SRO made extensive findings of fact to support his conclusion that, given the multiplicity of needs and the priorities of goals on the IEPs recommended for M.A. in 2004-2005 and 2005-2006, there was no reliable evidence that M.A.'s stuttering in 2004-2005 "was pronounced to the extent that it negatively affected his educational performance or that the speech-language services offered by the ....[District] denied .....[him] a FAPE." Norlander Aff. Exhibit "A" at 20 and 21. Regarding the summer of 2005, the June 2005 CPSE recommended that M.A. receive two individual sessions per week of speech-language therapy specifically to address his stuttering. Def.'s L.R. 56.1 St. ¶ 60. During the 2005-2006 school years, the IEP provided for three individual sessions a week to address M.A.'s dysfluency. Def.'s L.R. 56.1 St. ¶ 77. Based on the foregoing, the SRO concluded that the Plaintiffs did not establish that their son was denied a FAPE with respect to his speech-language needs during the summer of 2005 or the prior school year and consequently were not entitled to reimbursement for future speech-language services for violations of his right to a FAPE. Norlander Aff. Exhibit "A" at 20 and 21.

Regarding the 2005-2006 school year, the SRO found otherwise. As the State Review Officer found, in September 2005, the student used three to four word utterances to answer questions and spoke well while his therapist observed his dysfluency primarily when he was excited or speaking too

---

[3] Notably, to the extent this is case involving a claim for reimbursement, Plaintiffs have never produced any proof that they continued to secure the services of Dr. Wexler after June 2006 when she testified. Def.'s L.R. 56.1 St. ¶ 23.

"The core of the statute is the collaborative process between parents and schools, primarily through the IEP process." *Schaffer v. Weast.* In the absence of any factual allegations to support a finding that the Plaintiffs were denied the opportunity for meaningful involvement in the development of their son's IEPs, there is no evidence of "gross violations" of their rights or their son's under the IDEIA. In the absence of a finding that M.A. was denied the right to a free appropriate public education and has no remedy available to make up for a loss of services, there is simply no basis to grant prospective relief under the IDEA.

### D.   The SRO Correctly Found That the Lack of an FBA Did Not Deprive M.A. of a FAPE for the 2005-2006 School Year

State regulations require that a FBA be performed as part of an initial evaluation of a child suspected of having a disability if the child's behavior impedes his or her learning or that of others (8 N.Y.C.R.R. §200.4[b][1][v]). In addition, the IDEA as well as state and federal regulations mandate that the CSE "shall. . . in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior." 20 U.S.C. §1414[d][3][B][I]; 34 C.F.R. §300.324[a][2][I]; see 8 N.Y.C.R.R. §200.4[d][3][I].

Regarding the need for an FBA and a BIP, the SRO properly found no evidence that the need for such an evaluation existed at the time M.A.'s IEP for the 2005-2006 school year was developed. Norlander Aff. Ex."A" at 16-17. Moreover, given the very nature of M.A.'s ABA program, which

provided an ongoing Functional Behavioral Assessment" there is simply no basis to conclude that the lack of an FBA constituted a basis to find the 2005-2006 IEP inappropriate.[4] *Id.*

## CONCLUSION

Defendant respectfully requests that this Court grant its motion for summary judgment, deny Plaintiffs' motion for summary judgment, uphold the decision of the State Review Officer, and grant other relief the Court deems just and proper.


DATED:        January 7, 2008


                            GIRVIN & FERLAZZO, P.C.

                            By: _____
                                Karen S. Norlander
                                Bar Roll No.: KN1860
                            Attorneys for Defendants
                            Office and P.O. Address
                            20 Corporate Woods Blvd.
                            Albany, New York 12211
                            Tel:    (518) 462-0300
                            Fax:    (518) 462-5037
                            Email: ksn@girvinlaw.com


TO:    Gary S. Mayerson
       Bar Roll No.:
       Attorneys for Plaintiffs
       Mayerson & Associates
       330 West 38th Street, Suite 600
       New York, NY 10580
       Tel.: (212) 265-7200
       Fax: (212) 265-1735

---

[4] In *Application of a Student with a Disability,* Appeal No. 01-080 (2002), the SRO held that a FBA is not required for a student receiving an ABA program, which is, by definition, an individualized behavior program. As he explained, ABA involves breaking down skills into small components, which a child is then taught to preform in a series of discrete trials which he later generalizes to other settings. A copy of the decision is provided to the Court.