COPY

**DEPARTMENT OF EDUCATION**
**EAST RAMAPO CENTRAL SCHOOL DISTRICT**
-------------------------------------------------------------x

In the Matter of:

                                    **Impartial Hearing Officer**
                                    **Richard Thaler**

MOSHE ABBOUDI, by his parents,

                Petitioners,

      -against-

East Ramapo Central School District,

                Respondent.

-------------------------------------------------------------x

**PETITIONERS' POST-HEARING MEMORANDUM OF LAW**

MAYERSON & ASSOCIATES
Attorneys for Petitioners
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (fax)
www.mayerslaw.com

## INTRODUCTION

This post-hearing memorandum of law is respectfully submitted on behalf of Moshe Abboudi ("Moshe") and his parents, Elisheva and Jonathan Abboudi, in support of their claims for declaratory, compensatory and Burlington/Carter reimbursement relief.

### Moshe's Claims Are Timely Brought

Moshe's claims are set forth in his July 29, 2005 request for hearing (P-A),[1] and encompass the 2004-2005 school year, the Summer of 2005, the 2005-2006 school year, and the Summer of 2006.

This hearing was initiated after the reauthorization of the federal Individuals With Disabilities Education Improvement Act (IDEIA). The IDEIA establishes a uniform two-year statute of limitations to quell conflict between the circuits. Inasmuch as Moshe's claims were asserted on July 29, 2005, Moshe's claims would easily fit within a two year statute of limitations. In point of fact, even if there were a mere one-year statute of limitations (and there is no such statute applicable here), Moshe's claims would still be timely.[2] No legal analysis is needed to establish the fact that the 2004-2005 school year is well within one year of July 29, 2005.[3]

Moshe has been diagnosed with an autism spectrum disorder. As detailed infra, Moshe's case is predicated upon the procedural and substantive failure of the East

---

[1] Reference is made to petitioners' exhibits.

[2] Any pre-IDEIA statute decisional law is preempted by the new statutory provision, and even if some jurist would err in continuing to apply a one year statute of limitations, the (more protective) federal statute would control over state action.

[3] East Ramapo's counsel claimed at the outset that Moshe's claims were somehow barred by a one year statute of limitations. Counsel is in error. Everyone is entitled to their own opinion, but no one is entitled to their own facts.

1

Ramapo Central School District ("East Ramapo") to offer Moshe a free and appropriate public education (Prong I), the demonstrable appropriateness and efficacy of the services that Moshe's parents secured for him (Prong II), and the absence of any equitable considerations that would preclude or diminish a reimbursement award (Prong III).[4]

**Moshe's Claims**

Moshe's Prong I claims are summarized in Moshe's July 29, 2005 request for hearing. For Prong I purposes, the evidence at the hearing was not so much about what East Ramapo did wrong, but what, if anything, East Ramapo did right. By way of example, over the repeated objections of his parents, East Ramapo improperly classified Moshe as "OHI" when he should have been classified under "autism." This was no mere procedural snag, as it underscores a variety of other failures. East Ramapo's failure to provide an appropriate "'foundation" to support its IEP was not the only structural failure. Among other things, East Ramapo

- ✓ Failed to meet its Section 200.13(d) mandate to provide Moshe's parentswith adequate and appropriate parent training and counseling

- ✓ Failed to properly assess Moshe's "present levels," including but not limited to his behavioral levels and his IEP performance levels

- ✓ Failed to properly baseline Moshe's present levels, thus allowing East Ramapo to subjectively guess as to how, if at all, Moshe had progressed and was progressing

- ✓ Proposed inadequately challenging IEP goals and objectives

- ✓ Failed to give appropriate credit to what Moshe learned with one-to-one teaching in his home and community based ABA program

- ✓ Failed to meet the Commissioner's Section 200.13.(mandate) as to minimum speech and language intervention time

---

[4] In fact, to the extent that "equities" figure into this proceeding, it is respectfully submitted that they mitigate against East Ramapo.

- ✓ Failed to develop a Functional Behavioral Assessment to measure Moshe's "present levels" concerning his various interfering behaviors

- ✓ Failed to meaningfully consider Moshe's need for assistive technology

- ✓ Failed to properly develop appropriate goals and objectives

- ✓ Failed to develop an appropriate Behavior Intervention Plan

- ✓ Failed to recognize Moshe's need for a 12 month program

- ✓ Failed to develop an appropriate IEP that was "calculated" to provide Moshe with a meaningful educational benefit

- ✓ Failed to properly address Moshe's serious fluency (stuttering) problem, and recklessly deciding to ignore it and give it time to grow worse (which, of course, it did)

- ✓ Failed to provide any individual speech and language intervention during the 2004-2005 school year

- ✓ Failed to properly "track" Moshe's progress as against his IEP goals and objectives

- ✓ Failed to timely implement goals and objectives that are stated in black and white on the challenged IEP

- ✓ Failed and refused, by reason of custom and district-wide policy, to give consideration to Moshe's need for extended day programming, even though the challenged IEP (P-C) recites on the bottom of page 2 that "he faces much difficulty in generalizing these skills"

- ✓ Improperly pressured Moshe's parents that if they wished to have any home based ABA services, such services would have to "come out of" Moshe's school based services (and that would be pretty difficult given the paltry level of 1:1 ABA teaching in the classroom)

- ✓ Improperly forced Moshe's parents to secure and pay for their own parent training and counseling

For Prong II purposes and the relaxed standard that is applicable under the Second Circuit's recent decision in <u>Frank G. v. Board of Education of Hyde Park</u>, 2006 U.S. App. LEXIS 19029 (2d Cir. 2006), we amply met the requisite evidentiary burden of

3

showing that the ABA and speech and language services for which reimbursement relief is sought are "appropriate" and thus, reimbursable.

On this point, East Ramapo was ungraciously attempting to take all the credit for Moshe's progress by pointing to its mere (at best) one hour per day of 1:1 teaching at Grandview. The evidence showed, however, that Moshe was receiving in his home and community ABA program far more 1:1 teaching in many of the same teaching domains Moreover, in contrast to East Ramapo's "sketchy" and inadequate data, Moshe's home ABA team has been collecting and maintaining data on Moshe's progress; and such data gives credit where it is primarily due. Moshe's mother never said that "all" the credit for Moshe's progress was due to his home-based services, but she did testify that Moshe's progress "primarily" came from the services he was receiving *outside* of school.

For Prong III purposes, the record shows that Moshe's parents cooperated at every turn but were frustrated by a school district that was not even timely responding to basic requests for information (e.g. Ms. Brusco's failure over a period of almost six months to produce East Ramapo's ABA program binder) and which refused to provide Moshe even with a proper (autism) classification. The record shows that the very people charged with the responsibility to address and remediate Moshe's stuttering problem recklessly decided to *ignore* it and then arbitrarily refused to implement Dr. Blaustein's recommendations to mitigate and remedy the fluency problem that they had helped to create!

To be sure, there are recorded instances of school districts acting more abominably, but let it suffice to say that if East Ramapo were being graded on the

4

equities, it would not receive a passing grade. In any event, there are no compelling equities that would suffice to preclude or diminish the relief that is being requested here.

Finally, on the issue of compensatory education, we fully acknowledge that there must be a "gross" failure on the part of the local educational agency. We urge, however, that East Ramapo's failure/refusal to properly address Moshe's severe dysfluency, coupled with its reckless course of ignoring the problem over time, qualifies for an award of compensatory speech and language intervention to be provided by a stuttering specialist, in an amount deemed appropriate by the hearing officer. [5]

East Ramapo's failure to provide appropriate and individualized parent training and counseling in flagrant violation of Section 200.13.(d) of the Commissioner's regulations is another area where an award of compensatory education is warranted (in addition to reimbursement and declaratory relief). That failure, we urge, transcended the 2004-2005 and 2005-2006 school years (and the applicable Summer time frames).

**East Ramapo's Stipulation To Assume The Prong I Burden**

The hearing started out prior to the Supreme Court's decision in Schaffer v. Weast. At the time, East Ramapo assumed the burden of persuasion on Prong I, as well as the burden of production. By the time of the second day of hearing (November 15, 2005), the Supreme Court had rendered its decision. On that date, however, East Ramapo's counsel stipulated that East Ramapo would continue to assume the burden of proof. (Tr. p. 262) Ultimately, we ask the hearing officer to cut through the "burden"

---

[5] Moshe's compensatory claim for additional speech and language intervention spilled over from the 2004-2005 school year into the 2005-2006 school year. (Tr. pp. 64-65) East Ramapo could have taken action to mitigate its exposure but it *continued* to inadequately address Moshe's severe dysfluency (stuttering) problem.

issues and rule that they were rendered moot because ultimately, Moshe met the burden of proof and the burden of proof as to all pertinent issues.

