**NEW YORK STATE EDUCATION DEPARTMENT**
**THE OFFICE OF STATE REVIEW**
-------------------------------------------------------------------x
IN THE MATTER OF THE APPEAL OF,
M.A., by his parents, J.A. and E.A.,


                  Petitioners,

                 -against-                          **VERIFIED**
                                                  **PETITION**

East Ramapo School District,

                 Respondent.
-------------------------------------------------------------------x

TO:    East Ramapo School District:

        J.A. and E.A.., on behalf of their son, M.A., as and for their Verified Petition,

allege:

        1.      Petitioners J.A. and E.A. are the parents of M.A., a young boy diagnosed

with an autism spectrum disorder who needs significant special education services and

supports.  Despite requests and protests from M.A.'s parents at M.A.'s IEP meeting,

respondent failed and refused to properly classify M.A. under "autism" on his IEP. There

were additional procedural and substantive violations that collectively resulted in a FAPE

deprivation.

        2.     As a student with a disability, petitioner M.A. is eligible for special

education supports and services that provide him with a free and appropriate public

education ("FAPE") that is tailored to address his unique and individual needs.

        3.     Respondent, the East Ramapo School District, is a public authority and

local educational agency obligated to provide a FAPE to children with eligible

disabilities.

4.    Petitioners, pursuant to Section 4404 of the New York State Education Law, the Individuals with Disabilities Education Improvement Act, and the "Prong II" standards summarized by the Second Circuit Court of Appeals in its recent decision in Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006), seek a *partial* review and modification of the Impartial Hearing Officer's January, 2007 Findings of Fact and Decision, a copy of which is annexed hereto as Exhibit A.

5.    Petitioners do not appeal from the IHO's Decision to the extent that it properly recognized that respondent had failed to provide M.A. with a FAPE. Petitioners also do not appeal from the IHO's Decision to the extent that the IHO properly awarded relief directed to speech and language services and parent training and directed respondent to conduct a Functional Behavioral Assessment and Behavior Intervention Plan and to "amend goals and objectives, as needed."

6.    Petitioners do, however, appeal from that portion of the IHO's Decision that erroneously concluded that petitioners' classification claim had been rendered moot at the hearing by reason of respondent's untimely offer to stipulate to change M.A.'s classification. Petitioners also appeal from that portion of the IHO's Decision that applied an erroneous and unduly elevated and restrictive standard in denying petitioners' request for reimbursement for after-school ABA services that were demonstrably appropriate and helpful in promoting M.A.'s progress.

7.    There was significant evidence at the hearing as to the scope, intensity and efficacy of M.A.'s home-based one-on-one ABA services. The evidence showed that M.A.'s school-based ABA programming was but a fraction of what was going on at home. The IHO did not find that M.A.'s after school ABA services were ineffective or

inappropriate. His Decision *presupposes* that M.A.'s home-based ABA services were substantively appropriate and helpful to M.A. Rather, the IHO's refusal to order reimbursement for ant after-school ABA teaching appears to stem from the IHO's personal philosophical opposition to such relief, without regard to the more relaxed Prong II standards most recently enunciated by the Second Circuit in Frank G. and Diane G. v. Bd. Of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006). As the IHO explained at page 14 of his Decision:

> The parents…secured extended day ABA for M.A. at home from TheraCare…..The petitioners seek financial compensation and reimbursement from the school district for these services.
>
> * * *
>
> Students may be doing poorly in math or reading and parents may provide additional, privately paid tutoring after the regular school day has ended but school districts are not expected to compensate parents for this.…While the parents have every right to enlist the services of ABA therapists to supplement the ABA activities M.A. receives in school, the school district is not required to pay for it.

8.    As the authorities set forth in the accompanying memorandum of law demonstrate, the classification claim was not rendered moot when respondent, on the first day of hearing, offered to change M.A.'s classification to "autism." Moreover, where, as here, the record establishes a Prong I FAPE deprivation, a parent's Prong II claim for reimbursement is subjected to a far less stringent standard.

9.    In determining whether the parents of a disabled child are entitled to reimbursement for a unilateral placement and/or program under Prong II, courts simply look to: (1) whether the IEP (placement and program) proposed by the school district was inappropriate (Prong I); and (2) whether the services provided by the parents were "appropriate" under the IDEA. School Comm. of Burlington v. Dept. of Educ. of Mass.,

471 U.S. 359, 369-370, 105 S.Ct. 1996, 2002-2003 (1985); <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 12-14, 114 S.Ct. 361, 364-366 (1993); <u>Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356 (2d Cir. 2006). Once the court has made a determination in favor of the parents on the first two prongs, it may then determine whether equitable considerations (Prong III) support the parents' claim, and order "appropriate" relief.     <u>See Still v. DeBuono</u>, 101 F.3d 888, 891 (2d Cir. 1996) ("appropriate" relief includes "the authority to order reimbursement for expenditures made to obtain appropriate educational services"). Significantly, the IHO properly concluded on page 16 of his Decision that "There are no compelling equitable considerations that would preclude or diminish a reimbursement award.

