

# The University of the State of New York

## The State Education Department
### State Review Officer

No. 07-012

**Application of a CHILD WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the East Ramapo Central School District**

**Appearances:**

Mayerson and Associates, attorney for petitioners, Gary S. Mayerson, Esq., of counsel

Greenberg, Wanderman and Fromson, attorney for respondent, Carl L. Wanderman, Esq., of counsel

## DECISION

Petitioners appeal from those parts of a decision of an impartial hearing officer that denied their request for reimbursement for home-based applied behavioral analysis (ABA) instruction for the 2004-05 school year, summer 2005, the 2005-06 school year and summer 2006. Respondent cross-appeals from that portion of the hearing officer's decision which found that it denied the child a free appropriate public education (FAPE) for summer 2005 and the 2005-06 school year, and which ordered reimbursement for privately obtained speech-language therapy. The appeal must be dismissed. The cross-appeal must be sustained in part.

The child was described as one who thrives on positive reinforcement and encouragement (Dist. Ex. 6 at p. 1). He has a diagnosis of a pervasive developmental disorder (PDD) and exhibits global delays in fine and gross motor skills, receptive and expressive language, cognitive abilities and social skills (Dist. Ex. 4 at pp. 2-5). He exhibits speech patterns characterized by stuttering (dysfluent) behaviors, stereotypic behaviors such as finger flapping and, at times, oppositional/noncompliant behaviors (Tr. pp. 117-18; Dist. Ex. 4 at pp. 4-5). At the time of the commencement of the impartial hearing in September 2005, the child was five years old and enrolled in an 8:1+2 special class at Grandview Elementary School (Grandview) that emphasized social communication (Dist. Ex. 4 at pp. 1, 6). In addition, the child received occupational therapy (OT), speech-language therapy and physical therapy (PT) (id. at p. 1). He

also received ten hours per week of private home-based ABA services (Tr. p. 867, see Tr. pp. 1344, 1527).

With respect to the child's eligibility for special education services, on the first day of the impartial hearing, respondent agreed to change the child's classification from a student with an other health impairment (OHI) (see 8 NYCRR 200.1[zz][10]) to a student with autism (see 8 NYCRR 200.1[zz][1]);(Tr. pp. 57-58). Petitioners challenge the child's classification on appeal to the extent that they argue that respondent should have determined initially that the child was eligible for special education services as a child with autism.

The child experienced difficulties in the perinatal period and was reportedly "somewhat encephalopathic" during his first few weeks of life (Dist. Ex. 12).[1] His developmental milestones were delayed and he began speech-language therapy, OT and PT at five months of age (id.). The child also had difficulty with gastrointestinal reflux and severe colitis necessitating a specialized diet (id.). When he was two years old, he attended an Early Intervention Program (EIP) at the Hebrew Academy for Special Children (HASC) for five half-days per week, where he received OT, PT, speech-language therapy, feeding therapy, special instruction services and the services of a 1:1 aide (see Parent Exs. R; S; T; U). In early August 2003, a pediatric neurologist recommended a "more intensive full-day therapeutic nursery program" to address the child's speech, social and cognitive delays (Dist. Ex. 7). During the 2003-04 school year, the child attended a full-day 6:1+1 special class at HASC and received an unspecified amount of OT, PT, speech-language therapy and ABA services (Parent Ex. P at p. 4).[2] In November 2004, when the child was three years old, a pediatric neurologist evaluated him and reported that the child presented with PDD (Dist. Ex. 12).

On April 27, 2004, respondent's Committee on Preschool Special Education (CPSE) met for the child's annual review and determined that he was eligible for extended school year (ESY) special education services as a preschool student with a disability (id. at p. 1). His summer 2004 program consisted of a full-day non-integrated 6:1+2 class at HASC with the related services of individual and group OT and PT, and group speech-language therapy (Parent Ex. P at p. 2). Due to progress made during the 2003-04 school year, the CPSE recommended that for the 2004-05 school year the child attend a half-day 12:1+2 non-integrated class and receive ten hours of individual ABA instruction per week; twice weekly OT; PT and group speech-language therapy three times per week; and twice monthly parent counseling and training (id. at pp. 1, 4). CPSE meeting notes indicate that the child's mother requested in-school delivery of the ten hours of ABA instruction in addition to home-based ABA instructional hours (id. at p. 4). Respondent's CPSE determined that ten hours per week of ABA services were appropriate for the child (Tr. p. 274). On the same day as the April 27 2004 CPSE meeting, the child's mother signed a parental consent form noting that she agreed with the CPSE's recommendations for summer 2004 and the 2004-05 school year (Parent Ex. Q).

---

[1] I note that the record contains multiple duplicative exhibits. For purposes of this decision, only District exhibits were cited in instances where both a District and Parent exhibit were identical. I remind the impartial hearing officer it is his responsibility to exclude evidence that he determines to be irrelevant, immaterial, unreliable or unduly repetitious (8 NYCRR 200.5[j][3][xii][c]).

[2] The record does not indicate where the 2003-04 ABA services were provided.

By letter dated May 5, 2004 to the CPSE chairperson, the child's mother requested clarification regarding a form that she signed at the meeting (Parent Ex. V). She advised the CPSE chairperson that the child was receiving private ABA services at a "ten hour level" and noted that during the CPSE meeting she requested that respondent "pay on a going forward basis" for those services (id.). The child's mother stated that if respondent refused her request she would seek reimbursement (id.). In response to the letter, the CPSE chairperson sent information to petitioners about the consent forms that had been signed, the child's individualized education program (IEP), and petitioners' due process rights (Tr. pp. 302-03; Parent Ex. N). The child's home-based services provided by HASC were discontinued during summer 2004 (Tr. p. 624).

On November 1, 2004, the child began receiving private ABA services provided by a special education teacher (Tr. pp. 789, 822; Dist. Ex. 15 at p. 2).[3] Later that month, a pediatric neurologist provided a review of the child's history and concluded that the child had a history of "probable autistic spectrum disorder" (Dist. Ex. 12). The report stated that the child should continue to receive ABA services (id.).

In early December 2004 the pediatric neurologist conducted an observation of the child at his preschool (Parent Ex. L at p. 1). According to the observation report, the child's day consisted of breakfast, book time, circle time/small group activity, gross motor activity, large group circle time, lunch and "dedicated" ABA program time (id.). The pediatric neurologist reported that after discussing the child's progress with his teachers, he was "quite pleased" with their reports (id.). He observed the child to exhibit extreme distractibility, characterized by staring and daydreaming, and self-stimulatory behavior (id.). Although the child demonstrated the ability to sit in a chair for circle time, the observation report indicated that he did not actively participate and was more of an observer (id.). The pediatric neurologist concluded that the child required "a lot" of ABA instruction and recommended that he receive "14 hours per week of intensive ABA intervention and support in school and at home, with appropriate supervision, consultation and parent training" (id. at p. 2).

In spring 2005 respondent's Committee on Special Education (CSE) conducted and compiled a series of evaluations, a classroom observation of the child and a social history update to prepare for the child's transition from the CPSE (Tr. pp. 83-85, 88-91, 92-99; Dist. Exs. 6, 8-18).[4] On March 14, 2005, the child's HASC special education teacher conducted an educational review (Dist. Ex. 16). She reported that the child showed interest in number and letter recognition, and that he enjoyed group activities but demonstrated non-compliant behaviors when presented with challenging tasks or tasks he did not want to complete (id. at p. 1). She noted that the child's non-compliant behavior was addressed through "consistent use of

---

[3] The record refers to the child's private special education teacher as a "SEIT" (special education itinerant teacher). However, Section 4410(1)(k) of the Education Law defines "special education itinerant services" as "an approved program provided by a certified special education teacher on an itinerant basis in accordance with the regulations of the commissioner, at a site determined by the board, including but not limited to an approved or licensed prekindergarten or head start program; the child's home; a hospital; a state facility; or a child care location as defined in [§4410(8)(a)]." The record did not indicate whether or not the SEIT's employer was an approved or licensed program. In this decision, I will refer to the child's "SEIT" as the child's "private special education teacher."

[4] Dist. Exhibits 16 and 18 are identical. For the purposes of this decision, Dist. Exhibit 16 will be cited.

behavioral techniques" and the use of ABA instruction within the child's program (id. at pp. 1-2). His special education teacher also commented that the child was easily distracted by visual and auditory stimuli, and that social interactions were reportedly anxiety provoking for him (id. at p. 2). Administration of the Learning Accomplishment Profile-Diagnostic Edition (LAP-D) yielded a fine motor manipulation subtest score in the 2nd percentile, a fine motor writing subtest score in the 28th percentile, a cognitive matching subtest score in the 15th percentile, a cognitive counting subtest score in the 90th percentile, a language naming subtest score in the 30th percentile and a language comprehension subtest score in the 60th percentile (id. at p. 3). The special education teacher recommended "special education services" due to the child's demonstrated delays in social, cognitive and language skills, and because his behavior and limited attention span impeded his ability to learn (id. at p. 5).

