UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

J.A. and E.A., on behalf of M.A.,

                              Plaintiffs,                  **COMPLAINT**

--against--

East Ramapo Central School District,              **Docket No. ___ CV ___**

                              Defendant.

------------------------------------------------------------x

      Plaintiffs, J.A. and E.A., on behalf of, M.A. by their attorneys, Mayerson & Associates, as and for their Complaint, allege and state the following:

    1. Plaintiff M.A. is a male child who has been diagnosed with Pervasive Developmental Disorder, Not Otherwise Specified (hereinafter "PDD-NOS"), a serious autism spectrum disorder. M.A. has global delays related to his diagnosis of autism, including specific delays in fine and gross motor skills, receptive and expressive language, cognitive abilities, and social skills.

    2. M.A. was at all relevant times a student within the East Ramapo Central School District's purview, entitled to all rights, entitlements, and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act (hereinafter "IDEIA"), 20 U.S.C. § 1400 et. seq., the pertinent implementing regulations promulgated under the Code of Federal Regulations, Article 89 of the New York State Education Law (hereinafter "Article 89") and Part 200 of the Regulations of the Commissioner of the New York State Education Department (hereinafter "the Commissioner's Regulations").

3. Plaintiffs J.A. and E.A., are M.A.'s parents and are residents of the State of New York, residing at all relevant times at an address within the East Ramapo Central School District, and presently residing at 156 East Willow Tree Road, Spring Valley, Rockland County, NY 10977.

4. M.A. and his parents, J.A. and E.A., are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. 1232(g), and 34 C.F.R. 99.

5. The Defendant East Ramapo Central School District (hereinafter "the District"), upon information and belief, is a duly constituted school district organized under the laws of the State of New York.

6. This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. §1331 and §1367 has jurisdiction of this action without regard to the amount in controversy. Venue is proper in that plaintiffs and defendants all reside in or are situated within this judicial district.

7. This action is brought pursuant to the provisions of 20 U.S.C. § 1400, et. seq., more commonly known as the IDEIA and, in particular, 20 U.S.C. § 1415(i)(2)(A), in order to seek (a) a modified *de novo* review and partial reversal of (i) an Impartial Hearing Officer's (hereinafter "IHO") December 30, 2006 Decision (Exhibit A) and (ii) the State of New York State Review Officer's (hereinafter "SRO") April 9, 2007 Decision (hereinafter "SRO Decision")(Exhibit B), (b) a determination that M.A. met the applicable Second Circuit standard for reimbursement and compensatory relief, (c) an order directing defendant to reimburse plaintiffs, as requested, and provide compensatory services, and (d) an order granting plaintiffs leave to file a fee application pursuant to the fee shifting provision of the statute.

8. Plaintiffs seek in this action to secure the declaratory and reimbursement relief denied by the IHO and SRO and to otherwise affirm the findings in the plaintiffs' favor.

9. Pursuant to the IDEIA statute, as well as the New York State Education Law, all school agencies within the State are required to offer each eligible student with a disability a free

appropriate public education (hereinafter "FAPE") that is tailored to meet his or her individual needs. As the Supreme Court recently ruled held in <u>Winkelman v. Parma City Sch. Dist.</u>, 127 S. Ct. 1994, 2003 (U.S. 2007), parents have their own statutory entitlements that correspond to their children's entitlements.

10. The District is a local education agency that is statutorily obligated under the IDEIA, as well as the laws of the State of New York, to provide M.A. with a FAPE.

11. The FAPE required under IDEIA necessarily will be different for each child, as IDEIA expressly rejects any "one size fits all" approach or restrictions that preclude the genuine individualization of a student's educational program.

12. On April 27, 2004, a meeting of the Committee on Preschool Special Education (hereinafter "CPSE") determined that M.A. was eligible to receive special education services as a preschool student with a disability.