## THE APPLICABLE LEGAL STANDARDS

### The Three-Part Test for Reimbursement

The Burlington/Carter reimbursement analysis requires a showing that: 1) the proposed IEP, either procedurally or substantively, is inadequate to afford the child a free and appropriate education, 2) the private education services obtained by the parents were "appropriate" to the child's needs, and 3) equitable considerations do not bar or diminish the requested relief. Burlington, 471 U.S. 359, 370 (1985); Florence County School District Four v. Carter; 510 U.S. 7 (1993), Walczak v. Union Free School District, 142 F.3d 119, 129 (2d. Cir. 1998). To provide FAPE, an LEA must comply with the procedural requirements set forth in the IDEA, and the IEP developed through the IDEA's procedures must be "reasonably calculated" to enable the child to receive a meaningful educational benefit. Mrs. B. v. Milford Board of Educ., 103 F.3d 1114 (2d Cir. 1997).

Conduct that smacks of "predetermination" is impermissible. Conduct that smacks of school districts following unwritten *policies* also is impermissible. It also is a classic no-no when the school district fails to meaningfully include the child's parents as equal members of the IEP team. See, e.g., Deal v. Hamilton County Bd. Of Educ., 392 F.3d 840 (6th Cir. 2004), en banc denied (2005), cert denied (2005).

While, concededly, not *every* violation is considered "material," the Supreme Court and Congress have greatly emphasized the importance of the procedural provisions found in the IDEA. Board of Ed. of Hendrick Hudson Central School Dist., Westchester

Cty. v. Rowley, 458 U.S. 176, 205, 102 S. Ct. 3034 (1982) ("the importance Congress attached to these procedural safeguards cannot be gainsaid"). The Supreme Court in Rowley held that the "free and appropriate public education" required by the IDEA means an education which must be "tailored to the unique needs of the handicapped child by means of an individualized educational program." 458 U.S. at 181-82.

At its core, the IEP must be "reasonably calculated" to provide the child with a meaningful educational benefit. What is meaningful will, of course, depend on the child's individual needs. According to the Court of Appeals in the Deal case, while the school district need not optimize a child's educational program to make the child reach his or her potential, the school district must, however, consider the child's potential (i.e. the child's strengths and deficits) in determining what kind of a program is meaningful.

Accordingly, an appropriate program begins with an IEP which accurately reflects the results of *evaluations* to identify the child's needs, provides for the use of appropriate special education services to address the child's special education needs, and establishes annual goals and short-term instructional objectives which are related to the child's educational deficits. S.H. o/b/o I.H. v. State-Operated School District of the City of Newark, 336 F.3d 260, 264 (3d Cir. 2003).

Among other mandatory statutory requirements, the IEP must contain "appropriate *objective* criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." Rowley, 458 U.S. at 182. The essence of the decision in Rowley is the Court's holding that an IEP must be "reasonably calculated" to provide personalized instruction with sufficient support services to permit the child to meaningfully benefit from such instruction.

The IEP is the "primary vehicle" of the IDEA's implementation. Honig v. Doe, 484 U.S. 305, 311, 108 S.Ct. 592, 597 (1988). "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Honig, 484 U.S. at 311, 108 S.Ct. at 598.

The annual goals in Moshe's case include "benchmarks or short-term objectives." 34 C.F.R. § 300.347(a)(2). These "benchmarks or short-term objectives" are critical to the strategic planning process used to develop and implement an IEP for any child with a disability. 34 C.F.R. Part 300, Appendix A p. 58. The failure to include sufficiently specific and *measurable* goals and objectives can itself be sufficient so as to constitute a denial of FAPE. In Re Sara P., 1988-89 EHLR 401:260 (SEA Wash. 1988).

### The More Relaxed Reimbursement Standard Applicable To Prong II

The Prong I determination of whether or not the Board's program denies the child a FAPE leads directly into the second prong of the Burlington/Carter analysis, in which the court considers whether the educational services secured by the parents were "appropriate" to the child's needs. In School Comm. of Burlington v. Dept. of Educ. of Mass., the Supreme Court held that a parent who can show that the education offered by the public schools is inappropriate may unilaterally place the child in a private educational setting and obtain reimbursement for tuition and other expenses provided that the child's privately funded service *is* appropriate. 471 U.S. 359, 105 S.Ct. 1996 (1985).

In Florence County School District Four v. Carter, the Supreme Court extended its holding in Burlington to clarify that under appropriate circumstances, a court may order reimbursement for parents who unilaterally withdraw their children from public

8

school settings which are not providing FAPE, even if the private educational setting

selected by the parents does not comply with all of the Act's procedures and requirements

(e.g., a school or program which is not yet "state-approved" or "certified"). Florence

County School District Four v. Carter, 510 U.S. 7, 114 S. Ct. 361 (1993).

As noted above, the Second Circuit's recent decision in Frank G. is highly

instructive. In that case, the Court held that there is a less stringent, far more *relaxed*

standard that is applied to Prong II reimbursement claims. Once Prong I is established, a

parent's choice under Prong II need not be perfect, need not satisfy all the child's needs,

and need not even be provided in the child's least restrictive environment.

### Equitable Considerations under Prong III

The third prong of the Burlington/Carter test requires the court to consider

whether or not equitable considerations bar relief. Under 20 U.S.C. § 1412

(a)(10)(C)(iii)(III), a tuition reimbursement award may be reduced or denied "upon a

judicial finding of unreasonableness with respect to actions taken by the parents." A

reimbursement award can be impacted if the conduct of the parents would serve to defeat

the purposes of the IDEA statute. A reimbursement award should not, however, be

reduced due to "[v]igorous advocacy [which] is an anticipated by-product of a policy

encouraging parental involvement." See Warren G. v. Cumberland County School

District, 190 F.3d 80, 86 (3d Cir. 1999)(referencing Board of Education v. Rowley, 458

U.S. at 209, 102 S.Ct. 3034, which commented that "parents... will not lack ardor in

seeking to ensure that handicapped children receive all of the benefits to which they are

entitled by the [IDEA]").  See also M.C. v. Central Regional School District, 81 F.3d 389 (3d Cir. 1996).[6]

Under this framework, then, it is fundamental that the hearing officer first look to whether East Ramapo offered Moshe a free and appropriate public education.  In Application of a Child with a Disability, SRO Appeal No. 03-003, the State Review Officer partially sustained an appeal of a case wherein an impartial hearing officer denied a reimbursement claim based solely on the determination that equities did not support the claim.  Citing to Bernardsville Bd. of Educ. v. J.H., 42 F.3d 149, 158 (3d Cir. 1994), the State Review Officer "'...recognize[d] that the school district has the duty in the first instance to provide an appropriate IEP....'"  Thus, the State Review Officer recognized that even where the parents' conduct may be questionable, the school district cannot escape its duty to offer a free and appropriate public education.  SRO Appeal No. 03-003.

In Warren G. v. Cumberland County School District, 190 F.3d 80, 86 (3d Cir. 1999), where "the District failed to come forward with appropriate IEPs and there [was] no finding that the parents' conduct obstructed its ability to do so[,]" the Court noted: "In those circumstances it makes little sense to determine the amount of reimbursement not with reference to what is required by the IDEA to provide an appropriate education but by comparing the conduct of the school district with that of the parents...."  See 190 F.3d at 86.

---

[6] Thus, while East Ramapo attempted to make out an equitable circumstances defense by claiming, for example, that Moshe's parents were "loud" and "rude," the record shows that East Ramapo was frustrating and brushing off Moshe's parents.  If Moshe's parents were at all turning up the volume a bit, it was only because they were dealing with a school district that was not "listening" in the true sense of the word. Since Moshe has a serious stutter and really cannot advocate for himself, we are confident that the IHO will agree that while Moshe's parents were zealous advocates for their son, their conduct was extremely reasonable under very trying circumstances.

Thus, even if East Ramapo thought that Moshe's parents were not cooperating – which we respectfully submit is not supported by the evidence presented in this hearing – East Ramapo still had the responsibility to offer Moshe a free and appropriate public education. East Ramapo failed in this regard, and it did so procedurally as well as substantively.

**Moshe's ("Autism") Classification Claim Is Not Moot**

There was a lot of confusion at the hearing concerning the viability of Moshe's claim that East Ramapo failed and refused, despite parental protest, to properly classify Moshe under "autism." On this point, we must set the record straight and we contend that the IHO needs to rule on this point. This is an important threshold issue that transcends other related claims.

Where, as here, a child carries a prior diagnosis of PDD-NOS (Pervasive Developmental Disorder, Not Otherwise Specified), as a matter of law, this qualifies for an autism classification once the child turns five and is of school age. SRO Appeal No. 00-016; SRO Appeal No. 99-3; SRO Appeal No. 91-28.

In Moshe's July 29, 2005 demand for a hearing (P-A), one of his central claims is the contention that East Ramapo improperly failed and refused to classify Moshe under "autism" and the related claims that East Ramapo failed to properly assess Moshe's present levels, and then failed to comply with Section 200.13(d) of the Commissioner's regulations applicable to children (like Moshe) who have been diagnosed with an autism spectrum disorder.