10.     The Second Circuit has expressly embraced the concept that the appropriateness of a parent's unilateral educational placement for his or her child should be subject to a more relaxed standard when judging its appropriateness. <u>See id.</u>     The <u>Frank G.</u> Court expressly held that the unilateral placement need not be perfect, need not meet all of the child's special education needs, and need not even be in the child's least restrictive environment. Once, as here, there has been a material Prong I failure that results in a deprivation of a FAPE, the parent's <u>Schaffer v. Weast</u> burden as to Prong II is significantly less stringent than a local educational agency must meet as to Prong I.

11.     The well-settled test for determining the appropriateness of the unilateral placement is simply whether such placement was "reasonably calculated to enable the child to receive educational benefits." <u>See Frank G. v. Board of Educ. of Hyde Park</u>, 459 F.3d at 364 (<u>citing Bd. of Educ. v. Rowley</u>, 458 U.S. 176, 207, 102 S.Ct. 3034 (1982); <u>Muller ex rel. Muller v. Comm. on Special Educ.</u>, 145 F.3d 95, 105 (2d Cir. 1998)).

4

12.    In that regard, the determination of appropriateness is linked to the question of whether the proposed placement is "likely to produce progress, not regression." <u>Frank G. v. Board of Educ. of Hyde Park</u>, 459 F.3d at 364 (quoting <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 130 (2d Cir. 1998) (in turn quoting Cypress-Fairbanks Indep. Sch. Dist. v. Michael F., 118 F.3d 245, 248 (5th Cir. 1997)). The fact-finder is to look for objective evidence as to whether it was likely that the child would make progress. <u>Frank G.</u>, 459 F.3d at 364 (referencing <u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1121 (2d Cir. 1997)). Here, the IHO did not have to look very far. There was ample evidence in the record as to M.A.'s success and progress receiving extended day ABA support. Based on such evidence, the IHO should have ordered reimbursement without regard to his personal feelings about "after school tutoring."

13.    The courts are to look to the totality of the circumstances in assessing whether the placement is reasonably calculated to confer educational benefit to the handicapped child. <u>Frank G.</u>, 459 F.3d at 364.

14.    The IHO's Decision erroneously presupposes that extended day ABA services are simply beyond what a school district may be expected to provide. We beg to differ. The IHO's Decision fairly takes the "individual" out of IDEA. Where, as here, there has been a material Prong I FAPE deprivation, the issue is not what services the school district would be expected to provide, but rather whether the unilateral services secured by the child's parents are appropriate in the sense of their *efficacy*. Where, as here, the unilateral programming is having a demonstrably salutary effect on the educational progress of the child, we urge that they are reimbursable under *Burlington/Carter*. In this connection, we note that there was <u>no</u> evidence, much less

any findings, that any of M.A.'s service providers from TheraCare are charging their time at excessive rates. TheraCare is an ABA provider that services a number of area school districts. TheraCare's hourly rates for direct services, supervision and parent training and counseling are well within market.

WHEREFORE, it is respectfully requested that upon this review, the SRO modify the underlying Decision of the IHO to (a) declare that the classification issue was not rendered moot and should have been adjudicated in petitioners' favor; and (b) direct respondent to reimburse M.A.'s parents for the documented cost of maintaining M.A.'s after-school ABA program with TheraCare.

Dated: New York, New York
       January 30, 2007

GARY S. MAYERSON
MAYERSON & ASSOCIATES
Attorneys for Petitioners
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (fax)
www.mayerslaw.com

## VERIFICATION

STATE OF NEW YORK    }
                            }     ss.
COUNTY OF ROCKLAND   }

ELISHEVA ABBOUDI, being duly sworn, deposes and says:

1.  I am one of the petitioners herein, and am united in interest with my husband, petitioner J.A. We are M.A.'s parents.

2.  I have read the annexed Petition and know the contents thereof. The same is true to my knowledge except as to the matters stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
ELISHEVA ABBOUDI

Subscribed and sworn to before me this
___ day of January, 2007.

_____
Notary Public

**COURTNEY K. JUKIC**
**No. 01JU6068309**
**Notary Public, State of New York**
**Qualified in Rockland County**
**My Commission Expires 12/31/2009**

**DEPARTMENT OF EDUCATION**
**STATE REVIEW OFFICE**
-------------------------------------------------------------x

In the Matter of:

M.A., by his parents, J.A. and E.A.,

              Petitioners,

     -against-

East Ramapo Central School District,

            Respondent.


-------------------------------------------------------------x




**PETITIONERS' MEMORANDUM OF LAW**
**ON LIMITED APPEAL AND REVIEW**




MAYERSON & ASSOCIATES
Attorneys for Petitioners
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (fax)
www.mayerslaw.com

## INTRODUCTION

This memorandum of law is respectfully submitted on behalf of M.A. and his parents, J.A. and E.A., in support of their limited appeal from the January, 2007 Decision of IHO Richard Thaler. Petitioners' appeal is primarily limited to two core issues:

**Issue No. 1**: Did petitioners' claim alleging that East Ramapo had improperly failed and refused to classify M.A. under "autism" become moot for Prong I purposes simply because, on the very first day of hearing, East Ramapo offered to stipulate to change M.A.'s classification to autism?[1]   We will show that the classification issue was very much a live claim that should have been adjudicated by the IHO as an *additional* FAPE deprivation.  By failing and refusing to classify M.A. under "autism," the record shows that East Ramapo then committed other violations, including but not limited to its failure to provide M.A. with appropriate levels of speech and language services, its related failure to offer M.A.'s parents adequate individualized parent training and counseling, and its related failure to properly assess M.A.'s "present levels."