A March 2005 classroom observation completed by his special education teacher indicated that the child adjusted to the class routine but had difficulty with the multi-steps involved during transitions between activities (Dist. Ex. 13). It was reported that the child had "strong" academic skills such as counting and matching as well as imaginative play skills (id.). The report also indicated that the child exhibited self-stimulatory behaviors, was often highly distractible and had difficulty gaining peer attention (id.).

On March 22, 2005, a HASC occupational therapist conducted an OT evaluation of the child (Dist. Ex. 6). Administration of the Peabody Developmental Motor Scales-Second Edition (PDMS-2) indicated that the child's fine motor and visual motor integration skills were "significantly delayed" (id. at p. 2). He also was reported to exhibit delays in self-care, sensory processing, attention and eye contact skills (id.). The evaluator strongly recommended that the child continue to receive OT during the upcoming school year (id.). Later that month a speech-language pathologist and teacher of the speech and hearing handicapped (TSHH) from HASC completed a speech-language evaluation of the child (Dist. Ex. 17). The report stated that the child's therapy focused on improving his receptive and expressive language skills in addition to his speech fluency (id. at p. 1). Administration of the Clinical Evaluation of Language Fundamentals-Preschool (CELF-P) yielded a receptive language standard score (SS) of 79 (8th percentile), an expressive language SS of 81 (10th percentile) and a total language SS of 78 (7th percentile, age equivalent 2-7 years) (id. at p. 2). The child used three to four word utterances to answer questions and required models to make a request, comment, or formulate a question (id.). His single word articulation skills were assessed to be above average; however, his connected speech intelligibility was judged to be moderately impaired due to a "lack of fluency" (id. at p. 3). The evaluator recommended speech-language therapy to address the child's language and speech fluency needs (id.).

In late April 2005 a HASC school psychologist conducted a psychological evaluation of the child (Dist. Ex. 9). Administration of the Stanford-Binet Intelligence Scales-Fifth Edition (SB5) yielded a verbal IQ SS of 71 (Borderline), a nonverbal IQ SS of 81 (Low Average), and a full scale IQ SS of 74 (Borderline) (id. at p. 3). The school psychologist reported that the child was more comfortable completing nonverbal tasks and that completion of quantitative reasoning tasks was an area of relative strength (id. at pp. 3-4). The child's working memory was found to be an area of relative weakness, and his SS was in the delayed range of functioning (id. at p. 4). Completion of the Vineland Adaptive Behavior Scales (VABS)-Interview Edition resulted in a communication domain SS of 81, a daily living skills domain SS of 60, a socialization domain SS of 64, a motor skills domain SS of 58 and an adaptive behavior composite SS of 60 (Low)

(id. at p. 5). Petitioners completed the Conners' Parent Rating Scale-Revised Short Version, which indicated that the child exhibited an elevated profile in the areas of cognitive problems/inattention and Conners' attention deficit hyperactivity disorder (ADHD) index (id. at p. 7). Administration of the Behavior Assessment System for Children (BASC) to the child's mother indicated that the child exhibited significantly clinical or at-risk profiles in the areas of somatization, atypicality, attention problems, adaptability and social skills (id. at p. 8). The school psychologist recommended that the child continue to receive special education and related services as well as social skills instruction that included positive peer interactions (id.).

In April 2005 the child's private special education teacher evaluated him (Dist. Ex. 15). Administration of the Brigance Inventory of Early Development yielded designations of below average in the areas of gross and fine motor skills, self-help skills and social emotional development (id. at p. 3). Although the child's speech-language skills and general knowledge and comprehension skills ranged from below average to average, the special education teacher reported that the child's skills in these areas were primarily below average (id.). The child performed in the above average range in the areas of readiness and basic math (id.). Results of the Gilliam Autism Rating Scale indicated that "the probability of autism is below average" (id. at p. 4). The special education teacher's report described the programs on which she worked with the child, and his progress with those programs (id. at pp. 4-8). She opined that the child would benefit from instruction in a small group, language-based setting with a focus on social interaction, for which she provided suggested annual goals and short-term objectives (id. at pp. 8-9).

In April and May 2005 a private speech-language evaluation of the child was conducted (Tr. p. 592; Dist. Ex. 14). Administration of an articulation assessment revealed that the child's overall intelligibility of speech was generally age appropriate (Dist. Ex. 14 at p. 2). Following formal language assessments and informal observations of the child's speech and language production, the speech-language pathologist concluded that the child demonstrated severe expressive and receptive language delays characterized by restricted form, content and use of language, restricted vocabulary, deficits in auditory processing and marked difficulty with pragmatic language skills (id. at pp. 5-6). The speech-language pathologist also reported that the child exhibited a severe pattern of speech dysfluency characterized by initial sound and syllable repetitions, whole-word repetitions, and secondary behaviors such as audible inhalations, lip posturing and tension, changes in pitch and intensity, and avoidance of answering questions (id. at pp. 3, 6). He concluded that the child's dysfluency "clearly and significantly" affected his language use and pragmatic skills, though the speech-language pathologist also opined it was difficult to separate symptoms of the dysfluent behavior with the child's diagnosis of PDD (id. at p. 6). The speech-language pathologist recommended "intensive" hourly sessions of speech-language therapy five times per week to remediate the child's speech dysfluency and language and pragmatic deficits (id.). Parent counseling also was recommended (id.).

On June 15, 2005 respondent's CPSE and CSE convened to develop the child's summer 2005 and 2005-06 school year programs, respectively (Tr. p. 78; Dist. Exs. 3; 4; 19-21; 24). For summer 2005, the CPSE concluded that the child was eligible for special education services as a preschool student with a disability and recommended a half-day non-integrated 12:1+2 program at HASC with ten hours per week of individual SEIT services to be provided at the preschool program (Dist. Ex. 24 at p. 2). The CPSE also recommended that the child receive individual speech-language therapy two times per week for 30 minutes and once in a group, in addition to

one group and one individual 30-minute session of OT and PT per week (id. at pp. 2-3). Parent counseling and training was also provided twice monthly for one hour (id. at p. 2).

The child's 2005-06 IEP indicated that he exhibited delayed cognitive skills as well as difficulty generalizing skills (Dist. Ex. 4 at p. 2). He was reported to have difficulty following oral directions and understanding long and complex sentences (id. at p. 3). The child used three to four word utterances to answer questions and it was reported that his connected speech intelligibility was moderately impaired due to his lack of fluency (id.). His social interactions with peers were limited and he demonstrated "stereotypical" behaviors such as finger flapping (id. at p. 4). Respondent's CSE found the child eligible for special education services as a student with an OHI and established annual goals and short-term objectives in the areas of study skills, speech-language, social/emotional/behavioral, motor, and basic cognitive/daily living skills (id. at pp. 1, 7-10). The June 2005 CSE recommended that the child receive instruction in a full-day, non-integrated 8:1+2 class at Grandview with related services including individual speech-language therapy three times per week, group language instruction two times per week in the classroom, individual OT one time per week and one time per week in a group, and individual PT one time per week (id. at p. 1). One 30-minute session of parent counseling and training per month also was recommended (id.). Refocusing, redirection and a positive reinforcement plan were recommended as program modifications and the child was offered extended time (1.5) as a testing accommodation (id. at pp. 1-2). The 2005-06 IEP noted that eligibility for summer 2006 ESY services would be determined at the child's annual review (id. at p. 1).

On June 15, 2005, the child's mother signed a consent form wherein she accepted the June 2005 CSE's recommendations that the child was eligible for special education services as a student with an OHI and placement in a non-integrated class on a "without prejudice basis" (Dist. Ex. 20). By letter received by respondent on June 17, 2005, the child's mother advised the CSE and CPSE chairpersons that she wanted her son's classification changed to autism (Tr. pp. 105-06; Dist. Exs. 22; 24). Her letter also indicated that she would request an independent evaluation "if the district is not prepared to correct this problem" (Dist. Ex. 22).