13. On July 15, 2005, both the CPSE and Committee on Special Education (hereinafter "CSE") determined that M.A. was eligible to receive special education services as a student with an "Other Health Impairment" (hereinafter "OHI"). M.A.'s parents objected to this generic catch-all classification and communicated that M.A. should properly be classified as "autistic," rather than OHI.

14. J.A. and E.A. secured and funded private Applied Behavioral Analysis (hereinafter "ABA") therapy and speech and language therapy during the 2004-2005 and 2005-2006 school years, including the 2005 and 2006 Summers, due to their concerns about the appropriateness of the placement and program offered M.A. by the District. Additionally, J.A. and E.A. secured and funded private speech therapy, beginning in May, 2006, for M.A.'s severe stuttering problem, which the District failed to appropriately address. The record showed that the District's personnel's "plan" to address M.A.'s severe stuttering was to ignore it.

3

15. The evidentiary record establishes that, during each of the IEP meetings and throughout the IEP development process, J.A. and E.A., though cooperative and un-obstructive, expressed reasonable concerns regarding the appropriateness and sufficiency of the services offered M.A. by the District.

16. On July 29, 2005, plaintiffs filed for due process to challenge, both procedurally and substantively, M.A.'s IEPs for the 2004-2005 school year, the Summer of 2005, the 2005-2006 school year, and the Summer of 2006. Plaintiffs sought a declaration that M.A. had been denied a FAPE and misclassified, as well as Burlington/Carter reimbursement relief for the ABA and speech services that M.A.'s parents privately funded during both school years. Plaintiffs also sought compensatory speech and language services covering the 2004-2005 school year, the Summer of 2005, and the 2005-2006 school year to the extent deemed appropriate to remedy the failure of the District to provide M.A. a FAPE, and, specifically, to properly and meaningfully address a severe stuttering problem.

17. The IHO's December 30, 2006 Decision held, based on an extensive evidentiary record spanning twelve days and over 2,500 pages of testimony, that the District had denied M.A. a FAPE (establishing Prong I in M.A.'s favor) and that equitable considerations favored M.A.'s parents (establishing Prong III in M.A.'s favor).

18. The SRO's April 9, 2007 Decision granted the District's cross-appeal to a large extent and held that a FAPE had not been denied M.A. during the 2004-2005 school year and the Summer of 2005. The SRO apparently ignored the record and the applicable review standards.

19. Though the SRO properly held that the District had denied M.A. a FAPE during the 2005-2006 school year due to its failure to appropriately address M.A.'s severe stuttering problem, the SRO improperly refused to award any compensatory relief to correct this deprivation of FAPE, as the IHO had done. It was error for the SRO to find a right without a remedy, and to arbitrarily reverse the IHO on the compensatory relief that he granted.

Upon information and belief, compounding the SRO's erroneous analysis was an apparent bias and appearance of impropriety on the part of the SRO, who is currently under active investigation. The allegations against the SRO are discussed in a recent article appearing on the front page of the Wall Street Journal (Exhibit C), and concern:

- Evidence that the SRO decided approximately 86% of appeals partially or fully in favor of the local education agencies in 2006 and 2007, even though parents apparently won approximately 54% of impartial hearings in 2005-2006,
- The statements of former agency staff members claiming that the SRO frequently overruled them when they prepared decisions in favor of parents, and
- Evidence that the SRO's already compromised independence and required impartiality have been further compromised by an ongoing romantic relationship with an assistant counsel for the New York State Education Department.

20. The allegations reported in the Wall Street Journal are serious ones that erode public confidence in the integrity of the system and, if at all true, they also should be considered as part of any duty this Court might otherwise have to give "due deference" to the underlying administrative fact-finding. Plaintiffs had no knowledge of the SRO's apparent bias and other related problems until *after* the SRO had ruled.

21. The IHO held that the District's failure to administer a Functional Behavioral Assessment (hereinafter "FBA") denied M.A. a FAPE. The decision was based on "more than sufficient evidence and testimony" concerning "non-compliant and oppositional behavior and self-stimulating conduct." The IHO ordered the District to conduct a FBA.