11

On the first day of hearing, East Ramapo's counsel offered "And if, in fact, it should be your determination that the child shold be classified as autistic and not as IHO, the district has absolutely no objection to doing that." (Tr. p. 41)

This was the equivalent of giving Moshe "ice in Winter" as East Ramapo did not have a genuinely defensible position on the classification claim. East Ramapo never made a timely pre-hearing offer of judgment to change Moshe's classification to autism. East Ramapo never capitulated on the issue as part of a pre-hearing resolution meeting. More importantly, we assign fault and consequence to East Ramapo's failure and refusal to classify Moshe under "autism," because we believe it to be a deliberate attempt to evade the mandatory requirements of Section 200.13(d) of the Commissioner's Regulations.

On the first day of hearing, there was some talk on the record as to whether or not East Ramapo's offer to change Moshe's classification to "autism" would serve to render the classification claim moot. At page 58 of the transcript, Moshe's counsel communicated that the IHO still needed to decide Moshe's classification claim on the merits. Moshe's counsel and East Ramapo's counsel then stipulated on the record, at pages 60-61, that the classification claim was still a live claim to be adjudicated by the IHO. Page 63 of the transcript reflects that the classification claim stayed on the table.

Later on in the proceedings, there was some confusion as to whether or not the classification claim was still on the table. East Ramapo's counsel almost had the IHO convinced that the claim had been rendered moot. However, as shown above, the record establishes that Moshe properly brought such claim, and is entitled to an adjudication on such claim.

We are requesting a declaration from the IHO to the effect that (a) Moshe was eligible for an autism classification because of his prior PDD diagnosis; (b) Section 200.13(d) of the Commissioner's Regulations provide special protections to children who are classified under "autism"; (c) Moshe's parents specifically requested and discussed at length that Moshe should be classified under "autism"; (d) East Ramapo refused at Moshe's June 15, 2005 IEP, to classify Moshe under "autism" and (e) certainly as at the June 15, 2005 IEP meeting, Moshe should have been properly be classified under "autism" and been provided the special protections mandated under Section 200.13(d) of the Commissioner's Regulations.

### THE EVIDENCE

**The Testimony of Dr. Amy Albers**

Dr. Albers spoke generically of her experience and education in autism. (Tr. pp. 71-72) She considers herself a "case manager." Dr. Albers identified SD-3 (the preschool/Summer IEP dated June 15, 2005) and SD-4 (the 05-06 school year IEP). Moshe's parents accepted the IEP program "without prejudice." (Tr. p. 100) (SD-19)

Dr. Albers admitted that Moshe is diagnosed with PDD and meets criteria for an autism classification. (Tr. pp. 119, 120, 135)

Dr. Albers testified that when the IEP team met on June 15, 2005, "there had been an increase in the dysfluency [stuttering] that had become for people at the time, Moshe's dysfluency." (Tr. p. 117)

In what would be revealed later on as quite an understatement, Dr. Albers described the Grandview program as follows" "They are not doing discrete trials all day." (Tr. p. 125) She claimed that there was some kind of "ongoing FBA" (Tr. p. 126) She

13

also claimed that the number of discrete trial ABA hours was "dependent on the child."
(Tr. p. 216) When asked to estimate how many hours of discrete trial ABA a child would
receive at Grandview, she said "a couple of hours." (Tr. p. 217) This testimony was
neither reliable nor accurate, because when Ms. Brusco (the classroom teacher) took the
stand, she confirmed that there was approximately a half-hour a day devoted to discrete
trial, with another half-hour of 1:1 instruction in reading and the like.

Dr. Albers confirmed that Dr. Blaustein's report (SD-14) was received and
reviewed by the IEP committee. The only problem was, East Ramapo did not go along
with Dr. Blaustein's recommendations. (Tr. pp. 157-58) This was arbitrary, as East
Ramapo did not even seek a corresponding counter-evaluation from its own expert.

Even though Moshe's parents signed the IEP's "without prejudice," Dr. Albers
claimed that she did not consider any issues to be outstanding. (Tr. p. 161) Nonsense.
Moshe's parents were pressing for an autism classification that East Ramapo steadfastly
refused to provide. (Tr. p. 162) They also were pressing for East Ramapo to fund
Moshe's home-based ABA program. (Tr. p. 164) Dr. Albers also knew that Moshe's
parents went outside the meeting room to consult with counsel. We contend that Dr.
Albers knew better—she knew or certainly should have known that there was a problem.

Dr. Albers, who certainly was in a position to testify unequivocally, said that she
did not "believe" that there was a policy in East Ramapo of refusing ABA on an extended
day basis for children who are of school age but that she could not speak to whether or
not there was a "practice" in that regard! (Tr. p. 167) In seven years with the district, Dr.

14

Albers could not recall a single instance of a child receiving ABA on an extended day basis. (Tr. p. 168) (Tr. p. 220)[7]

Dr. Albers agreed that the generalization of skills was a problem for Moshe. (Tr. p. 174) See also SD-4, p. 2 ("faces much difficulty in generalizing these skills"). (Tr.. p. 175) Dr. Albers, Moshe's "case manager," never made an effort to visit Moshe in his home, where significant programming was occurring. (Tr. p. 178)

Dr. Albers claimed that the IEP goals and objectives were clear and unambiguous, as well as objectively measurable. (Tr. pp. 199-208) Nevertheless, Dr. Albers herself struggled to give meaning to them, and was faced with the fact that they could be read lots of different ways i.e. they are neither clear nor objectively measurable. Dr. Albers then claimed that Moshe's lack of eye contact did not adversely impact his availability for learning. (Tr. p. 209) When she saw that no one in the hearing room was "buying" such testimony, she beat a hasty retreat. (Id.)

In the Summer 2005 IEP, (SD-3), Moshe's parents were getting two hours per month of individual parent training and counseling. For September of 2005 (SD-4), this went down to 30 minutes a month on an integrated basis. (Tr. pp. 227-28) No wonder East Ramapo refused the autism classification—doing so helped them to justify giving Moshe's parents short (and inadequate) shrift on this important support.

According to Dr. Albers, Moshe's fluency was not really an issue until the June 15, 2005 IEP. (Tr. p. 238) However, even when East Ramapo saw Dr. Blaustein

_____

[7] Surprise, surprise, surprise! Dr. Albers' conveniently opined that Moshe did not need any extended day ABA programming. (Tr. p. 184) That opinion, unfortunately, is brought to the IHO by the same people who decided not to do anything to address Moshe's dysfluency, allowing that problem to spiral to a rather severe level.

sounding the alarm in his report, and recommending 5 x 60 of speech per week, East Ramapo failed to take appropriate action. (Tr. pp. 238-39)

June 15, 2005 apparently is the first time that East Ramapo offered Moshe ANY individual speech and language. There was no individual speech during 2004-2005 and that is the period when Moshe's dysfluency "grew" to its highly problematic proportions. (Tr. pp. 242-43) Dr. Albers refused to recognize this connection. (Tr. p. 244-45)

Against Dr. Blaustein's recommendations for five hours of speech per week, East Ramapo came up with 3, 30-minute sessions per week. (Tr. p. 246)

Moshe's stuttering was causing him frustration. (Tr. p. 249) He was displaying non-compliance, but Dr. Albers would not acknowledge that connection either. (Tr. p. 250) She did, however, admit that Moshe had interfering behaviors, and that there was no FBA or BIP done. (Tr. p. 251-52)

P-X is a "student profile." (Tr. p. 410) While Moshe can "imitate," she had no concern about Moshe imitating the inappropriate behaviors of others. (Tr. 415) One of the other children in Moshe's class is a non-verbal child who is not even using PECS. (Tr. pp. 425-26) Another child had a LEITER (non-verbal test), and could not even complete his testing. (Tr. pp. 418, 432)    At best, Moshe "fits" with about half the other children in the class. (Tr. p. 441)

Dr. Albers denied that Moshe's stutter was profound and pronounced. (Tr. 420) Ms. Brusco apparently is in accord. Nevertheless, Moshe's expressive language falls in the second percentile. (Tr. p. 431)

Dr. Albers received SD-22, which is the Abboudi's June, 2005 letter. (Tr. p. 445) She did not read the letter as opposition to an OHI classification. When she received the

16

July 29, 2005 request for hearing, she still did not take action to change Moshe's classification. (Tr. 449) She said that she considered OHI the "better" classification, yet grouped Moshe with three other children having an autism classification. (Tr. p. 451) Dr. Albers denied that she was motivated by evading the burden placed on school districts by Section 200.13(d) of the Commissioner's regulations.

Dr. Albers would not admit that Moshe needed any individual speech during 2004-2005. (Tr. pp. 465-467) A child with PDD and dysfluency needing some individual speech? Nah! If you give a child some individual speech, there's no telling what that child's parent might ask for next.