**Issue No. 2**:   Did the IHO apply erroneous standards and his own personal reimbursement philosophy in denying petitioners' claim seeking reimbursement for supplemental, after-school ABA support services?  We will show that the IHO evidently has a personal philosophical opposition to asking a school district to pay for after-school (extended day) services (Decision, pp. 14-15).  The IHO failed to apply the less stringent Prong II reimbursement standards enunciated by the Second Circuit.

---

[1] East Ramapo failed to keep its word.  Even after telling the IHO that it would change M.A.'s IEP classification to autism, it did not timely do so.  Months later, even when a new IEP was issued, East Ramapo *continued* to classify M.A. under "OHI."

1

**M.A.'s Claims**

M.A.'s Prong I claims are summarized in his July 29, 2005 request for hearing. By way of example, over the repeated objections of his parents and an extended discussion at M.A.'s IEP meeting, East Ramapo classified M.A. as "OHI" when he should have been classified under "autism." This was no mere procedural snag, as it underscores a variety of other failures. Among other things, East Ramapo:

- ✓ Failed to meet its Section 200.13(d) mandate to provide M.A.'s parents with adequate and appropriate individual parent training and counseling;

- ✓ Failed to properly assess M.A.'s "present levels," including but not limited to his behavioral levels and his IEP performance levels;

- ✓ Failed to properly baseline M.A.'s present levels, thus allowing East Ramapo to subjectively guess as to how, if at all, M.A. had progressed and was progressing;

- ✓ Proposed inadequately challenging IEP Goals and Objectives;

- ✓ Failed to give appropriate credit to what M.A. learned with one-to-one teaching in his home and community based ABA program;

- ✓ Failed to meet the Commissioner's Section 200.13.(mandate) as to minimum speech and language intervention time;

- ✓ Failed to develop a Functional Behavioral Assessment to measure M.A.'s "present levels" concerning his various interfering behaviors;

- ✓ Failed to meaningfully consider M.A.'s need for assistive technology;

- ✓ Failed to properly develop appropriate Goals and Objectives;

- ✓ Failed to develop an appropriate Behavior Intervention Plan;

- ✓ Failed to recognize M.A.'s need for a 12 month program;

- ✓ Failed to develop an appropriate IEP that was "calculated" to provide M.A. with a meaningful educational benefit;

✓ Failed to properly address M.A.'s serious fluency (stuttering) problem, and recklessly deciding to *ignore* it and give it time to grow worse (which, of course, it did);

✓ Failed to provide any individual speech and language intervention during the 2004-2005 school year;

✓ Failed to properly "track" M.A.'s progress as against his IEP goals and objectives;

✓ Failed to timely implement Goals and Objectives that are stated in black and white on the challenged IEP;

✓ Failed and refused, by reason of custom and district-wide policy, to give consideration to M.A.'s need for extended day programming, even though the challenged IEP (P-C) recites on the bottom of page 2 that "he faces much difficulty in *generalizing* these skills";

✓ Improperly pressured M.A.'s parents that if they wished to have any home based ABA services, such services would have to "come out of" M.A.'s school based services (and that would be pretty difficult given the relatively miniscule level of 1:1 ABA teaching in M.A.'s classroom);

✓ Improperly forced M.A.'s parents to secure and pay for their own parent training and counseling.

For Prong II purposes and the relaxed standard that is applicable under the Second Circuit's recent decision in Frank G. v. Board of Education of Hyde Park, 2006 U.S. App. LEXIS 19029 (2d Cir. 2006), we amply met the requisite evidentiary burden of showing that the ABA services for which reimbursement relief is sought are "appropriate" and thus, reimbursable.    On this point, East Ramapo ungraciously attempted to take all the credit for M.A.'s progress by pointing to its mere (at best) one hour per day of 1:1 ABA teaching at Grandview.    The evidence showed, however, that M.A. was receiving many more ABA teaching hours in his home ABA program and that the home program was responsible for much, and, in fact, of M.A.'s progress.

3

## THE APPLICABLE LEGAL STANDARDS

### The Three-Part Test for Reimbursement

The <u>Burlington/Carter</u> reimbursement analysis is well known to the SRO and is discussed in <u>School Comm. of Burlington v. Dept. of Educ. of Mass.</u>, 471 U.S. 359, 370 (1985), <u>Florence County School District Four v. Carter</u>; 510 U.S. 7 (1993) and <u>Walczak v. Union Free School District</u>, 142 F.3d 119, 129 (2d. Cir. 1998). To provide FAPE, an LEA must comply with the procedural requirements set forth in the IDEA, and the IEP developed through the IDEA's procedures must be "reasonably calculated" to enable the child to receive a meaningful educational benefit. <u>Mrs. B. v. Milford Board of Educ.</u>, 103 F.3d 1114 (2d Cir. 1997).

Conduct that smacks of "predetermination" is impermissible.    Conduct that involves unwritten *policies* also is impermissible.    It also is improper when the school district fails to meaningfully include the child's parents as equal members of the IEP team. <u>See</u>, <u>e.g.</u>, <u>Deal v. Hamilton County Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004), <u>en banc denied</u> (2005), <u>cert denied</u> (2005).