By due process complaint notice dated July 29, 2005, petitioners requested an impartial hearing and alleged that the child's 2004-05, summer 2005 and 2005-06 IEPs were inappropriate, inadequate and resulted in a denial of a FAPE (Parent Ex. A). Petitioners alleged, among other things, that the aforementioned IEPs were substantially inadequate because they failed to include individual home-based ABA instruction as part of the child's proposed programs (see id.). Accordingly, petitioners sought reimbursement relief for purposes of the 2004-05 school year, summer 2005, the 2005-06 school year, and summer 2006 (id. at p. 1). Petitioners also requested reimbursement for "supplemental" ABA and speech-language services provided during the 2004-05 and 2005-06 school years, in addition to "compensatory" speech-language services "to the extent deemed appropriate" for the 2004-05 school year and summer 2005 (id. at p. 5).

During the 2005-06 school year the child received ten hours per week of private direct ABA services and two to four hours per month of ABA supervision (Tr. pp. 822-23, 867-68). Beginning in September 2005, the child attended respondent's full-day self-contained social communications class (Tr. p. 113; Parent Ex. DDD at p. 1). He was instructed within the social communications class with the exception of his related services and participation in mainstream lunch, gym and "specials" (id.). He received approximately one hour per day of individual direct

instruction that included implementation of discrete trial ABA programs (Tr. p. 2370; see Parent Ex. DDD at p. 1).

An impartial hearing convened on September 30, 2005 and after 12 days of testimony concluded on September 29, 2006. At the commencement of the impartial hearing, the parties stipulated to change the child's eligibility for special education services as a student with an OHI to a student with autism (see Tr. pp. 58-61). Accordingly, the impartial hearing officer determined that the child was eligible for special education services as a student with autism (see Tr. p. 58; IHO Decision at p. 2).

In November 2005 the child's mother began attending monthly parent counseling and training sessions with respondent's school psychologist (Tr. p. 1593; Parent Exs. AA; DDD at p. 6). At the December 2005 counseling session, the child's mother and the school psychologist drafted an amendment for the child's IEP adding a half hour of play therapy per week (Tr. pp. 1593-95). The record indicates that respondent's CSE convened in March 2006 to add this service to the child's program, but it does not contain a March 2006 IEP (Tr. pp. 1599, 1743).

During the 2005-06 school year the child's mother and his private ABA supervisor observed him at school (Tr. pp. 1642-44; Parent Ex. BB; Joint Ex. 2 at pp. 54-55).[5] During a February 2006 classroom observation of the child's ABA session, the private ABA supervisor reported that despite distractions, the child attended to the special education teacher, was highly motivated by her social praise and was immediately prompted for incorrect responses (Joint Ex. 2 at p. 54). The child also was observed to make comments to the special education teacher about the book they were reading, to select his own motivators, and to complete tasks independently (id.). At times during the observation, the child required prompting to remain on task or for redirection (id. at p. 55).

In spring 2006 educational, PT, OT, and speech-language evaluations of the child were conducted, and the school psychologist prepared a parent training report (Parent Ex. DDD). Special education teacher administration of the Wide Range Achievement Test - 3 (WRAT-3) to the child yielded a reading SS of 112 (79th percentile), spelling SS of 95 (37th percentile) and arithmetic SS of 97 (42nd percentile) (id. at p. 2). The special education teacher stated that the child's skills were "equivalent to his grade level" (id.). She reported that the child made progress within the "cognitive domain," was well-liked, interacted appropriately with peers and was an active verbal participant in the classroom (id. at p. 3). She further commented that he exhibited periods of non-compliant behavior that usually occurred when he was removed from the group for individual ABA instruction (id.). The report stated that the child mastered 7 out of 22 ABA programs that were implemented during the year (id. at p. 1). The parent training report indicated that sessions focused on discussing the child's behavior at home and school, parental concerns about the child's communication skills and the child's private ABA services (id. at p. 6).

The February 2006 PT report stated that the child enjoyed going to therapy and was cooperative (id. at p. 4). The evaluator noted that the child required verbal cues to refocus in

---

[5] A February 10, 2006 classroom observation of the child conducted by the private ABA supervisor is discussed as part of Joint Exhibit 2 (Tr. pp. 1647-59). The Office of State Review did not receive this part of the exhibit. Respondent confirmed that this office received the correct number of pages contained in Joint Exhibit 2.

order to remain on task (id.). The report indicated that the child made progress toward his gross motor and physical goals (id.). The February 2006 OT report stated that that the child was motivated and demonstrated progress in the areas of fine motor, visual perception, activities of daily living (ADL) skills, and sensory processing (id. at p. 7). In March 2006 the speech-language therapist reported that the child exhibited moderately dysfluent speech patterns characterized by repetitions of initial sounds of words and limited secondary characteristics (id. at p. 9). The March 2006 speech-language report also noted that the child demonstrated use of learned fluency techniques and, with minimal prompting, exhibited them in structured settings (id.). Administration of the Test of Language Development-Primary: Third Edition (TOLD-P: 3) yielded scores within the average range for three out of four subtests administered (id.). The child achieved scores within the average range during administration of the Test for Auditory Comprehension of Language-Third Edition (TACL-3) (id.). The speech-language therapist also reported that at the beginning of the year the child's pragmatic skill deficits interfered with goal attainment "many times" during therapy sessions, but were "slowly dissipating at present" (id. at p. 10).

On May 4 and 5, 2006, a private speech-language pathologist who specialized in stuttering (specialist) conducted a speech fluency evaluation of the child (Tr. pp. 1756-57; Dist. Ex. 25 at pp. 13-16). The specialist reported that the child exhibited "severe" speech-motor symptoms characterized by laryngeal blocks, repetitions and prolongations (Dist. Ex. 25 at p. 13). He also exhibited struggle to force out words and verbal inhibition (id. at p. 14). The private specialist recommended that the child receive individual therapy from a speech-language pathologist "specializing in this condition," five times per week for one hour sessions (id. at p. 15). Her report concluded that the recommended service was educationally necessary for the purposes of class participation, discourse with teachers and peers, and oral presentations (id.). The child received private fluency services provided by the specialist three times per week for 45-minute sessions through at least June 13, 2006 (Tr. p. 1800; Dist. Ex. 25 at p. 1).

By decision dated December 30, 2006, the impartial hearing officer concluded that the IEPs at issue were not reasonably calculated to provide the child with an educational benefit and accordingly denied the child a FAPE (IHO Decision at p. 15).[6] Specifically, he concluded that the IEPs were substantively deficient because respondent failed to administer a functional behavioral assessment (FBA) and develop a behavioral intervention plan (BIP) (id. at p. 11). He noted that by the end of the 2005-06 school year, the need for an FBA/BIP became evident (id. at p. 2). Accordingly, the impartial hearing officer ordered respondent to develop an FBA/BIP for the child and to amend goals and objectives as needed (id. at p. 11). In addition, the impartial hearing officer determined that the child required individual speech-language sessions in light of the severity of his speech-language needs (id. at p. 12). As a result, he ordered respondent to provide the child with five 60-minute sessions of individual speech-language therapy per week (id.).[7] In addition, the impartial hearing officer ordered respondent to reimburse the private

---

[6] It is not clear from the impartial hearing officer's determination on which of the IEPs at issue in this matter he based his decision. Consequently, for purposes of this decision, I will consider the appropriateness of each IEP as raised by petitioners in their due process complaint notice dated July 29, 2005.

[7] Inasmuch as neither party appeals the impartial hearing officer's order with respect to the provision of five 60-minute sessions of speech-language therapy, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

speech-language therapist for "three 45-minute sessions per week of one to one stuttering therapy at [her] rate of $150.00 per session" (id. at p. 13). He further found that the private speech-language therapist "conducted the stuttering sessions and parent interviews starting on May 4, 2006 and [that] she should be compensated through June 29, 2007" (id.). Lastly, the impartial hearing officer concluded that respondent failed to provide petitioners with adequate parent training and counseling, and he ordered respondent to provide petitioners with one 60-minute session of individual parent training per month (id. at p. 15).[8,9] Although he concluded that the IEPs were substantively deficient, the impartial hearing officer did not award reimbursement for the home-based ABA instruction that petitioners obtained for their son (id. at p. 14). He determined that the child made progress and obtained an educational benefit from his 8:1+2 program and further noted that while petitioners had the right to supplement the ABA instruction that the child received in school, respondent was not obligated to reimburse them for it (id.). Lastly, the impartial hearing officer concluded that there were no equitable considerations that weighed against petitioners (id. at p. 16).

This appeal ensued. Petitioners maintain that the issue of the child's classification was a live claim that should have been adjudicated as an additional deprivation of FAPE. Petitioners further contend that the impartial hearing officer erred by failing to award reimbursement for privately obtained home-based ABA instruction for the child, and that the impartial hearing officer applied an erroneous and unduly elevated standard in denying petitioners' claim for reimbursement.