22. The Commissioner's Regulations *require* that a FBA be conducted for any student "whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 NYCRR § 200.4(b)(1)(v).

23. Federal decisional law has also firmly established that an FBA must be conducted when interfering behaviors are present. Walczak v. Florida Union Free School Dist., 142 F.3d 119,

5

129 (2d Cir. 1998); A.C. v. Bd. of Educ., 2007 U.S. Dist. LEXIS 31417, *12 (D.N.Y. 2007)(reversing the SRO as a matter of law).

24. Even the SRO's Decision acknowledges that M.A. had interfering behaviors. SRO Decision at 15.

25. The SRO erroneously concluded, however, that "routine observation" could substitute for the statutorily mandated FBA. SRO Decision at 15. The SRO applied an unduly low standard to measure the appropriateness of the District's conduct.

26. The SRO's interpretation also is erroneous as a matter of law, as it ignores the regulatory mandate for a *Functional* Behavioral Assessment, as well as the regulatory language that expressly states that the FBA's purpose is to "ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 NYCRR § 200.4(b)(1)(v); A.C. v. Bd. of Educ., 2007 U.S. Dist. LEXIS 31417, *12 (D.N.Y. 2007).

27. The SRO cited no evidence, *and the record includes no evidence*, establishing that the District *functionally* assessed M.A.'s interfering behaviors to determine what "physical, mental, behavioral and emotional factors" contributed to M.A.'s disability, as required by law. 8 NYCRR § 200.4(b)(1)(v). As such, the SRO glossed over the District's failure to conduct a proper FBA. Given the Wall Street Journal's account of the SRO's apparent bias, we do not think the SRO's failure to recognize this important violation was mere coincidence.

28. The SRO then goes on to cite a myriad of practices undertaken by individual practitioners responding to observed behaviors as somehow being evidence that the District fulfilled its legal responsibilities. Tellingly, the SRO states that though M.A. "engaged in behaviors that impeded his learning, the record shows that his teacher and therapists successfully employed a variety of behavior ***management*** techniques" in his program. SRO Decision at 16 (emphasis added). This statement highlights the SRO's failure (or refusal) to understand or properly apply the regulation's requirement for a functional behavioral assessment to enable behavior *modification*,

6

not mere "management." The statute does not grant local education agencies an FBA exception if they are "trying" techniques.

29. Moreover, the evidence adduced at hearing establishes that the employment of a "variety" of techniques to "manage" behavior is, on its face, an ineffective practice. An FBA is the recognized <u>precursor</u> of and thus *facilitates* the creation of a Behavioral Intervention Plan (hereinafter "BIP")(a plan to modify a child's behavior that is supposed to be implemented *uniformly* by all practitioners working with the child). The Commissioner's Regulations required the CSE to create a BIP for M.A. once it was determined that he had interfering behaviors. 8 NYCRR § 200.4(b)(3)(i).

30. No weight should be given to the SRO's illogical and erroneous argument that an FBA was somehow "not necessary" because M.A. had not yet attended the District's recommended program and the "CSE had no way of knowing if the child would exhibit behaviors." SRO Decision at 17. In making such an absurd argument, the SRO ignored his own acknowledgement that the CSE *had evidence* that M.A. already was exhibiting interfering behaviors when it met in July, 2005. The SRO cites as support for this argument another of his decisions. Interestingly, the decision cited, <u>Application of a Child with a Disability</u>, Appeal No. 04-033, held that since there was *no evidence of interfering behaviors at the time of the CSE meeting*, the CSE could not be expected to predict whether behaviors might occur in the new placement. By the SRO's own admission, in his Decision at p. 15, M.A. already had exhibited interfering behaviors, as at the time of his IEP, and, therefore, the SRO's citation to Appeal no. 04-033 is misleading, if not disingenuous. The SRO repeatedly twisted and contorted to blindly accept the District's pretexts and excuses.