Dr. Albers revisited her prior testimony about Moshe allegedly receiving "two hours" of 1:1 ABA per day, and claimed that at a "minimum," Moshe receives an "hour" of 1:1 discrete trial per day. (Tr. p. 473) She also said that this was confirmed by Ms. Brusco, the classroom teacher. (Tr. p. 476) However, when Ms. Brusco took the stand, she retreated from such testimony and admitted that at most, Moshe is receiving about a half-hour a day of 1:1 discrete trial teaching. This is significant on the issue of progress attribution, because Moshe has a 15 hour per week 1:1 ABA home program paid for by his parents. (Tr. p. 481) Dr. Albers did say, however, that the home and school staff are "communicating." (Tr. pp. 484-85)[8]

As to a request for program data from Gan Ezra (HASC), Dr. Albers said "we haven't gotten anything from them." (Tr. 493) Unfortunately, the HASC teacher from 2004-2005 is "gone." (Tr. p. 494)

---

[8] This proceeding does not present a "methodology dispute," where the school district is pitting its "Advil" against a parent's choice of "Extra Strength Tylenol." Dr. Albers acknowledged that nobody is contending that discrete trial ABA is inappropriate for Moshe. (Tr. p. 483)

Relevant to the classification issue, and the claim going to the district's failure to properly assess Moshe's "present levels," Dr. Albers said that neither the CARS (Childhood Autism Rating Scale) nor the GARS (Gillian Autism Rating Scale) was employed to assess Moshe. (Tr. pp. 497-99)  Yet, the district arbitrarily decided to refuse Moshe's parents' request for an autism classification.

There was a discussion at Moshe's IEP meeting about his regression. (Tr. p. 501) Somehow, without any notes on the subject, and without any indication on SD-4, and after going to hundreds of IEP meetings each year, Dr. Albers miraculously "remembered" to minimize Moshe's regression. (Tr. p. 503)

Dr. Albers spoke about Moshe's "compliance" issues. (SD-4, p. 5)(Tr. pp. 538-39)  There was a reference to Moshe's "problem with stutter interferes with his ability to complete tasks." (Tr. p. 526) (SD-4, p.4)  The IEP notes that Moshe "requires intensive individual instruction in order to learn skills and decrease oppositional behavior." (Tr. 539)  Everyone at Moshe's IEP understood and accepted that Moshe presented with interfering behaviors. (Tr. p. 540)

East Ramapo did not do an assistive technology evaluation. (Tr. p 546)

On November 16, 2006, East Ramapo rested its case in chief. (Tr. p. 570)

**The Testimony of Marlene Slackman**

Ms. Slackman is the chairperson of the CPSE. (Tr. pp. 265-66)  She chaired the 4/27/04 IEP. (P-P)(P-Q)  There was concern even then about Moshe's "generalization." (Tr. pp. 272-73)

Ms. Slackman contended that it was mere "clerical error" that the 2005-2006 IEP did not contain 2 hours per month of parent training and counseling. (Tr. p. 282)

18

She saw Moshe 10 days before her testimony, but denied that such observation was in anticipation of her testimony. (Tr. p. 283)  Despite her glowing accolades concerning Moshe and his ostensible progress, she had no notes.  (Tr. p. 284)  She saw no 1:1 teaching in his class and there was no discussion regarding his dysfluency, his behaviors, his dysfluency, or any of the ABA hours he was getting at home. (Tr. pp. 285-289)

There was an April 27, 2004 IEP developed for the 2004-2005 school year.  (Tr. p. 293) (P-V) Moshe's parents put East Ramapo on notice of potential claims, and their dissatisfaction with Moshe's programming. (Tr. p. 302) (P-V)  At this IEP, Moshe's parents said that they wanted more hours.  Ms. Slackman made no effort then to see Moshe's home ABA program. (Tr. p. 208-309)

Ms. Slackman admitted that many of Moshe's skills were learned through "discrete trials" ABA. (Tr. p. 311)  To address Moshe's generalization problem, her thought was not to add extra ABA hours at home, but rather to "move" some of Moshe's ABA hours at school to home. (Tr. p. 311)  This is East Ramapo's erroneous "pizza pie" approach to providing services.

Significantly, only 11 of 37 goals and objectives in Moshe's 04-05 IEP were claimed to have been mastered by East Ramapo. Ms. Slackman admitted that there was a degree of "subjectivity" to the goals. She simply accepted what she had been told by Moshe's teachers. (Tr. pp. 321-22)

As noted above, there was no individual speech for Moshe during the 2004-2005 school year.  Moshe's dysfluency came up at the end of the 04-05 school year, with the production of Dr. Blaustein's report. (Tr. 323)  Moshe's dysfluency was not even

mentioned in P-P. It just was not considered a primary problem by East Ramapo. (Tr. p. 325) None of the district's tests went to the issue of dysfluency or stuttering. (Tr. pp. 327-28) This, we urge, points out East Ramapo's gross failure to properly assess Moshe's "present levels."

According to Ms. Slackman, the district personnel thought that Moshe's dysfluency would "go down" over time, by itself. But that did not occur. (Tr. p. 335) That was apparent enough by the time the team got Dr. Blaustein's report. (P-D) (SD-14)(Tr. 335) East Ramapo hardly needed Dr. Blaustein's report to see that Moshe had a severe stuttering problem. This is something that it would have "discovered" had it done its own due diligence in assessing Moshe's "present levels." Had East Ramapo checked with any genuine stuttering specialist, it also would have "discovered" that ignoring stuttering is an ancient Bubbemeiser that is not followed in modern times. Ignoring Moshe's stuttering is about the last thing one should do.

Page 5 of P-P (04-05 speech goals) shows that fluency problems were already being recognized, but there apparently was no plan to deal with those problems. (Tr. pp. 336-37) The measurement date was June 15 and as Ms. Slackman admitted, she had "no way of knowing" if Moshe's stuttering was growing worse by the day. (Tr. p. 339) East Ramapo was not tracking or properly assessing Moshe's "present levels" in the important area of his dysfluency.

Prophetically, it was Ms. Slackman herself who challenged Dr. Blaustein's recommendations and opinion by questioning whether or not it would be any more valid than what Dr. Karin Wexler of Columbia University would say. (Tr. 346) By doing this, Ms. Slackman cleverly suggested that Dr. Wexler was working for the district, and that

her opinion was at odds with Dr. Blaustein. [9] Obviously, Ms. Slackman and East Ramapo had high regard for Dr. Wexler. Ironically, however, Dr. Wexler would appear later on in the hearing, testifying for Moshe and validating all of Dr. Blaustein's recommendations.

Ms. Slackman admitted that at Moshe's "joint" IEP meeting on June 15, 2005, Moshe's classification was the subject of "extended discussion." (Tr. 362, 401) Moshe's parents wanted "autism." (Tr. pp. 368-69) After all, Moshe had been in HASC's "autism" class. (Tr. p. 368)

D-24 is an ostensibly "corrected" IEP, sent during the hearing and only a week before Ms. Slackman's testimony. The "corrected" IEP reflects two hours per month of parent training and counseling. (Tr. p. 366) Ms. Slackman said that she would be surprised to learn that such counseling was not being provided. (Tr. p. 378) Ms. Slackman—we hope you are sitting down to hear the news, but it wasn't.

Ms. Slackman said that she did not "recall" Moshe's mother asking for more ABA hours. (Tr. p. 404)

Ms. Slackman (confirmed by counsel) said that she would confirm whether or not any Summer parent training and counseling was provided by HASC, but she never did. Moshe's mother, on the other hand, said that she never received any parent training and counseling during the 2004-2005 school year. (Tr. p. 385)

The Testimony of Elisheva Abboudi

Mrs. Slackman never responded to her May 5, 2004 letter (P-V). (Tr. p. 571)

There was a lengthy discussion at the June 15, 2005 IEP as to Moshe's classification. Moshe's mother wanted "autism." She was told that if she went along

---

[9] Ms. Slackman testified that Dr. Wexler had authored an "article" that ostensibly was supportive of the district's position, but she never produced it. (Tr. pp. 346-349)

with OHI, "it won't change anything at all" insofar as Moshe's services. (Tr. p. 576)
However, she sent SD-22 a couple of days later because she had continuing concerns that
OHI was the wrong classification. (Tr. p. 577)

There was no communication book during 2004-2005 and Moshe was stuttering
throughout that school year. (Tr. pp. 578-79)

HASC was telling Moshe's mother during the 04-05 school year "with stuttering
you do not interrupt."(Tr. p. 581) However, Moshe's mother did not see any
improvement. That is precisely why Moshe's parents went to go see Dr. Blaustein. (Tr.
p. 581) East Ramapo did not come out with their own report; rather, then simply offered
2 x 30 of speech. (Tr. p. 586) No speech and language person from HASC was present at
the IEP, and East Ramapo never justified its 2 x 30 speech offer. (Tr. p. 586)

Moshe's mother wanted to have Moshe evaluated for his speech issues. Moshe's
attorney gave her three possible names to check out, and she ultimately chose to go with
Dr. Blaustein. (Tr. p. 608)

Moshe was stuttering for a year before he was seen by Dr. Blaustein. (Tr. p. 609)
HASC personnel were saying that they were happy with Moshe's progress and not to
address Moshe's stuttering. (Tr. p. 640) This "Hacuna Mattata" approach was most
unhelpful for Moshe.

As at the June 15, 2005 IEP meeting, Moshe'stuttering had gotten worse. (Tr.
611) East Ramapo, without the benefit of any data, concluded in a fit of wishful thinking
that Moshe's stuttering was "diminishing." (Tr. p. 611, 613-14) Moshe's dysfluency had
turned into frustration. He was throwing off his glasses and hitting. He also was hand-

flapping, crying, grabbing, whining, etc. Was an FBA and BIP warranted? Of course it was. Moshe did not have to be chewing his shoulder off to warrant such supports.