While, concededly, not *every* violation is considered "material," the Supreme Court and Congress have greatly emphasized the importance of the procedural provisions found in the IDEA. <u>Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley</u>, 458 U.S. 176, 205, 102 S. Ct. 3034 (1982) ("the importance Congress attached to these procedural safeguards cannot be gainsaid").

The IEP is the "primary vehicle" of the IDEA's implementation. <u>Honig v. Doe</u>, 484 U.S. 305, 311, 108 S.Ct. 592, 597 (1988). Among other mandatory statutory requirements, the IEP must contain "appropriate *objective* criteria and evaluation

4

procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved." <u>Rowley</u>, 458 U.S. at 182. The essence of the decision in <u>Rowley</u> is the Court's holding that an IEP must be "reasonably calculated" to provide personalized instruction with sufficient support services to permit the child to meaningfully benefit from such instruction.

### The More Relaxed Reimbursement Standard Applicable To Prong II

The Prong I determination of whether or not the Board's program denies the child a FAPE leads directly into the second prong of the <u>Burlington/Carter</u> analysis, in which the court considers whether the educational services secured by the parents were "appropriate" to the child's needs. 471 U.S. 359, 105 S.Ct. 1996 (1985).

In <u>Florence County School District Four v. Carter</u>, 510 U.S. 7 (1993), the Supreme Court extended its holding in <u>Burlington</u> to clarify that under appropriate circumstances, a court may order reimbursement for parents who unilaterally withdraw their children from public school settings which are not providing FAPE, even if the private educational setting selected by the parents does not comply with all of the Act's procedures and requirements (e.g., a school or program which is not yet "state-approved" or "certified").

As noted above, the Second Circuit's recent decision in <u>Frank G.</u> is highly instructive. In that case, the Court held that there is a less stringent, far more *relaxed* standard that is applied to Prong II reimbursement claims. Once Prong I is established, a parent's choice under Prong II need not be perfect, need not satisfy all the child's needs, and need not even be provided in the child's least restrictive environment.

**Equitable Considerations under Prong III**

The third prong of the <u>Burlington/Carter</u> test requires the court to consider whether or not equitable considerations bar relief. Under 20 <u>U.S.C.</u> § 1412 (a)(10)(C)(iii)(III), a tuition reimbursement award may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents entitled by the [IDEA]"). <u>See also</u> <u>M.C. v. Central Regional School District</u>, 81 F.3d 389 (3d Cir. 1996). The IHO made <u>no</u> such findings against petitioners.

**M.A.'s ("Autism") Classification Claim Is Not Moot**

Despite M.A.'s claim (P-A), the IHO erroneously failed to make any adjudication against East Ramapo by reason of its failure to properly classify M.A. on his IEP as a child with autism. The IHO apparently allowed East Ramapo's counsel to unilaterally, at *the hearing*, change M.A.'s classification without adjudicating this claim, or its impact on other related claims.

We respectfully urge that the SRO should rule on the classification claim, and hold that East Ramapo failed to properly classify M.A. under autism.

Where, as here, a child carries a prior diagnosis of PDD-NOS (Pervasive Developmental Disorder, Not Otherwise Specified), as a matter of law, this qualifies for an autism classification once the child turns five and is of school age. SRO Appeal No. 00-016; SRO Appeal No. 99-3; SRO Appeal No. 91-28.

In M.A.'s July 29, 2005 demand for a hearing (P-A), one of his central claims is the contention that East Ramapo improperly failed and refused to classify M.A. under "autism" and the related claims that East Ramapo failed to properly assess M.A.'s present levels, and then failed to comply with Section 200.13(d) of the Commissioner's

regulations applicable to children (like M.A.) who have been diagnosed with an autism spectrum disorder.

East Ramapo never so much as interposed an Answer denying the foregoing allegations. Nor did East Ramapo, as part of any pre-hearing offer of judgment, or as part of any resolution meeting, offer to change M.A.'s classification to autism.

On the first day of hearing, East Ramapo's counsel offered "And if, in fact, it should be your determination that the child should be classified as autistic and not as OHI, the district has absolutely no objection to doing that." (Tr. p. 41)

On the first day of hearing, there was some talk on the record as to whether or not East Ramapo's offer to change M.A.'s classification to "autism" would serve to render M.A.'s classification claim moot. At page 58 of the transcript, M.A.'s counsel communicated that the IHO still needed to decide M.A.'s classification claim on the merits. M.A.'s counsel and East Ramapo's counsel then stipulated on the record, at pages 60-61, that the classification claim was still a live claim to be adjudicated by the IHO. Page 63 of the transcript reflects that the classification claim stayed on the table.

East Ramapo did not have standing to unilaterally render the classification claim moot. We are requesting a declaration from the SRO to the effect that M.A. should have been properly classified under autism, as his parents had requested at M.A.'s IEP meeting.

**The IHO's Personal**
**Philosophical Opposition**
**To After School (Extended Day) Services**

The Decision reflects the IHO's personal opposition to extended day support services. According to the IHO, M.A.'s extended day ABA services are in the nature of

after school "tutoring" that no school district should be expected to pay for. (Decision, p.

14-15). The IHO's personal feelings on the subject implicitly promote a one-size-fits-all

model of appropriateness, and they also are inconsistent with the more relaxed standards

applicable to Prong II claims.