Respondent cross-appeals, arguing that the impartial hearing officer erred in determining that it failed to offer the child a FAPE during summer 2005 and the 2005-06 school year. Respondent contends that the impartial hearing officer erred in finding that the lack of a FBA/BIP compromised the child's right to a FAPE. Respondent further maintains that the summer 2005 and 2005-06 IEPs offered programs to the child that were tailored to meet his special education needs. Respondent also asserts that the impartial hearing officer erred in ordering reimbursement for the services provided by the speech-language pathologist privately obtained by petitioners. Specifically, respondent argues that petitioners are not entitled to reimbursement for the privately obtained speech-language therapy because the IDEA does not require respondent to provide the child with an optimum level of services as provided by an expert such as the therapist obtained by petitioners. With regard to petitioners' request for reimbursement for home-based ABA services, respondent asserts that the impartial hearing officer properly denied their claim. Finally, respondent argues that equitable considerations do not favor petitioners' request for reimbursement.

_____

[8] Inasmuch as neither party appeals the impartial hearing officer's order with respect to parent counseling and training, that part of the decision is final and binding (34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[j][5][v]; see Application of a Child Suspected of Having a Disability, Appeal No. 05-128).

[9] I note that in their due process complaint notice and at the impartial hearing, petitioners raised objections to the annual goals and short-term objectives contained in the child's 2005-06 IEP. Inasmuch as the impartial hearing officer did not make a finding on this issue nor was the issue raised by either party on appeal, I do not address it in this decision.

A central purpose of the IDEA (20 U.S.C. §§ 1400-1482)[10] is to ensure that students with disabilities have available to them a FAPE (20 U.S.C. § 1400[d][1][A]; Schaffer v. Weast, 126 S. Ct. 528, 531 [2005]; Frank G. v. Bd. of Educ., 459 F.3d 356, 371 [2d Cir. July 27, 2006]). A FAPE includes special education and related services designed to meet the student's unique needs, provided in conformity with a written IEP (20 U.S.C. § 1401[9][D]; 34 C.F.R. § 300.17; see 20 U.S.C. § 1414[d]; 34 C.F.R. § 300.320).[11, 12] "The core of the statute" is the collaborative process between parents and schools, primarily through the IEP process (see Schaffer, 126 S.Ct. at 532). A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parent, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parent were appropriate, and equitable considerations support the parents' claim (Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359 [1985]; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]. In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (Burlington, 471 U.S. at 370-71). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP" (id. at pp. 370-71; see 20 U.S.C. § 1412[a][10][C][ii]). With respect to equitable considerations, the IDEA allows that tuition reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; see Mrs. C. v. Voluntown, 226 F.3d 60, 66 n. 9 [2d Cir. 2000]).

The first step is to determine whether the district offered to provide a FAPE to the student (see Mrs. C., 226 F.3d at 66). A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Bd. of Educ. v. Rowley, 458 US. 176, 206-07 [1982]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to

---

[10] On December 3, 2004, Congress amended the IDEA, however, the amendments did not take effect until July 1, 2005 (see Individuals with Disabilities Education Improvement Act of 2004 [IDEA], Pub. L. No. 108-446, 118 Stat. 2647). Citations contained in this decision are to the statute, as it existed prior to the 2004 amendments. The relevant events in the instant appeal took place prior to the effective date of the 2004 amendments to the IDEA; therefore, the provisions of the IDEA 2004 do not apply.

[11] The term "free appropriate public education" means special education and related services that -
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
20 U.S.C. § 1401[8]; see also 34 C.F.R. §300.17; 20 U.S.C. §1414[d].

[12] The Code of Federal Regulations (34 C.F.R. Parts 300 and 301) has been amended to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004. The amended regulations became effective October 13, 2006. In this case, none of the new provisions contained in the amended regulations are applicable because all the relevant events occurred prior to the effective date of the new regulations. However, for convenience, citations herein refer to the regulations as amended because the regulations have been reorganized and renumbered.

comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]. If a procedural violation has occurred, relief is warranted only if the violation affected the student's right to a FAPE (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]). The IDEA directs that, in general, a decision by an impartial hearing officer shall be made on substantive grounds based on a determination of whether or not the child received a FAPE (20 U.S.C. § 1415[f][3][E][i]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a child did not receive a FAPE only if the procedural inadequacies (a) impeded the child's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; see 8 NYCRR 200.5[i]). Also, an impartial hearing officer is not precluded from ordering a local educational agency to comply with IDEA procedural requirements (20 U.S.C. § 1415[f][3][E][iii]). The Second Circuit has determined that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression'" and if the IEP affords the student with an opportunity greater than mere "trivial advancement" (Cerra, 427 F.3d at 195, quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]), in other words, likely to provide some "meaningful" benefit (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]). The IDEA, however, does not require school districts to develop IEPs that maximize the potential of a student with a disability (Rowley, 458 U.S. at 197 n.21, 199; see Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 C.F.R. § 300.114; 8 NYCRR 200.6[a][1]).

As a preliminary matter, I note that the impartial hearing officer's decision was unclear as to which party was assigned the burden of proof on prong one of the Burlington/Carter analysis described above, i.e., whether the services offered by the board of education were appropriate. In the instant matter, the impartial hearing commenced before and concluded after the Schaffer v. Weast decision, which was issued on November 14, 2005. In Schaffer, the United States Supreme Court held that the "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." (Schaffer, 126 S.Ct. at 537 [2005]). Moreover, "where [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule" (Harper v. Virginia Department of Taxation, 509 U.S. 86 at 97 [1993]; see also, Bay Shore Union Free School Dist. v. T ex. rel. R, 405 F. Supp. 2d 230 [E.D.N.Y. 2005]). Accordingly petitioners as the party seeking relief, have the burden of persuasion to demonstrate that respondent failed to offer the child a FAPE.

I will address the parties' claims in chronological order. I note that the impartial hearing officer's decision does not indicate whether he considered the appropriateness of the 2004-05 IEP; however, the record shows that he considered evidence with respect to the 2004-05 IEP (see Tr. p. 36). The record reveals that petitioners raised the issue of its appropriateness at the impartial hearing; however, it is unclear from the pleadings whether respondent seeks review of the 2004-05 IEP as part of its cross-appeal. A review of petitioners' due process complaint notice indicates that petitioners alleged that the 2004-05 IEP was substantively inadequate because it failed to provide the child with individual home-based ABA services, which they contend were a necessary component of a FAPE for the child (Parent Ex. A). Under the

circumstances, inasmuch as petitioners raised the issue of the appropriateness of the 2004-05 IEP at the impartial hearing, I have reviewed the appropriateness of the 2004-05 IEP, and for reasons set forth in greater detail below, I find that at the impartial hearing, petitioners did not sustain their burden of proving that at the time that the 2004-05 IEP was formulated, the proposed program was inappropriate to meet the child's special education needs.

Despite having alleged in their due process complaint notice a number of deficiencies with respect to the 2004-05 IEP, an independent review of the record reveals that it is devoid of information to support petitioners' claims. I further note that many of the allegations cited in the due process complaint notice were not raised or developed at the impartial hearing. The record also reflects that with the exception of testimony from the child's 2004-05 HASC TSHH, petitioners did not enter into evidence the evaluative information considered by respondent's CPSE at the time the 2004-05 IEP was formulated to support their claim that the proposed program was insufficient to meet their son's special education needs (see Parent Ex. P at p. 4), nor did they call any witnesses who provided the child's special education services during the 2004-05 school year, or otherwise provide information regarding that school year.

At the impartial hearing, petitioners asserted that the April 2004 CPSE failed to adequately consider the child's need for intensive home-based ABA services in order to generalize his skills across settings (Parent Ex. A). The CPSE chairperson testified that at the April 2004 CPSE meeting she was unaware that the child received private ABA services (Tr. pp. 308-09). In April 2004 the CPSE recommended a five half-day per week 12:1+2 special class with ten hours of in-school delivery of 1:1 ABA instruction provided by a SEIT, and related services (Parent Ex. P at pp. 1, 4).

The CPSE chairperson testified that there was a lengthy discussion about the amount of ABA services and where the services would be provided (Tr. pp. 270-71). The CPSE offered to provide the ABA services at the child's home, at school or in a combination of settings (Parent Ex. P at p. 4). According to the 2004-05 IEP, the child's mother rejected this idea and requested that the child receive his ABA instruction at the preschool program and that he also receive additional ABA hours at home (id.).