31. The IHO determined that the District's failure to provide the appropriate level of speech and language therapy further deprived M.A. of a FAPE. On this point, the District's record was particularly shameful.

7

32. The IHO founded his holding that the inadequate speech and language program deprived M.A. of a FAPE on the weight of evidence and testimony establishing that M.A. required one-on-one therapy to benefit, due to the "severity" of M.A.'s speech and language deficits.

33. The SRO, reversing the IHO on the District's cross-appeal, cited only the testimony of the CSE chairperson describing the design (without any discussion of the theory underlying said design) of the program as "evidence" that the program was uniquely tailored to meet M.A.'s needs. The SRO ignored the weight of the evidence, which suggests that the speech and language services offered by the District were inappropriate for M.A. In fact, the SRO only described the recommendation of the CSE and cited *no* evidence regarding what would be appropriate for M.A. when making a determination that the program did not deprive M.A. of a FAPE. Such selective use of testimony by the SRO appears throughout his decision. The SRO, who was not even present at the hearing, repeatedly accepted all of the District's testimony at face value. The Wall Street Journal offers an explanation as to how and why this occurred.

34. The speech and language programs offered to M.A. by the District in both 2004-2005 and 2005-2006 did not even fulfill the mandates of the Commissioner's minimal Regulations for children diagnosed with autism spectrum disorders. Thus, these programs, on their face, denied M.A., a child with an autism spectrum disorder, a FAPE.

35. The IHO had properly held that the District had denied M.A. a FAPE by its gross failure to address M.A.'s severe stuttering during the 2004-2005 and 2005-2006 school years.

36. The IHO awarded reimbursement and compensatory services to address M.A.'s stuttering, running from May, 2006 to the end of the 2006-2007 school year.

37. The SRO affirmed the IHO's finding that the District's failure to address M.A.'s stuttering amounted to a denial of FAPE during the 2005-2006 school year.

38. The SRO erred, however, in determining that the failure of the District to counteract M.A.'s growing stuttering problem during the 2004-2005 school year did not deprive M.A. of a

8

FAPE. The SRO himself acknowledges that the record indicates that the CPSE chairperson was aware of the stuttering problem at the start of the 2004-2005 school year and that "the child's stuttering increased to a noticeable level at school during the period of December 2004 through January 2005." Despite both citing testimony establishing that the stuttering problem was pronounced and negatively affected M.A.'s progress during 2004-2005, both the IHO and the SRO held, erroneously, we contend, that M.A. had not been deprived of a FAPE.

39. The SRO again blindly accepted (only) the testimony of the CSE chairperson in finding that the District provided appropriate speech and language services, including services to counteract M.A.'s worsening stutter, during the Summer of 2005. The SRO's one-sided "whatever the CSE chairperson says" approach appears to value the testimony of the CSE chairperson exclusively, as he repeatedly cites only the Chairperson's testimony throughout his decision when called on to "weigh" the evidence. Such a one-sided assessment is cause for serious concern, particularly in light of the heightening public controversy over the SRO's apparent bias and partiality and the fact that SRO staff members are fleeing that office for reasons that have nothing to do with the pay (see *supra* at No. 19).

40. Further, the SRO held that M.A.'s stuttering problem had worsened to the point that the CSE team *should have reconvened* by at least March 2006. However, the SRO failed and refused to award M.A. any compensatory speech and language services. Rather, the SRO erred by replacing the IHO's award of *compensatory* services with *reimbursement* relief covering only the short window from May, 2006 to the end of the 2005-2006 school year, i.e., June 30, 2006. Such a miniscule award cannot be justified, given the weight of the evidence and the SRO's own holding, which supports a compensatory award. The SRO should not have reversed the IHO on the issue of his compensatory award.

41. The SRO, though finding a denial of FAPE related to the District's failure to address M.A.'s severe stuttering, nevertheless failed to analyze M.A.'s parents' reimbursement claim for

9

the 2005-2006 school year. A denial of a FAPE, for any reason, should have warranted such an analysis and, based on the weight of the evidence under the less stringent Frank G. standard (see *infra* at No. 52), a reimbursement award should have issued.