HASC admitted that they were having "compliance" issues with Moshe (Tr. p. 617) but Moshe's parents never got a behavior plan they could use at home. (Tr. p. 618-19)

In contrast to the di minimus and inadequate 1:1 ABA discrete trial teaching that Moshe received at Grandview, Moshe's mother described Moshe's home-based ABA program as consisting of 15 hours of direct ABA teaching per week, with team meetings and parent counseling and training. (Tr. p 619) There also is data collection, an ABA program book. (Tr. pp. 619-20) Moshe's team addresses his compliance issues. (Id.)

Moshe's mother described Moshe's progress, his programs, and his dysfluency. (Tr. pp. 622-24)

HASC stopped in the Summer of 2004. Theracare started in November of 2004. (Tr. p. 625) HASC personnel were not able to schedule and attend with the requisite consistency. (Tr. p. 625)

P-CC is part of the communication book. (Tr. 1720)

Moshe's mother spoke to Ms. Brusco regarding P-DD, her November 2005 progress report. (1721) This was the only reporting on the IEP, and nobody explained its coding system, or why it was not tracking progress by specific percentage (as written). (Tr. p. 1721, 1722, 1724)

There were religious holidays in the first marking period (Tr. pp. 1725-26) andn Ms. Brusco herself had a significant number of absences. (Tr. 1726)

23

Ms. Brusco said that Moshe was receiving 5 hours of ABA each week.  (Tr. 1729) This was a surprise, as Moshe's mother had been led to believe the amount at school would be 10 hours per week.  (Tr. p. 1729-1732)

In 04-05, there was no ABA in the classroom—Moshe was receiving 10 hours a week of ABA outside of school.  Grandview, on the other hand, had "some" ABA. (Tr. p. 1733-34)

It was Dr. Albers who came up with the OHI classification.  (Tr. 1735)  Moshe's mother had requested an "autism" classification. (Tr. p. 1736)  Dr. Albers said it made no difference. (Tr. 1738)  If that, in fact, was really the case, then why would the district fight a parent so hard on such an issue?  The answer is that it DID make a difference under the Commissioner's regulations, and that mandate was driving the district to avoid an autism classification.  We urge that the district should have been more forthright with Moshe's parents, and disclosed the special protections that are available to students with autism under Section 200.13(d) of the Commissioner's Regulations.

At this point in the transcript, the IHO's somehow got the erroneous impression that the classification claim and issue had been rendered moot and was not to be adjudicated.  (Tr. pp. 1740-1742, 1743-1744).   East Ramapo's counsel did not help matters in this regard. This, however, was contrary to counsel's prior stipulation on the record.  (Tr. pp. 58, 63)  On the first day, the parties clarified that the classification claim was still a claim to be adjudicated in this proceeding.

Ironically, even very late in the proceeding, despite East Ramapo's prior promise to change Moshe's classification going forward, East Ramapo was still classifying Moshe as OHI on his then later IEP's (Tr. 1743, 1744).

24

As of her June 14, 2006 testimony, Moshe's mother STILL had not had an opportunity to get a copy of the ABA program book from Ms. Brusco. (1878-80) Ms. Brusco apparently had been stalling and stonewalling for months. She told Mrs. Abboudi that she was "revising the book." (Tr. 1883) Given the six months that Ms. Brusco had to "revise," she could have written War and Peace.

Ms. Brusco treated her "unprofessionally." (Tr. 1885-86)

It was the CPSE that recommended Dr. Karin Wexler. (Tr. 1890-92) How is it that the CPSE knew to recommend a private stuttering specialist, but failed to fund that need?

Moshe has been seeing Dr. Wexler three times a week. (1896) That's $450 per week. Moshe already is responding positively to this stuttering therapy. (1903)

Mrs. Abboudi has a B.A. in psychology, and has taught in Israel. (Tr. 1903-05)

Mrs. Abboudi attended the 6/15/05 IEP's. (Tr. 1907) It was basically one big meeting lasting two hours. (1908) She requested home based services (1918-19) And, she also was looking for reimbursement on a going forward basis. (1919-20)

Marlene Slackman said that she could have 10 hours at home, but with such hours to be "taken out of" Moshe's hours at school. (1921-22) She signed the IEP's "without prejudice" because of the outstanding speech and ABA issues. (Tr. 1925-26)

Moshe made "some" progress during the time at Grandview, but "most of it" is due to what Moshe is being taught in his home program. (1939)

Her communications with Ms. Brusco were limited, and there often was little or no follow through. (1950-67) Ms. Brusco was impolite at team meetings, but would not act that way in front of Dr. Albers. (1967)

25

Moshe's mother gave "primary" credit to Moshe's home ABA program for the progress Moshe had made. (Tr. 2023-24, 2031, 2038, 2039)

On rebuttal, after the conclusion of Ms. Brusco's testimony, Moshe's mother confirmed that she had tried on at least a half dozen occasions over the course of about six months to get to see the district's ABA program book. Finally, in June, 2006, Ms. Brusco let her see Moshe's ABA book for about 8 minutes. (Tr. p. 2580)

As for the so-called parent training and counseling received from school psychologist Robin Bernstein (who was not called by the district), it was Mrs. Abboudi who would raise issues in a single, 30 minute per month meeting with Ms. Bernstein. Ms. Bernstein would basically say "it's okay" and treat Mrs. Abboudi like a psychotherapy patient on a couch. Ms. Bernstein never once gave Mrs. Abboudi any instructions or recommendations as to how to deal with Moshe. (Tr. p. 2582)

**The Testimony of Dr. Steven Blaustein**

Dr. Blaustein has his Ph.D. from CUNY and is ASHA certified. He is an EI provider and evaluator. In a 33 year career, he has worked with "hundreds" of children diagnosed with autism spectrum disorders. He has consulted to New York school districts, including on Long Island. (Tr. pp. 590-91) He treats about 30 children per week. He is not, however, treating Moshe. (Tr. pp. 592, 604-05)

Dr. Blaustein's notes were marked as P-Z, with his report coming in as P-D.

Dr. Blaustein learned that Moshe's stuttering began in December of 2003, and was getting worse. (Tr. p. 595) Dr. Blaustein was "struck" by what he characterized as a "severe" dysfluency problem—one that adversely affected his behavior. (Tr. pp. 595-96, 599, 601)

26

We asked Dr. Blaustein straight out whether or not East Ramapo's 05-06 offer of 2, 30 minute sessions was reasonably calculated to produce a meaningful educational benefit. Dr. Blaustein said "no." (Tr. p. 604)

On cross, Dr. Blaustein explained why he recommended 5, one-hour sessions for Moshe. (Tr. 1275-76)(1292-93) (Tr. 1286-88)  His belief that Moshe presents with a severe dysfluency is based on "my time spent with him, what I observed during the evaluation, etc." (Tr. 1535)  With less than five hours a week, Moshe will learn less, it's that simple. (Tr. p. 1537)  A speech level of 3 x 30 would not produce meaningful progress. (Tr. p. 1538)

Dr. Blaustein said that he was qualified to look independently at a child and assess whether that child has speech and language deficits. Translation:  Dr. Blaustein can assess a child "fresh" and does not need to see a mountain of reports. (Tr. 1542)

Dr. Blaustein first came into contact with Moshe's counsel years ago, in assessing HIS son. (Tr. pp. 1544-45)  Since 1997, out of the many hundreds of hearings that Moshe's attorneys have done, Dr. Blaustein has testified in perhaps 3-5 cases.

Just for the dysfluency issue alone, Dr. Blaustein would be recommending hours of services.  In fact, he said that Moshe could benefit from a level of services even higher than five hours per week. (Tr. 1546)

Dr. Blaustein confirmed that there are a multitude of ways to provide effective programs to Moshe. (Tr. 1548)

**The Testimony of Christina Hauser**

Ms. Hauser has been working with children for roughly 15 years, the last five years in an ABA format.  She is dually certified. Her supervisor is Dawn Sanchez.  She

received ABA training from Theracare and from Dr. Vincent Carbone of the Carbone
Clinic in Valley Cottage, New York. (Tr. pp. 631-33)

She began with Moshe in November of 2004. (Tr. p. 632) Dawn Sanchez also
became involved at that time. (Tr. p. 633) There has been good provider consistency on
Moshe's program. (Tr. 634) In addition to the "direct" ABA hours, there also is time for
team meetings, email and phone communication. There also is a communication
notebook, and an ABA program book. (Tr. pp. 633-36)

The home ABA team takes data on Moshe's progress, and his non-compliant
behaviors. (Ttr. pp. 636-37)

Moshe was stuttering back in November, 2004, but it has gotten worse. (Tr. p.
642) She spoke personally with HASC in the late Winter or early Spring (of 2005),
HASC's strategy was to let Moshe go as long as he could "until he worked it out." (Tr. p.
644) Thus, East Ramapo left Moshe to his own devices, believing that the only
intervention needed was the passage of time. East Ramapo apparently thought of Moshe
as if he were a bottle of wine (i.e. his stuttering would improve with age). East Ramapo's
strategy was not working. (Id.)