## THE EVIDENCE

### The Testimony of Dr. Amy Albers

Dr. Amy Albers, an East Ramapo administrator, admitted that M.A. is

diagnosed with PDD and meets criteria for an autism classification. (Tr. pp. 119, 120,

135).

She claimed that there was some kind of "ongoing FBA" (Tr. p. 126) She also

claimed that the number of discrete trial ABA hours was "dependent on the child." (Tr. p.

216)  When asked to estimate how many hours of discrete trial ABA a child would

receive per day at Grandview, she said "a couple of hours." (Tr. p. 217) This testimony

was neither reliable nor accurate, because when Ms. Brusco (the classroom teacher) took

the stand, she confirmed that there was approximately (only) a half-hour a day devoted to

discrete trial, with another half-hour of 1:1 instruction in reading and the like.

Even though M.A.'s parents pressed for an autism classification, and sought

additional service levels, and signed the IEP's "without prejudice," Dr. Albers claimed

that she did not consider any IEP issues to be outstanding! (Tr. p. 161) Nonsense.

M.A.'s parents were pressing for an autism classification that East Ramapo steadfastly

refused to provide. (Tr. p. 162) They also were pressing for East Ramapo to fund M.A.'s

home-based ABA program. (Tr. p. 164)

8

Dr. Albers, who certainly was in a position to testify unequivocally, said that she did not "believe" that there was *a policy* in East Ramapo of refusing ABA on an extended day basis for children who are of school age but that she could not speak to whether or not there was a "practice" in that regard! (Tr. p. 167)  In seven years with the district, Dr. Albers could not recall a single instance of a child receiving ABA on an extended day basis. (Tr. p. 168) (Tr. p. 220)  This spoke volumes on the predetermination claim.

Dr. Albers agreed that the "generalization" of skills was a problem for M.A.  (Tr. p. 174)  See also SD-4, p. 2 ("faces much difficulty in generalizing these skills"). (Tr.. p. 175)  Dr. Albers, M.A.'s "case manager," never made an effort to visit M.A. in his home, where significant programming was occurring. (Tr. p. 178)  More importantly, M.A.'s home ABA program was promoting the generalization of skills.

In the Summer 2005 IEP at the CPSE level, (SD-3), M.A.'s parents were getting two hours per month of individual parent training and counseling.  Inexplicably, for September of 2005 (SD-4), this went down to 30 minutes a *month* on an *integrated* basis. (Tr. pp. 227-28)  No wonder East Ramapo refused the autism classification—doing so helped them to justify giving M.A.'s parents short (and entirely inadequate) shrift as to parent training and counseling.  M.A.'s mother later described what if anything, happened with the school psychologist.

Dr. Albers admitted that M.A. had interfering behaviors, and that there was no FBA or BIP done. (Tr. p. 251-52)

Dr. Albers received SD-22, which is M.A.'s parents' June, 2005 letter. (Tr. p. 445)  Dr. Albers did not read the letter as opposition to an OHI classification.  However, even after Dr. Albers received the July 29, 2005 request for hearing, she still did not take

action to change M.A.'s classification. (Tr. 449)  She said that she considered OHI the "better" classification, yet she grouped M.A. with three other children having an *autism* classification. (Tr. p. 451)

Dr. Albers changed her prior testimony about M.A. allegedly receiving "two hours" of 1:1 ABA per day in class, and claimed that at a "minimum," M.A. receives an "hour" of 1:1 discrete trial per day. (Tr. p. 473)  She also said that this was confirmed by Ms. Brusco, the classroom teacher.  (Tr. p. 476)    However, when Ms. Brusco took the stand, she retreated from such testimony and admitted that at most, M.A. is receiving about a half-hour a day of 1:1 discrete trial teaching.  This is significant on the issue of progress attribution, because M.A. has a 15 hour per week 1:1 ABA home program paid for by his parents. (Tr. p. 481)  Dr. Albers did say, however, that the home and school staff are "communicating." (Tr. pp. 484-85)[2]

## The Testimony of Marlene Slackman

Ms. Slackman is the chairperson of the CPSE. (Tr. pp. 265-66)  She chaired the 4/27/04 IEP. (P-P)(P-Q)  There was concern even then about M.A.'s "generalization." (Tr. pp. 272-73)

Ms. Slackman claimed that it was mere "clerical error" that the 2005-2006 IEP did not contain 2 hours per month of parent training and counseling. (Tr. p. 282)

There was an April 27, 2004 IEP developed for the 2004-2005 school year. (Tr. p. 293) (P-V) M.A.'s parents put East Ramapo on notice of potential claims, and their dissatisfaction with M.A.'s programming. (Tr. p. 302) (P-V)  At this IEP, M.A.'s parents

---

[2] This proceeding does not present a "methodology dispute," where the school district is pitting its "Advil" against a parent's choice of "Extra Strength Tylenol." Dr. Albers acknowledged that nobody is contending that discrete trial ABA is inappropriate for M.A. (Tr. p. 483)

said that they wanted more hours. Ms. Slackman made no effort then to see M.A.'s home ABA program. (Tr. p. 208-309)

Ms. Slackman admitted that many of M.A.'s skills were learned through "discrete trials," ABA. (Tr. p. 311)  To address M.A.'s generalization problem, her thought was <u>not</u> to add extra ABA hours at home, but rather to "move" some of M.A.'s ABA hours at school to the home. (Tr. p. 311)  This is East Ramapo's erroneous "pizza pie" approach to providing services.  What is worse, East Ramapo did not have sufficient "slices" to work with.  At best, East Ramapo had five hours per week to "move."