The CPSE chairperson reported that the child had made "consistent progress" since she first observed him in August 2003, in that he became more social, his language emerged, he became more focused and his rate of skill mastery increased (Tr. p. 277). She testified that for the 2004-05 school year the CPSE recommended ten hours of ABA services, given that during the 2003-04 school year the child received between seven and a half and ten hours of ABA instruction and made "wonderful progress" (Tr. pp. 270, 273-74, 312). She stated that the CPSE took into consideration the child's mother's concern that her son was not generalizing skills to the home setting and her request for home-based ABA hours in addition to the ten school-based hours (Tr. p. 273). Nevertheless, the CPSE determined that ten hours of ABA instruction in total were "appropriate for [the child] to make good progress" (id.). The CPSE chairperson stated that with the exception of the child's mother, the CPSE agreed that ten hours of in-school ABA instruction were appropriate (id.).

Based on the foregoing, the record demonstrates that respondent afforded petitioners meaningful parent participation in the development of the 2004-05 IEP and gave careful consideration to their concern that their son required home-based ABA services in order to

receive a FAPE (see Cerra, 427 F.3d at 194-95).  Although petitioners maintain that at the time the IEP was developed their son required home-based ABA services in order to generalize his skills across settings, the record is devoid of documentation to support this allegation.  Based upon the information before me, I find that the program proposed in the 2004-05 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021).  In light of the foregoing, I find that for the reasons set forth above, respondent offered the child an appropriate program for the 2004-05 school year.  Having determined that the challenged IEP offered the child a FAPE for the 2004-05 school year, I need not reach the issue of whether the privately obtained supplemental ABA services were appropriate, and the necessary inquiry is at an end (Mrs. C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

I now turn to the appropriateness of the summer 2005 IEP.  Respondent contends that the impartial hearing officer erred in determining that the child was not offered a FAPE during summer 2005.  I concur.  A review of petitioners' due process complaint notice reveals that although petitioners seek reimbursement for home-based ABA services obtained during summer 2005, they fail to set forth any procedural or substantive deficiencies in the summer 2005 IEP that would warrant reimbursement for privately obtained home-based ABA services (see Parent Ex. A).  Based on the record before me, for the reasons detailed below I find that petitioners did not demonstrate during the impartial hearing that at the time the summer 2005 IEP was developed, it was inappropriate to meet the child's special education needs.

The record reveals that petitioners participated at the June 2005 CPSE meeting, accompanied by one of the child's private ABA therapists to report about his performance (Tr. pp. 397-98).  According to the CPSE chairperson, the private ABA therapist recommended a "small, language-based class" for the child and did not specifically state that the child continued to need home-based ABA therapy (Tr. p. 402).  It is not clear from the record whether or not petitioners requested home-based ABA services at the June 2005 CPSE meeting (see Tr. pp. 164, 397-98, 788, 1918).

A review of the summer 2005 IEP shows that it identified the child's social skill deficits and needs for peer interaction, "intensive individual instruction" to learn skills and behavior, and exposure to larger group settings to "practice social and language skills and to generalize skills learned" (Dist. Ex. 24 at pp. 4-5).  Annual goals and short-term objectives were developed in the areas of study skills, speech-language, social/emotional/behavioral, motor and basic cognitive/daily living skills (id. at pp. 6-8).  The summer 2005 IEP stated that the CPSE considered a program consisting of only related and SEIT services but determined that the child required a half-day special education program to successfully engage in age appropriate activities (id. at p. 3).  The summer 2005 IEP recommended a five half-day per week 12:1+2 non-integrated program with related services, parent counseling and training, and ten hours of individual SEIT instruction per week provided at the preschool (id. at pp. 2-3).

The record reflects that the program proposed in the summer 2005 IEP met the child's needs as identified by the present levels of performance. I find that the self-contained classroom addressed the child's needs for peer interaction and social skill practice, and the individual SEIT instruction addressed the child's "intensive" individual instruction needs. The record also reveals that related service recommendations addressed the child's speech-language and fine and gross motor needs. Under the circumstances presented herein, I find that the record shows that the program proposed in the summer 2005 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). Accordingly, petitioners did not sustain their burden of persuasion that the child was denied a FAPE during summer 2005, and they are not entitled to reimbursement for private ABA services for that timeframe.

Next, I will address the appropriateness of the program proposed in the 2005-06 IEP. Both parties raise a number of issues with respect to the appropriateness of the 2005-06 IEP. As a preliminary matter, petitioners claim on appeal that respondent's failure to properly classify the child during the June 2005 CSE meeting as a student with autism should have been adjudicated by the impartial hearing officer as an additional denial of FAPE. I disagree. First, I note that the record shows ample parental participation in determining that the child was eligible for special education services as a student with an OHI. The record indicates that the June 2005 CSE meeting, which determined the child's initial classification, was attended by petitioners, who fully participated in that discussion (Tr. pp. 108, 121, 575-76; Dist. Ex. 4 at p. 5). The CSE chairperson testified that the June 2005 CSE recommended services based on the child's needs, regardless of his classification (Tr. pp. 182, 184). The CSE chairperson further testified that although the child met the New York State eligibility criteria for services as a student with autism, he also had a number of medical conditions including gastrointestinal reflux, the need for a restricted diet, esophagitis, and asthma (Tr. p. 120). She stated that there was a "long" discussion about classification at the meeting, and the June 2005 CSE recognized the child's diagnosis of PDD, but determined that another "piece" to the child existed (Tr. pp. 119-20). She stated that the intent of the CSE was to do a "better job" describing each of the child's needs, and accordingly respondent's CSE recommended that the child be found eligible for special education services as a student with an OHI (Tr. p. 120).

Based on the record before me, and in light of the testimony of the CSE chairperson regarding the information about the child's medical conditions that the CSE had at the time of the June 2005 meeting, I find that the record supports the June 2005 CSE's determination that the child was eligible for special education services as a student with an OHI (see Dist. Ex. 12). Under the circumstances, I disagree with petitioners' contention that respondent's failure to initially classify the child as a student with autism resulted in an additional denial of FAPE.

I will now address respondent's argument that the impartial hearing officer erred in determining that respondent did not provide the child with a FAPE during the 2005-06 school year. Specifically, respondent asserts that the impartial hearing officer erred in finding that the 2005-06 IEP was deficient because the June 2005 CSE failed to conduct an FBA of the child and further finding that "by the end of the school year, the need for a BIP and FBA became obvious

to the classroom teacher" (IHO Decision at p. 3).  State regulations require that an FBA be performed as part of an initial evaluation of a child suspected of having a disability if the child's behavior impedes his or her learning or that of others (8 NYCRR 200.4[b][1][v]).  In addition, the IDEA as well as state and federal regulations mandate that the CSE "shall…in the case of a child whose behavior impedes his or her learning or that of others, consider, when appropriate, strategies, including positive behavioral interventions, and supports to address that behavior" (20 U.S.C. 1414[d][3][B][i]; 34 C.F.R. § 300.324[a][2][i]; see 8 NYCRR 200.4[d][3][i]).

        Where behavior impedes a child's learning, the CSE must properly assess that behavior as an initial step in developing an appropriate IEP (Application of the Bd. of Educ., Appeal No. 05-123; Application of the Bd. of Educ., Appeal No. 05-031; Application of a Child with a Disability, Appeal No. 03-057; Application of a Child with a Disability, Appeal No. 02-032; Application of a Child with a Disability, Appeal No. 01-094; Application of the Bd. of Educ., Appeal No. 01-060).  Respondent contends that the impartial hearing officer erred by considering evidence of the child's interfering behaviors during the 2005-06 school year, evidence that was not before the June 2005 CSE when the 2005-06 IEP was formulated.  I concur.  Numerous courts have held that the determination of appropriateness "is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the child's] subsequent progress … but rather consider the propriety of the [program] with respect to the likelihood that it would benefit [the child] at the time it was devised" (J.R. v. Bd. of Educ. of Rye Sch. Dist., 345 F. Supp. 2d 386, at 395-96 [S.D.N.Y. 2004]).  Accordingly, I will consider whether the child was denied a FAPE by respondent not conducting an FBA at the time that 2005-06 IEP was devised based on the information before the June 2005 CSE.