42. The IHO failed to rule on the plaintiffs' further claim that they were denied meaningful participation in the development of M.A.'s IEP, and were thus denied a FAPE. Winkelman v. Parma City Sch. Dist., 127 S. Ct. 1994, 2003 (U.S. 2007); Deal v. Hamilton County. Bd. of Educ., 392 F.3d 840 (6th Cir. 2004), *cert denied* 546 U.S. 936 (2005); T.P. v. Mamaroneck Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, *19 (D.N.Y. 2007). The evidence adduced during the hearing amply establishes that the District impermissibly predetermined that M.A. should be classified as OHI, rather than "autistic." Despite M.A.'s parents' continuous objections to the OHI classification, the District unilaterally classified M.A. as OHI. Further, the weight of the evidence from the hearing established that the District predetermined that it would not provide any "extended-day" (after-school) services, unless the services would "come out" of M.A.'s existing school services.

43. The IHO further erred when he allowed the District to unilaterally change M.A.'s classification from OHI to autistic *at the hearing* without adjudicating the claim that M.A. had not been properly classified. The misclassification claim was a central issue included in the plaintiffs' demand for due process, and it was critical to any Prong I determination of whether a FAPE had been offered M.A. by the District, and, thus, for any Prong II determination of whether plaintiffs were justified in securing private ABA and speech services for which reimbursement relief should issue. The District was not empowered to eliminate this claim, and the IHO and SRO were not empowered to ignore it.

44. M.A. has been diagnosed with PDD-NOS, and the District included language in both M.A.'s 2004-2005 and 2005-2006 IEPs acknowledging an awareness of this diagnosis.

45. Despite an awareness of M.A.'s PDD-NOS diagnosis, the District improperly classified M.A., against the objection of M.A.'s parents, as "Other Health Impaired" (hereinafter "OHI") on M.A.'s 2005-2006 IEP.

46. A child carrying a diagnosis of PDD-NOS is qualified, as a matter of law, for an "autism" classification once he or she has turned five-years-old and is of school age.

47. The Commissioner's Regulations mandate certain enhanced and more protective (and thus, more expensive) service levels for children classified with "autism." Mandated services include parent training and counseling, intended "to enable[e]parents to perform appropriate follow-up intervention activities at home." 8 NYCRR § 200.13(d). The Commissioner's Regulations also require that instructional services shall be provided to meet the individual language needs of a student with autism for a minimum of 30 minutes daily in groups not to exceed two, or 60 minutes daily in groups not to exceed six." 8 NYCRR § 200.13(a)(4).

48. The District's classification of M.A. as OHI improperly concealed M.A.'s primary disability and, upon information and belief, was undertaken as a means to avoid the greater legal obligations placed by the New York State Education Department on Districts when educating children with autism. An OHI generic classification operates to largely let a district "off the hook" with respect to any § 200.13(a)(4) obligations.

49. New York law and IDEA require that a child only be classified as OHI only when he or she has multiple disabilities that are not substantively interrelated to the child's primary disability. M.A.'s speech and language, physical, and occupational therapy deficits are part of his primary diagnosis on the autism spectrum. While M.A. also had some gastro-intestinal difficulties and asthma, both were under control, and did not justify invoking the generic classification of OHI, particularly where M.A.'s parents were *objecting* to OHI and requesting an "autistic" classification.

11

50. Regardless of whether the OHI "classification" was proper, it did not release the District from its obligation to provide M.A. the type and level of services mandated for children with autism, as the District acknowledged *within the four corners of M.A.'s IEP* that M.A. had been diagnosed with PDD-NOS, which is on the autism spectrum.

51. The District did not even interpose an Answer denying the allegation that M.A. was improperly classified. While there were "offer of judgment" provisions the District could have invoked weeks before the hearing, the District never invoked those provisions. The District did not have standing to unilaterally eliminate the classification claim at the hearing, and the IHO and SRO should have decided the classification claim in M.A.'s favor. That claim was not "moot."