Ms. Hauser attended Moshe's June 15, 2005 IEP. (Tr. p. 647) She provided input
as to his home program. She had a notebook, but she was in the process of moving and
doing a renovation, and records were in storage. (Tr. 654)

Moshe made progress in 04-05 with his ABA programs at home. (Tr. pp. 656-57)
We explored Moshe's data collection system. (Tr. 659) We also explored the team's use
of reinforcement, incidental teaching, and teaching Moshe how to play independently
and reducing prompt dependency. (Tr. p. 667, 668)

Moshe's frustration levels have decreased. (Tr. p. 669) With 1:1 teaching, Moshe continues to learn.

Looking at SD-4 (the 6/15/05 IEP), Moshe's parents did request additional ABA, but she could not recall the specifics. (Tr. 788) She prepared P-F, her April 10, 2005 report. (Tr. 788-89) Moshe is receiving 10 hours a week of direct 1:1 ABA, with Hauser providing all of the direct hours. (Tr. 789) Ms. Hauser has seen Moshe's progress. (Tr. pp. 790-95) Data has been collected. (Tr. 792)

Theracare contracts with numerous area school districts, Not surprisingly, it is "policy" that Theracare personnel are not allowed to make recommendations. Reports get "kicked back" if recommendations are made. (Tr. 798)

Ms. Hauser went through Moshe's numerous (home-based) ABA programs. (Tr. pp. 798-799) Overall, Moshe made meaningful progress. (Tr. 801, 805-09) She also discussed Moshe's biggest deficits, including compliance, communication, anger, and communicating his frustration.  When he is being challenged, there is an increase in behaviors. (Tr. pp. 811-12)

Ms. Hauser identified Moshe's communication book for the period January, 2005-March, 2005 (P-LL). She went over Moshe's ABA programs and described her communications and conversations with Moshe's classroom teacher. "We try to incorporate things that they're doing at school." (Tr. p. 950) Ms. Brusco told Ms. Hauser that there was data collection, but did not reveal any. (Tr. 965)

Ms. Brusco's approach was to use a lot of verbal prompting. (Tr. 975-77) Ms. Hauser disagreed with that approach because Moshe becomes highly dependent on that kind of prompting because of the attention that he receives. (Tr. p. 977)

29

Significantly, Ms. Brusco never once asked to see Moshe's home program book. (Tr. 979)

Moshe is making good and meaningful progress in his home ABA program.  (Tr. p. 984)  Ms. Hauser identified her recent daily session notes. (P-MM)

Ms. Hauser taught school as a substitute teacher.  She did her student teaching right in East Ramapo. (Tr. pp. 1006-08)

The team was not able to schedule a team meeting with Moshe's classroom teacher before December, 2005. (Tr. 1020,1024)  Ms. Brusco was not returning the telephone calls and emails.   There was difficulty in getting the district's documentation. (Tr. 1073)

Noncompliance has picked up (with demanding tasks, but not with mastered skills). (Tr. 1030)  In her view, the main goal was to supplement the IEP. (Tr. 1057)(Tr. 1106)  She went over problems in the district's data collection. (Tr. 1113-1115)

Moshe has noncompliant behaviors and interfering behaviors.  (Tr. 1118)  She described what Moshe's team does to address those behaviors, and how his incidental learning skills are emerging. (Tr. 1121)  Discrete trial is used to teach Moshe "new" skills.  When the skills are acquired, the team switches to (somewhat more natural) "incidental" teaching techniques.   (Tr. 1122-23)

Ms. Hauser said that at the June 15, 2005 IEP, Moshe's parents were requesting more speech and ABA services at home. (Tr. 1513-14)  She did not recall any specific discussions to develop goals and objectives at the IEP meeting. (Tr. 1517-18)

She emailed Ms. Brusco, but had difficulty getting Ms. Brusco to respond. (Tr. pp. 1521-22, 1523)

Ms. Hauser sees Moshe three times a week. Each session is two hours.  He has progressed. (Tr. p. 1525-27)

Ms. Hauser does not see Moshe in school, but the team leader, Ms. Sanchez, does. (Tr. 1529)  Ms. Sanchez reported to Ms. Hauser as to what was transpiring in school. (Id.)

**The Testimony of Kristina Young**

Ms. Young received her Master's in ABA from Columbia University. (Tr. 1335) She has significant experience working with children with autism spectrum disorders. (Tr. 1336)

Ms. Young first began providing ABA to Moshe in January of 2006. (Tr. 1339) She speaks with Christina Hauser and attends the weekly team meetings. She updates the goals and objectives.  She is in a data driven program and charges $45/hr. for her time. (Tr. pp. 1339-46)    She described why team meetings are necessary.  (Tr. pp. 1356-57)

Theracare's ABA book is set up as per Moshe's IEP goals.  (Tr. 1351)  According to Ms. Young, Ms. Brusco communicates what not to work on.  (Tr. 1354-55)  Ms. Brusco never once discouraged Moshe's home program from proceeding. (Tr. 1355)

The team meetings delineate what to work on at home vs. at school. (Tr. 1357) Ms. Brusco never asked to see Moshe at home. (Tr. 1360-61)

Ms.. Young worked on "theory of mind" and "perspective taking."  (Tr. 1363) Telling and retelling stories, focusing on the main idea. (Tr. 1363-66) These are problem areas for Moshe.  She also is working on working to filter out auditory and visual distractions, turn taking, complying with teacher directives, the proper expression of

31

emotions, and maintaining eye contact. (Tr. 1471-83) The team also is working on getting Moshe to initiate toileting. (Tr. 1491)

Moshe is making good and meaningful progress with his ABA programs. (Tr. 1375) Ms. Young is doing about 4 hours per week. (Tr. 1389) Moshe's parents are receptive and involved. (Tr. 1392-93)

### The Testimony of Adele Rapp

Ms. Rapp does <u>not</u> have a Master's degress in speech. (Tr. 686) She does not have her CCC-SLP.

Ironically, while Ms. Rapp was called to speak to the "speech" issue for the district,. she had a lot of difficulty keeping her voice up, and she came accompanied by supervisory personnel. (Tr. p. 686-88)

During 04-05, Ms. Rapp said that she chose not to start working on some of Moshe's goals and objectives. (Tr. 690-92) She saw Moshe twice a week for a total of one hour, but in a group. (Tr. 692-93) None of the goals were scored as having been "mastered." (Tr. 696) Still, like Dr. Albers, Ms. Rapp was not able to say whether or not Moshe needed any direct, 1:1 speech! (Tr. p. 702-03) She actually ventured that there were "pros and cons" with giving Moshe some individual speech. (Tr. p. 704) [10] Ms. Rapp, who is no speech expert, said that she did not see Moshe's stutter as so pronounced. (Tr. 707)

Ms. Rapp said that she and her supervisor concluded that Moshe was "very young" and that by "calling attention to the problem," it would get worse, so "we felt better to not address it." (Tr. p. 708) Bad move. It also was a bad move to the extent that she took absolutely no data to measure Moshe's dysfluency problem.

---

[10] Now we have seen everything.

Ms. Rapp said that she had a "stuttering course" once during her Bachelor's but she could not recall what she was taught. (Tr. 715)  She did not attend Moshe's June 15, 2005 IEP. SD-17 is her report, and it really does not focus on Moshe's dysfluency. Ms. Rapp never formally tested Moshe for his stuttering. She took no data.  She thought Moshe was "moderately impaired."  Ironically, she was so reluctant to testify, she had her hand over her mouth. (Tr. 721)

Ms. Rapp continued to refuse to answer whether Moshe needed any 1:1 speech. (Tr. p. 722)  She made no recommendation because she believed it would be "illegal" for her to do so (Tr. 723)[11]

Referring to SD-17, she acknowledged that her report did touch upon Moshe's stuttering. (Tr. 726-27)  At age 4.5, she had ranked Moshe's speech at the level of a 2.7 year old child. (Tr. 731)

There was a significant "disconnect" between Ms. Rapp's evaluation of Moshe's perceived deficits, and the goals and objectives proposed for 05-06. (Tr. 732-737)  Even Ms. Rapp admitted "these are broad goals." (Tr. 737) Ms. Rapp admitted that the goals and objectives for speech were not even developed at Moshe's IEP, which she did not attend. (Tr. pp. 737-38)  She got the goals out of a "handbook." (Tr. p. 739)[12]

Ms. Rapp could not make sense out of the progress coding.  She admitted "I don't work with stuttering too much." (Tr. 753)  Maybe that is why Moshe's stuttering was not even noticed until AFTER January of 2005. (Ttr. 755)

Even on cross-examination by East Ramapo's  counsel, Ms. Rapp could not answer whether or not Moshe's stuttering impeded or prevented Moshe's learning.  (Tr.