Significantly, only 11 of 37 goals and objectives in M.A.'s 04-05 IEP were claimed to have been mastered by East Ramapo. Ms. Slackman *admitted* that there was a degree of "subjectivity" to the goals. She simply accepted what she had been told by M.A.'s teachers. (Tr. pp. 321-22)

Ms. Slackman admitted that at M.A.'s "joint" IEP meeting on June 15, 2005, M.A.'s classification was the subject of "extended discussion." (Tr. 362, 401)  M.A.'s parents wanted "autism." (Tr. pp. 368-69)  After all, M.A. had been in HASC's "autism" class. (Tr. p. 368)

Ms. Slackman said that she would confirm whether or not any Summer parent training and counseling was provided by HASC, but she never did.  M.A.'s mother, on the other hand, said that she never received any parent training and counseling during the 2004-2005 school year. (Tr. p. 385)

**The Testimony of E.A. (M.A.'s Mother)**

There was a lengthy discussion at the June 15, 2005 IEP as to M.A.'s classification.  M.A.'s mother wanted "autism."  She was told by East Ramapo that if she

11

went along with OHI, "it won't change anything at all" insofar as M.A.'s services. (Tr. p. 576)  However, she sent SD-22 a couple of days later because she had continuing concerns that OHI was the wrong classification. (Tr. p. 577)

In contrast to the di minimus and inadequate 1:1 ABA discrete trial teaching that M.A. received in school, M.A.'s mother described M.A.'s home-based ABA program as consisting of 15 hours of ABA teaching per week, with team meetings and parent counseling and training. (Tr. p 619)  There also is data collection, an ABA program book. (Tr. pp. 619-20)  M.A.'s team addresses his compliance issues. (Id.) M.A.'s mother described M.A.'s progress, his programs, and his dysfluency. (Tr. pp. 622-24) HASC stopped in the Summer of 2004.  Theracare started in November of 2004. (Tr. p. 625)  HASC personnel were not able to schedule and attend with the requisite consistency. (Tr. p. 625)  P-CC is part of the communication book. (Tr. 1720)

It was Dr. Albers who came up with the OHI classification.  (Tr. 1735)  M.A.'s mother had requested an "autism" classification. (Tr. p. 1736)  Dr. Albers said it made no difference. (Tr. 1738)  However, it DID make a difference under the Commissioner's regulations.    At this point in the transcript, the IHO somehow got the erroneous impression that the classification claim and issue had been rendered moot and did not need to be adjudicated. (Tr. pp. 1740-1742, 1743-1744)  East Ramapo's counsel did not help matters in this regard. This, however, was contrary to counsel's prior stipulation on the record.  (Tr. pp. 58, 63)

Ironically, even very late in the proceeding and despite East Ramapo's prior promise to change M.A.'s classification going forward, East Ramapo was still classifying M.A. as "OHI." (Tr. 1743, 1744).

As of her June 14, 2006 testimony, M.A.'s mother STILL had not had an opportunity to get a copy of the ABA program book from Ms. Brusco. (1878-80) Ms. Brusco apparently had been stalling and stonewalling for months. She told M.A.'s mother that she was "revising the book." (Tr. 1883) Ms. Brusco treated her "unprofessionally." (Tr. 1885-86)

M.A.'s mother attended the 6/15/05 IEP meeting. (Tr. 1907) It was basically one big meeting lasting two hours. (1908) She requested home based services (1918-19) and, she also was looking for reimbursement on a going forward basis. (1919-20) Marlene Slackman said that she could have 10 hours at home, but with such hours to be "taken out of" M.A.'s ABA hours at school. (1921-22) We have done the math over and over, but we still are unable to create "ten hours at home" out of the (at most) *five* hours per week of discrete trial ABA that East Ramapo says M.A. was receiving in school.

M.A. made "some" progress with ABA during his time at Grandview, but "most of it" was due to what M.A. is being taught in his far-more-intensive ABA home program. (1939) M.A.'s mother gave "primary" credit to M.A.'s home ABA program for the progress M.A. had made. (Tr. 2023-24, 2031, 2038, 2039)

On rebuttal, after the conclusion of Ms. Brusco's testimony, M.A.'s mother confirmed that she had tried on at least a half dozen occasions over the course of about six months to get to see the district's ABA program book. Finally, in June, 2006, Ms. Brusco let her see M.A.'s ABA book for about 8 minutes. (Tr. p. 2580)

As for the so-called parent training and counseling received from school psychologist Robin Bernstein (who was not called to testify by the district), it was M.A.'s mother who would raise issues in a single, 30 minute per month meeting with Ms.

13

Bernstein. Ms. Bernstein would basically say soothing things like "it's okay" and treat M.A.'s mother like a psychotherapy patient on a couch. Ms. Bernstein never once gave M.A.'s mother any instructions or recommendations as to how to deal with M.A.. (Tr. p. 2582) There was no rebuttal of such evidence.