        Reports considered by the June 2005 CSE indicated that at times during the 2004-05 school year, the child engaged in behaviors that impeded his learning; however, his substantive program addressed those behaviors (Dist. Exs. 4 at p. 6; 6; 9 at p. 1; 13; 16 at pp. 1, 5; 17 at p. 1).  The March 2005 OT evaluation report states that the child exhibited distractibility, limited frustration tolerance and task refusal (Dist. Ex. 6 at p. 1).  The therapist reported that he used verbal and physical cues to help the child follow directions, and that the child was learning to "manage his frustration" by using language such as "please help me" (id.).  The March 14, 2005 education review report described the child's non-compliant behaviors and stated that these behaviors were addressed through consistent use of behavioral techniques, such as prompting the child through the task and expecting compliance from him (Dist. Ex. 16 at p. 1).  The special education teacher stated that instructions were repeated and prompts were faded until the child completed the task independently (id. at pp. 1-2).  She also reported that, in order to address behavioral concerns, the child was provided with opportunities throughout the day to have control over his learning environment, such as choosing a preferred activity (id. at p. 2).  The record also indicates that ABA instruction was incorporated into the child's program in order to maintain "compliant" behavior (id.).  The March 22, 2005 classroom observation report stated that the child had "difficulty" with multi-step transitions, but when the special education teacher broke down each step of the transition and provided a visual prompt, the child followed the direction (Dist. Ex. 13).  In the March 29, 2005 speech-language annual review report, the speech-language therapist stated that when the child was distracted, many verbal prompts were required to redirect him to the activity (Dist. Ex. 17 at p. 1).  The April 2005 psychological evaluation report indicated that during testing, the child was initially reluctant to answer questions with verbal answers but did so when prompted by the evaluator (Dist. Ex. 9 at p. 2).  I

also note that none of the evaluation reports contained in the record that the June 2005 CSE based its recommendations upon recommended that the child undergo an FBA (Dist. Exs. 4 at p. 6; 6; 8-18).

The private ABA education annual review report also considered by the June 2005 CSE stated that the child sat for up to 30 minutes with little prompting and did not need to be "highly reinforced" (Dist. Exs. 15 at p. 2; 4 at p. 6). The private special education teacher reported that sensory activities were used with the child when he had difficulty with an ABA program, and that she also encouraged him to use his language skills when he was frustrated (id. at pp. 2-3). The private special education teacher also used planned ignoring of a behavior with the child (id. at p. 3). None of the extended school day ABA programs described in the private special education teacher's annual review report specifically address the child's behaviors that impeded his learning, nor does the report indicate that the level of the child's behaviors warranted an FBA (id. at pp. 4-8). The majority of recommended annual goals and short-term objectives to address the child's social/emotional/behavioral needs contained in the private special education teacher's report were adopted by the June 2005 CSE and are contained in the child's 2005-06 IEP (compare Dist. Ex. 4 at pp. 7-8, with Dist. Ex. 15 at p. 8).

The record also demonstrates that the 2005-06 IEP present levels of performance reflected the child's behavioral difficulties, including his use of stereotypic behaviors, non-compliance with teacher directives, and attention deficits, which were documented in the evaluation reports that the June 2005 CSE considered (Dist. Ex. 4 at pp. 4-6). The 2005-06 IEP contained annual goals and short-term objectives in the area of study skills that addressed the child's attention problems, and in the social/emotional/behavioral areas that addressed non-compliance and self-stimulatory behaviors (id. at pp. 7-8). The 2005-06 IEP also recommended a positive reinforcement plan and refocusing/redirection throughout the child's educational program (id. at p. 1).

The CSE chairperson testified that the program recommended for the child for the 2005-06 school year was an ABA program, and her description of the child's classroom revealed that principles of ABA instruction were applied throughout the day (Tr. pp. 125-26). She stated that the program incorporated more than individual discrete trial instruction, as it also included skill generalization to small and large group settings (Tr. p. 125). She opined that the child's program analyzed behavior on an ongoing basis and therefore consisted of an "ongoing Functional Behavioral Assessment" (Tr. p. 126). She also opined that FBAs and BIPs are more commonly needed in programs that are not so data based, because those programs do not gather information for analysis (id.). She stated that the program specifically recommended for the child was designed to analyze and respond to behavior throughout the day, which she opined was "the assessment and intervention" (Tr. p. 251).

Accordingly, under the circumstances presented herein, the record does not demonstrate that at the time the 2005-06 IEP was developed, the child required an FBA. As noted above, although at times the child engaged in behaviors that impeded his learning, the record shows that his teachers and therapist successfully employed a variety of behavior management techniques to redirect the child to task completion. The record also indicates that the 8:1+2 program recommended for the child incorporated principles of ABA instruction throughout the day, in which his behavior could be assessed and interventions could be implemented.

Moreover, I note that at the time that the 2005-06 IEP was developed in June 2005, the child had had yet to attend the proposed placement. Therefore, the June 2005 CSE had no way of knowing if the child would exhibit behaviors that would impede his learning in the proposed program, which included structures and supports designed to manage such behaviors. In addition, an integral aspect of conducting an FBA is determining how a child's behavior relates to the environment in which it occurs. At the time of the development of the child's proposed IEP, the CSE did not yet know whether, in his new environment, the child would engage in behavior that impeded learning. Therefore, I find that an FBA would have been premature because the child had not attended the recommended program and placement (see Application of a Child with a Disability, Appeal No. 04-033).

The record also indicates that the June 2005 CSE was aware of the child's speech-language needs, including his dysfluent speech, and addressed them (Tr. pp. 117-18; Dist. Exs. 4 at pp. 3, 5-6; 9 at p. 2; 14; 16 at p. 2; 17). It recommended that the child receive individual speech-language therapy three times per week for 30-minute sessions, language instruction twice weekly in a group of five students, and placement in a "social communication class" (Tr. pp. 112-13; Dist. Ex. 4 at p. 1). The CSE chairperson described the program as a full-day 8:1+2 self-contained class with a certified special education teacher and two teacher assistants for eight children (Tr. pp. 113-14). The emphasis of the class was on language, communication, social interaction and academics; and children in the classroom had needs in those areas (Tr. p. 113). The CSE chairperson further stated that the social communication class utilized an ABA model with a heavy emphasis on communication and language, but that in addition to the class itself and the two group language instruction sessions, the child needed a level of individual speech-language service to address his dysfluent speech (see Tr. pp. 117-18).

In light of the foregoing, the record reflects that at the time the 2005-06 IEP was developed, the June 2005 CSE's recommendation regarding the child's speech-language services for the 2005-06 school year was appropriate, based on the information before it. The record further shows that the overall recommendation was for a small, staff-rich and language-based classroom, with additional twice-weekly group language instruction and three individual speech-language therapy sessions per week to address the child's dysfluent speech. Lastly, a review of the private speech-language pathologist's report considered by the June 2005 CSE indicates that his recommendation for five one hour sessions of speech-language therapy per week was designed to not only address the child's stuttering, but to attend to the child's other communication deficits as well, which respondent addressed with its total program recommendation (Parent Ex. 4 at p. 6; Dist. Ex. 14 at p. 6). Under the circumstances, I find that at the time that it was developed the June 2005 CSE made an appropriate recommendation with respect to the child's dysfluency and speech-language needs.

Furthermore, although the impartial hearing officer found, among other things, that the child was denied a FAPE for the 2005-06 school year because the June 2005 CSE did not conduct an FBA, he noted that the child made progress and received an educational benefit from respondent's full-day classroom program. Nevertheless, petitioners contend that the 2005-06 IEP was substantively deficient because it failed to take into account the child's need for an extended day program consisting of individual home-based ABA services. I disagree. As detailed below, I find that the program recommended for the child in the 2005-06 IEP was appropriate to meet the child's special education needs at the time that it was developed by respondent's CSE.

The record indicates that the June 2005 CSE considered a significant amount of current evaluative data regarding the child (Dist. Ex. 4 at pp. 3-4, 6). None of the evaluation reports contained in the record upon which the June 2005 CSE based its recommendations recommended that the child receive extended school day services (id. at p. 6; Dist. Exs. 6; 8-18). The present levels of performance contained in the 2005-06 IEP identified, among other things, the child's cognitive, social/emotional/behavioral, and attention needs based on information contained in the spring 2005 evaluation reports (Dist. Ex. 4 at pp. 3-6).

Additionally, the child's private special education teacher testified that at the June 2005 CSE meeting she provided information about the child's home-based ABA programs, her concerns about the child's speech and the results of testing she had conducted (Tr. pp. 650-51). The child's private special education teacher recommended that the child be placed in a small group language-based setting with a particular focus on social interaction (Dist. Ex. 15 at p. 8). As described above, the CSE chairperson indicated that the child's recommended program was a full-day 8:1+2 self-contained social communication class with an emphasis on language, communication, social interaction and academics (Tr. pp. 113-14). She further stated that the program utilized an ABA model with a heavy emphasis on communication and language (see Tr. pp. 117-18). The CSE chairperson testified that when the CSE considers the need for an extended school day program, it considers the child's total needs (Tr. p. 169). She opined that in light of the child's individualized special education needs, he did not require extended school day services (Tr. p. 184).