52. Despite discussion on the record stating that the classification issue would remain active, the IHO, a non-lawyer, erroneously concluded that the classification issue was rendered moot and he denied plaintiffs any opportunity to have that claim adjudicated. The SRO then followed the IHO's erroneous lead.

53. For Prong II purposes, the IHO's analysis of the appropriateness of the parents' unilateral program ignored the less stringent standard established by the Second Circuit in Frank G. and Dianne G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006), which held that "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education." The proper test merely requires that the placement be "likely ['reasonably calculated'] to produce progress, not regression." Frank G., 459 F.3d at 364. The weight of the evidence overwhelmingly established that M.A.'s unilateral placement and program met this less stringent standard.

54. While the Department failed to offer M.A. a FAPE, the program unilaterally selected for M.A. by his parents, which included both ABA therapy and speech and language services, was, in fact, appropriate under the Frank G. standards. 459 F.3d at 364.

55. Specifically, M.A.'s unilateral program was tailored to enable T.Y. to make meaningful educational gains, pursuant to Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Weschester Cty v. Rowley, 458 U.S. 176 (1982).

56. Further, the IHO impermissibly based his decision not to reimburse M.A.'s extended day program on his personal belief and philosophy that "school districts are not *expected* to compensate parents" for extended-day services. The Frank G. standard contains no such "expectation" restriction and, as a matter of law, there is no such restriction under New York or federal law. See 459 F.3d at 364.

57. The notion that it would not be appropriate for a local education agency to fund any extended day programming runs counter to the *individualization* ideals on which IDEA is founded. In fact, extended day (after school) programming is often provided for children with autism, so as to provide necessary programmatic consistency and to promote generalization.

58. Further, the evidence introduced during the hearing amply establishes that the equities further support J.A. and E.A.'s claim for reimbursement. Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). M.A.'s parents were cooperative and forthcoming, they acted reasonably, and they provided due notice of their claims.

WHEREFORE, it is respectfully requested that this Court:

 (a) reverse, in part, the April 9, 2007 Decision of the SRO and the December 30, 2006 Decision of the IHO to the extent that they denied relief that plaintiffs had requested;

 (b) declare that defendant failed to offer M.A. a FAPE for the 2004-2005 school year, the Summer of 2005, the 2006-2007 school year, and the Summer of 2006;

 (c) declare that M.A.'s privately secured programs for the 2004-2005 school year, the Summer of 2005, the 2006-2007 school year, and the Summer

13

of 2006 were appropriate and reimbursable under applicable Prong II standards, and that the equities favor M.A. under Prong III and do not preclude or diminish a reimbursement award;

(d) order that the defendant reimburse J.A. and E.A. for the actual incurred costs of M.A.'s private program for the 2004-2005 school year, the Summer of 2005, the 2006-2007 school year, and the Summer of 2006, and provide M.A. by way of compensatory damages with the full supplementary services M.A. was slated to receive under "pendency";

(e) order that the defendant provide compensatory services, as appropriate, to remedy its gross failure to provide M.A. a FAPE during the 2004-2005 school year, the Summer of 2005, the 2006-2007 school year, and the Summer of 2006;

(f) declare plaintiffs to be the "substantially prevailing" parties;

(g) grant leave to plaintiffs' counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative level, the SRO level, and in this action, pursuant to the express fee-shifting provisions of the federal IDEIA statute and <u>A.R. v. N.Y. City Dep't of Educ.</u>, 407 F.3d 65, 75 (2d Cir. 2005); and

(h) grant plaintiffs such other, further and different relief as may be just under the circumstances.

Dated: New York, New York
August 8, 2007

_____
Gary S. Mayerson
Mayerson & Associates
330 West 38th Street, Suite 600
New York, New York 10018
212.265.7200
212.265.1735 (fax)

14