---

[11] Where do East Ramapo's witnesses come up with these excuses?
[12] Such evidence helps to give the IHO a window of insight as to how Moshe's stuttering was allowed to worsen to such a severe stage.

p. 757)[13] One thing came out—Moshe's stuttering was bad enough that Ms. Rapp felt compelled to discuss the problem with her supervisor. (Tr. p. 768)

Goals and objectives were written to be tracked by percentage, but that is not the way that Ms. Rapp measured progress. (Tr. pp. 776-778)

Ms. Rapp was going to produce her "session logs." (Tr. 773) However, we never did see them.

**The Testimony of Marcy Glicksman**

Moshe had three different speech type providers in 04-05. One provider left mid-year. (Tr. p. 993) There was no policy of making up any unfulfilled therapy hours. (Tr. p. 996)

Ms. Glicksman admitted that she tracked a "percentage" IEP with "letters" (as opposed to percentages). (Tr. pp. 1004-05)

**The Testimony of Dawn Sanchez**

Ms. Sanchez is certified in elementary (general) education and special education. (Tr. 814-15) This helps her to promote the general curriculum. She has worked with many children over the years, and supervised many cases. She has had prior dealings with East Ramapo, and she discussed he problems she has experienced when recommendations are made in a report. (Tr. 817-18)

She attended the 6/15/05 IEP. (Tr. 819) Moshe's parents asked for additional ABA hours at home, over and above SEIT support at school. (Tr. p. 819) She agreed that Moshe had great difficulty "generalizing." (Tr. pp. 820-21)

---

[13] East Ramapo's argument is akin to going in to see the dentist for an impacted tooth, and the dentist only wants to talk about all the "good" teeth in your head that are not giving you a problem. This is to avoid, if not evade, the central claim on the speech and language programming.

Theracare provided ABA in the home and she oversees the program day to day. (Tr. 822) She sets up and supervises data collection. There is discrete trial, but also different ABA approaches delivered 1:1. She described the prompt hierarchy and the fading of prompting to promote independence. She also spoke of her overlap with Christina Hauser for meetings, and the use of "incidental teaching." (Tr. pp. 824-830)

Her work also includes a component for parent training and counseling. (Tr. 831-32) Especially to address Moshe's many interfering behaviors. (Tr. 833)

Moshe gets frustrated in expressing himself verbally. He has problems recognizing the emotional states of others. (Tr. pp. 834-35)

Ms. Sanchez saw SD-15, Ms. Hauser's April 19, 2005 report. She saw it before it was finalized. (Tr. 836)

Ms. Sanchez discussed Moshe's programs, which are modified based on his progress. She said that the extra ABA hours Moshe is receiving at home, coupled with her supervision and team meeting hours, are appropriate for Moshe. (Tr. pp. 842-43) This teaching is helping Moshe to generalize his skills. He needs this additional support. (Tr. pp. 842-44)

She met with Moshe's teacher and she is working on similar skills. Moshe learns more at home (with his 1:1 teaching) and he then generalizes those skills to the classroom. (Tr. 870)

Ms. Sanchez asked Ms. Brusco at a meeting to show the ABA data from school, but Ms. Brusco did not do so. (Tr. 877) She never saw the school's ABA data.

Significantly, at this stage of the proceedings, East Ramapo's counsel stipulated that the services provided in the home program were "calculated" to benefit Moshe. (Tr.

35

927)  That seemed like a generous concession, but it would have done nothing to advance the Prong II issue, which must be adjudicated based on a finding of appropriateness in fact, not simply whether or not a program was "reasonably calculated" to be appropriate.

Ms. Sanchez reviewed P-LL, Moshe's ABA program book. (Tr. 1139)  She described the frustrating efforts to see Ms. Brusco's ABA data from the classroom. (Tr. pp. 1141-44)  She also said that Ms. Brusco had no interest in seeing Moshe's home ABA data, or any of it.  (Tr. p. 1145)  She also testified to her difficulty in getting into the classroom for an observation. (Tr. pp. 1156, 1161, 1145, 1194)

Ms. Sanchez said that Moshe is receiving 10 hours a week of direct ABA teaching 1:1 at home, on top of the ABA he is receiving at school.  Ms. Sanchez said that it would NOT be consistent with Moshe's needs to cut his home ABA.  (Tr. 1151)

In one hour, Moshe can get through 10-15 ABA programs. (Tr. 1154)  She testified about Moshe's home ABA programs, which included "wh" questions, cause and effect, letter identification, etc. (Tr. 1208)  She also explained why Moshe was being taught 1:1. (Tr. 1208-1216)

There were "compliance" issues at school.  Moshe was resistant. (Tr. 1213)  He engaged in "self-stims."  (See, e.g. Tr. 1232)

At the June 15, 2005 IEP, Mrs. Abboudi was asked to "choose" from 10 hours of ABA that ostensibly would be delivered at school.  She wanted additional hours at home over and above the ABA, if any, that Moshe was receiving at school.  Sanchez wrote in her notes, "If they label him OHI, he won't probably get ABA." (Tr. 1233-34, 1240)

Ms. Sanchez discussed her use of the word "stutter." (Tr. pp. 1243-47)  She explained how Moshe's ABA team prioritizes programming.  (P-OO)

36

Joint Exhibit 2 are emails concerning the "scheduling" issue. She did an observation in February of 2006. She also spoke with Ms. Brusco. (Tr. p. 1642-44) She saw Ms. Brusco doing discrete trial (DTT). Ms. Brusco never said how much 1:1 ABA Moshe was actually receiving in the classroom. Ms. Sanchez did not see any school ABA data. Ms. Brusco reported to her, however, that 1:1 teaching sessions were "inconsistent" with regards to Moshe's behavior. (Tr. pp. 1644, 1665)

Imitation programs are going on in Moshe's home ABA programs. (Tr. 1666-67) So are "WH" questions, social questions, sequencing, etc. (1668)

During her February 10, 2006 visit, she saw Moshe at Grandview sitting on the floor, speaking in a low voice to himself. He was not functional. (Tr. 1671-72)

She spoke of the multiple efforts to get to see the ABA program book at Grandview. (Tr. 1677)

Ms. Brusco controlled the time of her observation. (Tr. 1679) Ms. Sanchez otherwise would have stayed longer. P-OO are Ms. Sanchez' s notes of the 6/15/05 CPSE/CSE meeting. (Tr. 1692) Moshe's stuttering must have come up. Moshe's parents asked for more speech, and they also wanted an autism classification. They were told that Moshe would have to meet certain criteria. (Tr. pp. 1679, 1692, 1694-95, 1698, 1699)

**The Testimony of Dr. Karin Wexler**

Dr. Wexler was referred to as an expert in stuttering during the testimony of Marlene Slackman. She was held out as a source that might rebut Dr. Blaustein, but in actuality, she came in to testify for Moshe and in so doing, she testified so as to confirm Dr. Blaustein's recommendations.

37

Dr. Wexler has impeccable credentials and experience in fluency disorders. She is a true "expert's expert." She serves as the head of speech and language pathology and audiology at Columbia. The list of her qualifications goes on and on. (Tr. pp. 1755, 1760, 1756, 1763) School districts turn to her. (Tr. 1771) East Ramapo is a school district that has asked about her services. (1772)

Dr. Wexler spoke of the danger of generalists trying to address what is really a specialization issue. (Tr. pp.. 1756-57)(1771) She is board certified by the Board for Fluency Disorders. (Tr. 1759)

Dr. Wexler explained the significance of stuttering as a child diagnosed with an autism spectrum disorder. (1764-69) For a child with a stutter, leaving it alone is "the worst mistake that can be made." (1778-79) Significantly, East Ramapo failed to produce a single expert witness to even attempt to rebut such testimony—testimony also given by Dr. Blaustein.

The approach of "leaving it alone" is likely (i.e. calculated) to cause significant damage to the child. (Tr. 1781) She has seen poor outcomes when that kind of approach is utilized. (Tr. 1782)

Dr. Wexler began to see Moshe in May of 2006. (Tr. 1784) She did her own evaluation on Moshe before she saw the Blaustein report. (Tr. 1785-86) She did not use the only "standardized" test for stuttering because it is subjective and essentially useless. (1787-88)

Dr. Wexler first treated Moshe on May 5, 2006 (1790) and she described his severe stuttering, aversion to eye contact, etc. (Tr. 1792-93)[14] She recommends that

---

[14] We seek reimbursement relief for the sessions with Dr. Wexler.