**The Testimony of Christina Hauser**

Ms. Hauser has been working with children for roughly 15 years, the last five years in an ABA format. She is dually certified. Her supervisor is Dawn Sanchez. She received ABA training from Theracare and from Dr. Vincent Carbone of the Carbone Clinic in Valley Cottage, New York. (Tr. pp. 631-33) Ms. Hauser taught school as a substitute teacher. In fact, she did her student teaching in East Ramapo. (Tr. pp. 1006-08)

She began with M.A. in November of 2004. (Tr. p. 632) Dawn Sanchez also became involved at that time. (Tr. p. 633) There has been good provider consistency on M.A.'s program. (Tr. 634) In addition to the "direct" ABA hours, there also is time for team meetings, email and phone communication. There also is a communication notebook, and an ABA program book. (Tr. pp. 633-36) The home ABA team takes data on M.A.'s progress, and his non-compliant behaviors. (Ttr. pp. 636-37)

M.A. made progress in 04-05 with his ABA programs at home. (Tr. pp. 656-57) We explored M.A.'s data collection system. (Tr. 659) We also explored the team's use of reinforcement, incidental teaching, and teaching M.A. how to play independently and reducing prompt dependency. (Tr. p. 667, 668)    M.A.'s    frustration    levels    have decreased. (Tr. p. 669) With 1:1 teaching, M.A. continues to learn.

Ms. Hauser prepared P-F, her April 10, 2005 report. (Tr. 788-89) M.A. is receiving 10 hours per week of direct 1:1 ABA at home, with Ms. Hauser providing all of

the direct hours. (Tr. 789)  Ms. Hauser has seen M.A.'s progress.  (Tr. pp. 790-95)  The additional ABA hours are for team meetings and parent training.

Ms. Hauser went through M.A.'s numerous (home-based) ABA programs.  (Tr. pp. 798-799)  Overall, M.A. made meaningful progress. (Tr. 801, 805-09)  She also discussed M.A.'s biggest deficits, including compliance, communication, anger, and communicating his frustration. (Tr. pp. 811-12)

Ms. Hauser identified M.A.'s communication book for the period January, 2005-March, 2005 (P-LL).  She went over M.A.'s ABA programs and described her communications and conversations with M.A.'s classroom teacher.  "We try to incorporate things that they're doing at school." (Tr. p. 950)  Ms. Brusco told Ms. Hauser that there was data collection, but did not reveal any. (Tr. 965)  Significantly, Ms. Brusco never once asked to see M.A.'s home program book. (Tr. 979)

Ms. Brusco's approach was to use a lot of verbal prompting. (Tr. 975-77)  Ms. Hauser disagreed with that approach because M.A. becomes highly dependent on that kind of prompting because of the attention that he receives.  (Tr. p. 977)

M.A. is making good and meaningful progress in his home ABA program.  (Tr. p. 984)  Ms. Hauser identified her recent daily session notes. (P-MM)

Noncompliance has picked up (with demanding tasks, but not with mastered skills). (Tr. 1030)  She went over "problems" in the district's data collection. (Tr. 1113-1115)

M.A. has noncompliant behaviors and interfering behaviors.  (Tr. 1118)  She described what M.A.'s team does to address those behaviors, and how his incidental learning skills are emerging. (Tr. 1121)  Discrete trial ABA is used to teach M.A. "new"

skills. When the skills are acquired, the team switches to (somewhat more natural) "incidental" teaching techniques. (Tr. 1122-23) Ms. Hauser sees M.A. three times a week. Each session is two hours. M.A. has progressed. (Tr. p. 1525-27)

Ms. Hauser said that at the June 15, 2005 IEP meeting, M.A.'s parents were requesting more speech and ABA services at home. (Tr. 1513-14) She did not recall any specific discussions to develop goals and objectives at the IEP meeting. (Tr. 1517-18)

**The Testimony of Kristina Young**

Ms. Young received her Master's in ABA from Columbia University. (Tr. 1335) She has significant experience working with children with autism spectrum disorders. (Tr. 1336) Ms. Young first began providing ABA to M.A. in January of 2006. (Tr. 1339) She speaks with Christina Hauser and attends the weekly team meetings. She updates the Goals and Objectives. M.A. is in a data driven program. She charges $45/hr. for her time. (Tr. pp. 1339-46) She described why team meetings are necessary. (Tr. pp. 1356-57)

Theracare's ABA book is set up as per M.A.'s IEP goals. (Tr. 1351) According to Ms. Young, Ms. Brusco communicates what not to work on. (Tr. 1354-55) Ms. Brusco never once discouraged M.A.'s home program from proceeding. (Tr. 1355)

The team meetings delineate what to work on at home vs. at school. (Tr. 1357) Ms. Brusco never asked to see M.A. at home. (Tr. 1360-61)

Ms. Young worked on "theory of mind" and "perspective taking." (Tr. 1363) Telling and retelling stories, focusing on the main idea. (Tr. 1363-66) These are problem areas for M.A.. She also is working on working to filter out auditory and visual distractions, turn taking, complying with teacher directives, the proper expression of

emotions, and maintaining eye contact. (Tr. 1471-83)  The team also is working on getting M.A. to initiate toileting. (Tr. 1491)  M.A. is making good and meaningful progress with his ABA programs. (Tr. 1375)  Ms. Young is doing about 4 hours per week. (Tr. 1389)  M.A.'s parents are receptive and involved. (Tr. 1392-93)

**The Testimony of Dawn Sanchez**

Ms. Sanchez attended the 6/15/05 IEP meeting.  (Tr. 819)  M.A.'s parents asked for additional ABA hours at home, over and above SEIT support at school. (Tr. p. 819) She agreed that M.A. had great difficulty "generalizing." (Tr. pp. 820-21)