As set forth above, I find that the 2005-06 IEP contained extensive evaluative data, specific present levels of performance, and annual goals and short-term objectives that addressed the child's identified areas of need. I further find that an independent review of the record does not reveal that the proposed 8:1+2 special class could not have addressed the child's needs or that the child required home-based ABA instruction in his areas of deficit in order to receive a FAPE. Based upon the information before me, I find that the program proposed in the 2005-06 IEP, at the time it was formulated, was reasonably calculated to enable the child to receive educational benefit (Viola, 414 F. Supp. 2d at 382 [citing to J.R. v. Bd. of Educ. of the City of Rye Sch. Dist., 345 F. Supp. 2d 386 at 395 n.13 [S.D.N.Y. 2004]; see Cerra, 427 F.3d at 195; see also Mrs. B., 103 F.3d at 1120; Application of a Child with a Disability, Appeal No. 06-112; Application of a Child with a Disability, Appeal No. 06-071; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 05-021). In light of the foregoing, I concur with respondent that it offered the child an appropriate program for the 2005-06 school year. Having determined that the challenged IEP offered the child a FAPE for the 2005-06 school year, I need not reach the issue of whether petitioners' privately obtained home-based ABA services were appropriate, and the necessary inquiry is at an end (Mrs. C., 226 F.3d at 66; Walczak, 142 F.3d at 134; Application of a Child with a Disability, Appeal No. 05-038; Application of a Child with a Disability, Appeal No. 03-058).

Petitioners' due process complaint notice dated July 29, 2005 also seeks reimbursement for unspecified services obtained or to be obtained during the 2004-05 school year, summer 2005, the 2005-06 school year and summer 2006 (Parent Ex. A; Pet'r Reply Mem. of Law at p. 1). At the time that petitioners filed their due process complaint notice in July 2005, the only private expenses incurred by petitioners were for the private ABA services. Petitioners also asserted claims for reimbursement for supplemental speech-language therapy and compensatory speech for the 2004-05 school year and summer 2005. The impartial hearing officer awarded

reimbursement for private speech-language therapy for the child for the period of May 4, 2006 through June 29, 2007 (IHO Decision at p. 13). It is unclear from his decision whether this award was intended to be relief for petitioners' claims for summer 2006 services, supplemental speech-language therapy or compensatory speech-language therapy. Under the circumstances, I have reviewed the appropriateness of the impartial hearing officer's award of reimbursement and prospective award for the privately obtained speech-language therapy for the period of May 2006 through June 2007, and for the reasons expressed below, while I agree with the impartial hearing officer's finding that respondent failed to offer the child a FAPE during part of the 2005-06 school year, I have modified the award as indicated.

Compensatory education is instruction provided to a student after he or she is no longer eligible because of age or graduation to receive instruction. It may be awarded if there has been a gross violation of the IDEA resulting in the denial of, or exclusion from, educational services for a substantial period of time (Mrs. C. v. Wheaton, 916 F.2d 69 [2d Cir. 1990]; Burr v. Ambach, 863 F.2d 1071 [2d Cir. 1988]). Compensatory education is an equitable remedy that is tailored to meet the circumstances of the case (Wenger v. Canastota, 979 F. Supp. 147 [N.D.N.Y. 1997]).

While compensatory education is a remedy that is available to students who are no longer eligible for instruction, State Review Officers have awarded "additional services" to students who remain eligible to attend school and have been denied appropriate services, if such deprivation of instruction could be remedied through the provision of additional services before the student becomes ineligible for instruction by reason of age or graduation (Application of the Bd. of Educ., Appeal No. 02-047; Application of a Child with a Disability, Appeal No. 02-042; Application of a Child with a Disability, Appeal No. 02-030).

The standard for awarding compensatory education or additional services depends on whether there is a finding of a "gross violation" of IDEA or a denial of FAPE, respectively. Here, the child was five years old at the time of the commencement of the impartial hearing and the deprivation of instruction can be remedied through the provision of additional services before he becomes ineligible for instruction (Application of a Child with a Disability, Appeal No. 04-054; Application of the Bd. of Educ., Appeal No. 04-016; Application of the Bd. of Educ., Appeal No. 03-075; Application of a Child with a Disability, Appeal No. 01-094).

In April 2004 the child primarily used single words to communicate and used full sentences only with "much support" (Tr. p. 326; Parent Ex. P at p. 4). The CPSE chairperson testified that in April 2004 she was aware of the child's dysfluent speech (Tr. pp. 324-25). She stated that the "theory" at that time was that as the child's language emerged and he became more comfortable using language, possibly the dysfluent speech would resolve (Tr. pp. 324-25, 334-35). In April 2004 the child's speech dysfluency was not considered a primary problem, and the CSE chairperson stated that the child had many other areas of need that were more significant (Tr. pp. 325-26). The focus was to improve the child's ability to use language with other children because, in the CSE chairperson's opinion, that was more of an "issue" with children "on the spectrum" than dysfluent speech (Tr. pp. 323-24). The 2004-05 IEP did not contain any information about the child's speech fluency skills or needs, but it contained one annual goal and short-term objective in the area of speech fluency (Parent Ex. P at p. 5). The CPSE chairperson testified that the people who worked with the child recommended the goal, the goals were reviewed at the CPSE meeting, and petitioners agreed to that particular goal (Tr. p. 337).

The child's mother testified that the child exhibited dysfluent speech at the beginning of the 2004-05 school year (Tr. pp. 578-79). Respondent's CPSE chairperson testified that she was aware of a "mild" dysfluency problem at the beginning of that school year as well (Tr. p. 323). The HASC speech-language pathologist who provided therapy to the child one time per week in a group reported that she noted the child's speech dysfluency in December 2004 (Parent Ex. NN at p. 23), though it was not documented again in speech-language therapy log notes until March 2005, when it was noted that during the session the child worked on "fluency and rate" (id. at p. 26). HASC's TSHH, who provided therapy to the child twice per week in a group during the 2004-05 school year, testified that she did not notice his dysfluent speech until approximately January 2005 (Tr. pp. 692, 717, 720; Dist. Ex. 17). The TSHH testified that the child's speech dysfluency was not pronounced when she worked with him (Tr. pp. 707-08, 712). The TSHH stated that, after discussion with her supervisor, she did not address the child's dysfluency "much" in therapy because she did not observe it frequently in her sessions and, in her opinion, the child was too young to address it (Tr. pp. 707-08, 715-16). She reported that as the year progressed and the child's language increased, the dysfluent speech emerged (see Tr. p. 324).

The child's March 2005 annual speech-language report states that a portion of therapy focused on improving the child's speech fluency (Dist. Ex. 17 at p. 1). At that time, the child used three to four word utterances to answer questions, but required a model to request, comment or formulate a question (id. at p. 2). In April 2005, the TSHH reported that the child made "some progress" toward the speech fluency objective on his IEP (Tr. pp. 744-45; Parent Ex. P at p. 5).

Neither party presented testimony from the child's 2004-05 HASC special education teacher, whose March 2005 educational review report stated that the child "at times" had difficulty expressing himself and that he repeated the beginning sound of a word (Dist. Ex. 16 at p. 2). The report also stated that the child made "significant progress" interacting with friends in the classroom, and that during formal testing the child recited numbers one through 20 and completed a variety of naming activities (id. at pp. 2, 4-5). The child's HASC special education teacher concluded that although the child continued to exhibit delays, he had made "significant progress" (id. at p. 5).

Furthermore, I note that the record does not contain information pertaining to the child's level of speech performance at the beginning of the 2004-05 school year. If the child's levels of speech performance at the beginning of the 2004-05 school year were consistent with the characterization developed in April 2004, the child was primarily using single words to communicate. If the child was using only single words to communicate, it would have been difficult for respondent to address fluency problems, especially in relation to his more pressing language needs, his cognitive delays and associated features of PDD. The record also indicates that by March 2005 the child's expressive language skills improved to the three to four word utterance level. Although the record reflects that the child's stuttering increased to a noticeable level at school during the period of December 2004 through January 2005, probably in relation to his improved expressive language skills, neither the TSHH's testimony or the special education teacher's report reflect that the child's speech dysfluency contributed to a lack of progress toward his IEP goals and objectives or inhibited his progress in speech therapy and in the classroom. In summary, based on the foregoing, I find that the record does not support petitioners' claims that during the 2004-05 school year the child's stuttering was pronounced to the extent that it

negatively affected his educational performance or that the speech-language services offered by respondent denied the child a FAPE.

Petitioners also asserted a claim for compensatory speech-language therapy for summer 2005. The CPSE chairperson testified that she became aware that the child's dysfluent speech had increased during the 2004-05 school year when she received information from the child's HASC TSHH and the spring 2005 report from the private speech-language pathologist (Tr. pp. 335, 350). She stated that although ESY services were provided to prevent regression, the June 2005 CPSE recommended that the child receive two individual sessions per week of speech-language therapy to address his stuttering (Tr. pp. 335, 350; Dist. Ex. 24 at p. 3). She stated that petitioners participated in the meeting and discussed the child's needs (Tr. p. 397). She did not recall that petitioners expressed dissatisfaction with the level of speech-language therapy that was recommended for the child during summer 2005 (Tr. p. 360).