Moshe be seen by a stuttering specialist for five hours a week. (Tr. 1794-95) He needs this level, according to Dr. Wexler. (Tr. p. 1796-97)

She had to train Moshe's parents (via some parent training and counseling) not to utilize techniques that the school district had taught them. These techniques are poor ones, because they can create secondary symptoms. (Tr. pp. 1795-96)

Moshe's parents cannot afford to pay for 5 hours per week. (Tr. p. 1797) The most they can afford is a couple of sessions with Dr. Wexler per week. Dr. Wexler's rate is $200/hr. (Tr. 1798-1799) This is within the market rate. (Tr. 1799) A 45 minute session would thus translate to $150 with Dr. Wexler. (1801)

Dr. Wexler is providing Moshe's parents with parent training and counseling. (Tr. 1800)

The average SLP does not have the training and experience to do what a stuttering specialist can do. According to Dr. Wexler, it also is essential that Moshe receive his speech services 1:1 because of the severity. (Tr. 1804-06)

Dr. Wexler identified a problem that has practical and political origins. School districts feel under "pressure" not to recommend stuttering specialists and refuse to admit that they are not trained and qualified to properly address stuttering. (Tr. 1810)

Dr. Wexler has no problem maintaining Moshe for a 45 minute session. (1812) he does not tantrum. He smiles and maintains eye contact, taking in everything like a sponge. (1813) Increase Moshe's communication and you will decrease his anxiety and behaviors, as he will feel happier and more productive. (Tr. pp. 1812-1814)

Dr. Wexler looked back on East Ramapo's admission that Moshe's speech had deteriorated over time. (1816) She said that she was competing with East Ramapo's

39

"history" of neglect. (1816) The 2 ½ hours a week of time she is giving Moshe is not enough. Moshe needs at least six solid months of seeing a stuttering specialist five hours per week before considering a decrease. (Tr. p. 1817)

Dr. Wexler gave an example of why it is important for Moshe to get his stutter under control. On one occasion, he was trying to tell his therapist how badly he needed to go to the bathroom. (Tr. p. 1819)

She described Moshe's stutter as a "true stutter," in case anyone still had any doubt. (Tr. p. 1819)

Moshe is responding positively to her stuttering therapy, but he still needs a full five hours per week. (Tr. p. 1822-23)

On cross-examination, Dr. Wexler, whom counsel was referring to on the record as "this lady" (1836-37) said that New York school districts paid her to provide therapy. (1827-28)

She said that since Moshe's stuttering had gotten worse, she had to conclude that Moshe was not getting any meaningful speech benefit from East Ramapo. (1840-41) It would only get worse without the 1:1 therapy she is recommending. (1846) Moshe still needs more sessions because "he's still not functional." (1849)

Moshe's stuttering is interfering with Moshe's ability to communicate with his teacher and peers, and it needs to be remediated even for "safety" issues. (1857)

Dr. Wexler's notes were received as SD-25.

She did not have to see Moshe's IEP to figure out what his problem was. (1870)

When school districts pay Dr. Wexler, they pay for her driving time and transportation. (1875-76)

**The Testimony of Adrienne Brusco (Maviglia)**

Ms. Brusco is not yet certified as a BCBA. She got the name of her "mentor" confused, and she was then unable to define behavioral terminology. (Tr. 2049-2051)

She explained the sequence of doing an FBA, but no FBA was done for Moshe. She did acknowledge that Moshe had non-compliance and interfering behaviors, sometimes to the point where he was not able to continue. (Tr. 2059, 2053-2054, 2058)

Her classroom ABA book was marked as P-BBB.

Ms. Brusco knew in the Fall of 2005 that Moshe was receiving ABA instruction in the home. She admitted that she did not know how many hours of 1:1 ABA Moshe was receiving in the classroom. (2077-78)

The district did not provide her with any criteria as to when to do an FBA. (Tr. 2081) She never had occasion to do an FBA for any student in her class. (Tr. 2081) She did, however, have discussions with Mrs. Abboudi about Moshe's behaviors in school. (2083) There is no BIP for Moshe within P-BBB.

Ms. Brusco's own attendance is reflected in P-CCC. (2056)

She did tell her class assistants not to speak with Mrs. Abboudi. (2091-92)

Ms. Brusco claims she did ask to see the home ABA book, but could not point to any written request attesting to such testimony. (2098-99) She knew about the due process litigation before she says she asked to see it.

We went over Moshe's school programs and why certain programs did not start, or did not start for months. (2114) We also discussed how Goldie Margareten came in

41

from HASC with a compliance "strategy," but it apparently backfired, because it only made matters worse. (2126)

She took no data as to changes in prompt levels. (2155) She could not see any regression in Moshe's drawing detail. (2157-58)

She claimed that a hand over hand prompt was a "gestural" prompt. (2168) In actuality, a gestural prompt is a much less intrusive prompt. (2169)

Ms. Brusco apparently had concerns that Ms. Margareten was lacking in skill levels. (Tr. 2192-93, 2208)

We showed Ms. Brusco P-DDD, and went over why Moshe was mastering things that were appearing at a very lowe level. (2218-19)

Goldie came to the classroom "maybe an hour" twice a week. (2225)

Compliance issues stood in the way of Moshe's performance. (2231) Compliance was a big issue at times. (2245) The report that Ms. Brusco filled out (P-RR) was very subjective. (2233-44)

She did not have Ms. Vasquez do any DTT with Moshe. (2252) She didn't start a token economy with Moshe until December or January. (2256) Nor did she ever do an FBA. (Id.) She would not have an aide do an FBA—they don't have the necessary skill sets. (2258)

As for P-RR-nobody from the district provided the criteria for scoring. (2263-64) The way that the IEP goals are written, "it could be anything." (2274) Yet, she maintained that the IEP goals and objectives were clear and unambiguous. (2308)

No data was taken on showing Moshe's turn taking with other children in the classroom. (2315) No data was taken on such "generalization." (2315)

Ms. Brusco admitted that her class was "not a data based class." (2317) Thus, there is a lack of any data as to the types, frequency and duration of Moshe's behaviors. (2337) There is not even any baseline data as to Moshe's behaviors. (2342-45)

Ms. Brusco told the district it was important that they have a BCBA level person. (2348)Ms. Brusco claimed that she got non-compliance when Moshe was being taught separately from a group, but this stands in contrast to Dr. Wexler's testimony—she had no problems teaching Moshe individually i.e. not in a group. (2359)

Ms. Brusco said that she refused to provide the ABA book because it was being "updated." (2364) She said that the Abboudi family was "loud" and "rude" to her. However, she also made it sound like there was not a pattern of requests over many months to see the ABA book. (2365)   We submit that Ms. Brusco left out a few important details.

There was one hour a day of 1:1 teaching in the classroom, and only a portion of that hour was devoted to discrete trial. (2367-70)

Ms. Brusco could not or would not say how many programs Moshe could get through in an hour session. 2377, 2393) She was afraid to commit to any standard because she clearly feared the consequences of providing that detail, or she did not have such detail to provide. She did deny, however, that Moshe's behaviors kept him from getting through more ABA programs. (2407)

In "revising" the ABA book, Ms. Brusco allowed that she may have recorded data for days that fell on weekends. She attributed this to human error. (2412-13) Sorry Ms. Brusco, but we would attribute this to recreating/revising/updating data so far after the

fact, and in such a last minute, end of year rush that she forgot to check the calendar to make sure that she did not record any data on weekends.

Ms. Brusco said that there were no district policies with respect to data collection. (2417)

We urge that Ms. Brusco is not an expert in any real sense of the word. Even East Ramapo's counsel initially took the position that "nor does she pretend to be." (2452-53) Then, however, he switched gears and claimed that Ms. Brusco is, in fact, an expert. (2454) Ultimately, the IHO ruled that he would hear and receive Ms. Brusco's opinions for what they are worth. (2454)

Ms. Brusco claimed that Moshe made some progress that was comparable to what a non-disabled child would do. (2479)

On redirect, Ms. Brusco said that she did not keep any log as to her discussions with Mrs. Abboudi. (Tr. 2508)

Ms. Brusco said that she did not "recall" how many times she was asked for the ABA program book before she produced it. (2522) She did not deny that there might have been at least a half dozen prior requests. (2523) She also admitted that when the Abboudi family was requesting to see the ABA program book, she thought the request was significant enough to bring to the attention of others. (2524) Perhaps that is why it took approximately six months of asking to get an 8 minute glimpse.

Ms. Brusco did not recall if Moshe had difficulty generalizing skills, on the basis that "youre asking me to think back a year...." (2528) Inexplicably, however, Ms. Brusco's memory came back so long as it was East Ramapo's counsel asking the questions.

Ms. Brusco and her counsel were unable to explain the ostensible meaning and operation of certain goals and objectives. (2533-35)

On the issue of Moshe's articulation, Ms. Brusco said that she did not necessarily "track" Moshe's progress—she just punted and claimed that his articulation was "average." (2543) She agreed that Moshe's intelligibility was impaired due to a lack of fluency. (2545) She said that Moshe had a stutter "at times" but did not recall if she told anyone about it. (2546)

By the end of the school year, Moshe could "unzip" his clothing, but he could not zip independently. (2547) During the middle of the school year, her 8:1:1 class turned into a 6:1:1 class as two children were taken out by their parents. (2558-2560) She admitted that she was unhappy with her classroom assistant, Ms. Vasquez. (2561) Ms. Vasquez was simply moved to another position within the district. (2562)

Even as at the end of the school year, Moshe's handwriting was a mess. (2564-2565) Ms. Brusco continued to repeat her rote mantra: "He's on kindergarten level.".(2568)

### CONCLUSION

For all of the foregoing reasons, we respectfully submit that an award should issue in favor of Moshe and his family, as requested.

Dated: November 22, 2006
New York, New York

> Mayerson & Associates
> Attorneys for Petitioners
> 330 West 38[th] Street, Suite 600
> New York, New York 10018
> (212) 265-7200

45