Theracare provided ABA in the home and she oversees the program day to day. (Tr. 822)  She sets up and supervises data collection.  There is discrete trial, but also different ABA approaches delivered 1:1. She described the "prompt hierarchy" and the "fading" of prompting to promote M.A.'s independence. She also spoke of her overlap with Christina Hauser for meetings, and the use of "incidental teaching." (Tr. pp. 824-830)  Her work also includes a component for parent training and counseling.  (Tr. 831-32)

Ms. Sanchez discussed M.A.'s programs, which are modified based on his progress.  She said that the ABA hours M.A. is receiving at home, coupled with her supervision and team meeting hours, are appropriate for M.A.. (Tr. pp. 842-43)  This teaching is helping M.A. to generalize his skills.  He needs this additional support. (Tr. pp. 842-44) She met with M.A.'s teacher and she is working on similar skills.  M.A. learns more at home (with his 1:1 teaching) and he then generalizes those skills to the classroom. (Tr. 870) Ms. Sanchez reviewed P-LL, M.A.'s ABA program book. (Tr. 1139)

<u>Significantly, at this stage of the proceedings, East Ramapo's counsel stipulated that the services provided in the home program were "calculated" to benefit M.A.. (Tr. 927) This goes to meeting the Prong II standard under Frank G..</u>

Ms. Sanchez said that M.A. is receiving 10 hours a week of *direct* ABA teaching 1:1 at home; on top of the ABA he is receiving at school. The balance of the home ABA is attributed to parent training, supervision and team meetings. Ms. Sanchez said that it would NOT be consistent with M.A.'s needs to cut his home ABA. (Tr. 1151-1154)

## The Testimony of Adrienne Brusco (Maviglia)

Ms. Brusco (teacher in school) properly explained the sequence of *doing* an FBA, but no FBA was done for M.A.. She did acknowledge that M.A. had non-compliance and interfering behaviors, sometimes to the point where he was not able to continue. (Tr. 2059, 2053-2054, 2058) Her classroom ABA book was marked as P-BBB. Ms. Brusco knew in the Fall of 2005 that M.A. was receiving ABA instruction in the home. Ms. Brusco, M.A.'s teacher, admitted that she did not even know how many hours of 1:1 ABA M.A. was receiving in the classroom. (2077-78)

We went over M.A.'s school programs and why certain programs did not start, or did not start for months. (2114) We also discussed how Goldie Margareten came in from HASC with a compliance "strategy," but it apparently backfired, because it only made matters worse. (2126) Compliance issues stood in the way of M.A.'s performance. (2231, 2245) She did not have Ms. Vasquez do any DTT with M.A.. (2252) She didn't start a token economy with M.A. until December or January. (2256) Nor did she ever do an FBA. (Id.) She would not have an aide do an FBA—she said they don't have the

18

necessary skill sets. (2258) How could M.A.'s <u>parents</u> <u>not</u> have supplemented such a progam?

As for P-RR, nobody from the district provided the criteria for scoring. (2263-64) The way that the IEP goals are written, "it could be anything." (2274)   Yet, she maintained (inconsistently) that the IEP Goals and Objectives were clear and unambiguous. (2308)  In reality, they were subjective and not objectively measurable.

Ms. Brusco admitted that her class was "not a data based class."  (2317)  There was one hour a day of 1:1 teaching in the classroom, and only *a portion* of that hour was devoted to discrete trial. (2367-70)

Ms. Brusco could not or would not say how many programs M.A. could get through in an hour session.   2377, 2393)  She was afraid to commit to any standard because she clearly feared the consequences of providing that detail, or she did not have such detail to provide.   She did deny, however, that M.A.'s behaviors kept him from getting through more ABA programs. (2407)

Ms. Brusco said that she did not "recall" how many times she was asked for the ABA program book before she produced it. (2522)  She did not deny that there "might" have been at least a half dozen prior requests. (2523)  She also admitted that when the M.A. family was requesting to see the ABA program book, she thought the request was significant enough to bring to the attention of others in the district. (2524)  Perhaps that is why there was stonewalling and why it took approximately six months just to get an 8 minute glimpse.

Significantly, Ms. Brusco and her counsel were unable to explain the ostensible meaning and operation of certain goals and objectives. (2533-35)

19

By the end of the school year, M.A. could "unzip" his clothing, but he still could not zip independently. (2547)  During the middle of the school year, her 8:1:1 class turned into a 6:1:1 class as two children were taken out by their parents.  (2558-2560) She admitted that she was unhappy with her classroom assistant, Ms. Vasquez. (2561) Ms. Vasquez was simply moved to another position within the district. (2562)  Even at the end of the school year, M.A.'s handwriting at school was a mess. (2564-2565)

### CONCLUSION

For all of the foregoing reasons, we respectfully submit that reimbursement award should issue in favor of M.A. and his family, as requested, with respect to extended day ABA support that is providing instruction to M.A., and parent training and counseling being provided to M.A.'s parents.   In addition, the SRO should now adjudicate the classification claim in favor of M.A. and his parents.

Dated:  January 31, 2007
       New York, New York

Gary S. Mayerson
Mayerson & Associates
Attorneys for Petitioners
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200