I note that the record does not contain information regarding implementation of the child's summer 2005 speech-language therapy services. The provider of the child's summer 2005 speech-language therapy did not testify, nor are there reports of how the summer 2005 IEP was implemented or reports of progress. What the record does show is that the CPSE recognized the child's speech fluency problem and added two sessions of individual speech-language therapy to address his needs. In light of the foregoing, I find that petitioners did not establish that the child was denied a FAPE with respect to his speech-language needs during summer 2005 and, accordingly, they are not entitled to reimbursement for future speech-language (fluency) services as additional services for that timeframe.

I must now consider whether petitioners sustained their burden of proving that the child is entitled to additional services as a remedy for a denial of FAPE with respect to his speech-language needs during the 2005-06 school year. As set forth in greater detail below, I find that the record supports their claim that for a portion of the 2005-06 school year respondent failed to adequately address the child's dysfluency, an identified area of need, thereby resulting in a denial of FAPE.

The special education teacher testified that in September 2005 the child usually used three to four word utterances to answer questions and that he spoke "well" (Tr. pp. 2540-42). The child's special education teacher also stated that once the child spoke in longer utterances, "issues" were noticed (Tr. p. 2542). She agreed with the statement on the child's IEP that his speech intelligibility was moderately impaired during connected speech due to a lack of fluency and that it was a problem he had "at times" throughout the 2005-06 school year (Tr. pp. 2545-46).

In November 2005 the child's IEP progress report stated, "a fluency program has been incorporated within the individual sessions of speech-language therapy. [The child] has revealed good modeling skills for all methods introduced, of correct diaphragmatic/abdominal breath control. Prognosis for success with this type of therapy is good, as revealed from the past four sessions" (Parent Ex. DD at p. 2). In November 2005, the CSE chairperson testified that the child's speech-language therapist emphasized a slower speech rate for the child (Tr. p. 422). The CSE chairperson also stated that she observed the child using four to five word utterances without stuttering, and that the special education teacher and speech-language therapist indicated that the child was dysfluent when excited or speaking too fast (id.).

The child's mother testified that during an early December 2005 observation of a school speech-language therapy session, her son's speech-language therapist told her that the child did not have a "true stutter" (Parent Ex. BB at p. 3). According to the child's mother, the speech-language therapist reported that the child's special education teacher also did not observe "much" dysfluent speech, "just recently a little" (Tr. pp. 1632-34; Parent Ex. BB at p. 3). The speech-language therapist informed the child's mother that she used relaxation, imagery techniques, ball rolling, blowing bubbles, breathing techniques and active listening as methods to improve his speech fluency (Tr. p. 1635; Parent Ex. BB at p. 4). At some point between January and March 2006 the child's speech-language therapist and the CPSE chairperson referred the child's mother to a private speech-language pathologist who specialized in therapy for stuttering (Tr. pp. 1636-40, 1756-57, 1895).

The child's mother testified that during a March 1, 2006 observation of the child the speech-language therapist described the child's stuttering as "severe" (Tr. pp. 1636-38).

On March 7, 2006, respondent's speech-language therapist conducted a speech-language evaluation of the child (Parent Ex. DDD at pp. 9-10). In her report, she described the severity of the child's dysfluent speech patterns as "moderate" with "barely noticeable secondary characteristics" (id. at p. 9). The report stated that formal and informal observations of the child during conversational speech did not reveal struggle and/or frustration or tension associated with his dysfluent speech (id.). She noted that the child was "sometimes" aware of his speech patterns, and that with prompting and learned techniques he was able to "pullout" of dysfluent episodes (id.). The report stated that the child exhibited good to excellent results when he used speech fluency techniques such as continuous airflow, easy onset, cancellation and pullout, and that he incorporated many to all of the techniques with minimal prompting in a structured setting and during small group speech-language therapy sessions (id. at pp. 9-10). The speech-language therapist recommended that for the upcoming 2006-07 school year the child receive twice weekly individual and once weekly group speech-language therapy to develop and improve speech fluency and pragmatic skills (id. at p. 10). As described above, in May 2006 the stuttering specialist conducted a speech fluency evaluation of the child and reported that he exhibited severe speech dysfluencies for which she recommended speech therapy five times per week (Dist. Ex. 25 at pp. 13-16).

A review of the record reveals that it does not contain testimony from the child's 2005-06 school-based speech-language therapist. Moreover, there are no speech-language therapy notes, progress reports or anecdotal information from the speech-language therapist about the child's speech dysfluency during the 2005-06 school year. Although as early in the year as November 2005 the speech-language therapist reported that the child made progress toward his IEP fluency objectives, a review of the record reveals that by March 2006 his stuttering was characterized as moderate to severe (Tr. pp. 1636-38; Parent Exs. DD at p. 2; DDD at p. 9). At that point, under the circumstances, I find that respondent's CSE should have reconvened to determine what additional intervention could be added to the child's program to address the increase in dysfluent speech. By referring the child to a stuttering specialist at some point in winter-spring 2006 and failing to address the dysfluency at school to increase the level of service, respondent effectively acknowledged the child's need for an increase in services.

Having found that respondent failed to adequately address the child's speech-language needs with respect to the 2005-06 school year, I must now consider whether the speech-language services privately obtained by petitioners were appropriate. Respondent asserts that the IDEA does not entitle the child to the optimum services that petitioners have obtained through the stuttering specialist. Respondent does not argue that the private speech-language therapy was inappropriate to meet the child's speech-language needs, only that his needs did not require the services of an "expert" therapist. As explained in greater detail below, I disagree, and find that the services of the specialist were appropriate to address the child's individual speech-language needs.

The record shows that the specialist who provided the May-June 2006 private speech fluency therapy has a doctorate in speech-language pathology with a specialization in stuttering (Tr. pp. 1754-55). She is a board recognized stuttering specialist who has devoted her "entire professional life to helping children and adults who stutter" (Tr. pp. 1755, 1759). She has taught courses in stuttering and stuttering therapy to graduate students since 1978 (Tr. p. 1755). Her May 4 and 5, 2006 evaluation of the child identified the characteristics of his speech dysfluency (Tr. pp. 1784-93). She provided strategies to petitioners for use at home (Tr. pp. 1794-96). During therapy sessions, she used intervention techniques such as enhanced modeling (speaking in a way to the child that includes all the fluency techniques that are taught to people who stutter), face-to-face communication with appropriate eye contact and full attention (Tr. pp. 1803-06, 1810-11). The specialist testified that the child sustained attention during the 45-minute sessions, maintained eye contact, smiled and appeared happy (Tr. pp. 1812-13). The specialist reported that by the middle of June 2006 the child spoke more easily and his speech initiation increased (Tr. p. 1814). She testified that within the 45-minute sessions the child made "very significant meaningful progress," and that the therapy met his individual needs (Tr. p. 1822).

Based on the foregoing, I find that the speech-language services that petitioners obtained for their son in May 2006 were appropriately tailored to address the child's individual speech-language needs. However, as detailed below, I will modify the award made by the impartial hearing officer.

The record suggests that a CSE meeting was held to develop an IEP a "few weeks" prior to the specialist's testimony on June 14, 2006 (Tr. p. 1861). I note that the most recent IEP contained in the record is the 2005-06 IEP. The record does not show whether the CSE meeting that took place in spring 2006 was held to amend the 2005-06 IEP or to develop the 2006-07 IEP. Under the circumstances, the record does not demonstrate what the CSE recommended for the child for the remainder of the 2005-06 school year, summer 2006 or the 2006-07 school year in regard to fluency therapy. Even if respondent did amend the 2005-06 IEP at some point in May 2006 to add additional fluency therapy, reimbursement for the specialist's services through the end of June 2006 may help remedy the deprivation of appropriate services that occurred since at least March 2006. Under the circumstances, I will modify the award to the extent that respondent will reimburse petitioners for the cost of the private stuttering specialist from May 4, 2006 through the end of the 2005-06 school year.

I have the considered the parties' remaining contentions and find them to be without merit.

**THE APPEAL IS DISMISSED**.

**THE CROSS-APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

    **IT IS ORDERED** that upon proof of payment respondent shall reimburse petitioners for the private speech-language therapy obtained during the period of May 4, 2006 through June 23, 2006.

Dated:    **Albany, New York**
            **April 9, 2007**

                                                    _____
                                                  **PAUL F. KELLY**
                                                  **STATE REVIEW OFFICER**